PD-0229-15

# No. _____

_____

In the Texas Court of Criminal Appeals

_____

FILED IN
COURT OF CRIMINAL APPEALS

March 2, 2015

ABEL ACOSTA, CLERK

Victor James Vargas
*Appellant*,

v.

The State of Texas
*Appellee*.

_____

On Review from the
Eleventh Court of Appeals at Eastland, Texas

_____

## APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

_____

Frank Sellers
Texas Bar No. 24080305
HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
P: 806.771.0700
F: 806.763.8199
frank@hurleyguinn.com
*Attorney for Appellant*

**ORAL ARGUMENT NOT REQUESTED**

## Identity of Judge, Parties, and Counsel

### Trial Court Judge
Honorable Carter Schildknect
106th District Court of Dawson County, Texas

| **Defendant/Appellant** | **Appellate Counsel** |
|---|---|
| Victor Vargas | Frank Sellers |
| | Hurley, Guinn & Sellers |
| | 1805 13th Street |
| | Lubbock, Texas 79401 |
| | P: (806) 771-0700 |
| | F: (806) 763-8199 |
| | E: frank@hurleyguinn.com |
| | |
| | **Court-Appointed Trial Counsel** |
| | Artie Aguilar |
| | 1015 Buddy Holly Avenue |
| | Lubbock, Texas 79401 |
| | |
| **The State of Texas** | **Trial and Appellate Counsel** |
| | Mike Munk |
| | Dawson County District Attorney's Office |
| | P.O. Box 1124 |
| | Lamesa, Texas 79331-0008 |

i

# TABLE OF CONTENTS

IDENTITY OF JUDGE, PARTIES, AND COUNSEL ..................................................... I

TABLE OF CONTENTS ........................................................................................ II

INDEX OF AUTHORITIES ..................................................................................... IV

STATEMENT REGARDING ORAL ARGUMENT ......................................................... 1

STATEMENT OF THE CASE ................................................................................. 2

STATEMENT OF PROCEDURAL HISTORY .............................................................. 3

GROUND FOR REVIEW ....................................................................................... 4

When a motion for new trial is supported by sworn affidavits alleging matters indeterminable from the record, the trial court must conduct a hearing. Vargas timely filed a motion for new trial, supported by sworn affidavits alleging facts that, if true, would entitle him to relief. Did the court of appeals err by dismissing Vargas's appeal of the denial of a hearing on his motion for new trial?

STATEMENT OF FACTS ....................................................................................... 4

ARGUMENT ...................................................................................................... 8

The court of appeals erred by dismissing Vargas's appeal instead of abating or remanding the case to the trial court to conduct an evidentiary hearing on his motion for new trial.

CONCLUSION AND PRAYER FOR RELIEF ............................................................. 13

CERTIFICATE OF SERVICE ................................................................................ 15

CERTIFICATE OF COMPLIANCE ......................................................................... 15

Tabs .................................................................................................................

1. Original Motion for New Trial (filed Aug. 22, 2014)
2. Defendant's Second Request for Hearing (filed Sept. 19, 2014)
3. First Amended Motion for New Trial (Oct. 3, 2014)
4. Notice of Appeal
5. Order to Show Cause (Oct. 28, 2014)
6. Court of Appeals Opinion (issued Nov. 20, 2014)
7. Motion for Rehearing (filed Dec. 31, 2014)
8. Denial of Motion for Rehearing (Jan. 22, 2015)

## INDEX OF AUTHORITIES

**Cases**

*Chavez v. State*, 183 S.W.3d 675, 680 (Tex. Crim. App. 2006)_____ 13

*Cooper v. State*, 45 S.W.3d 77, 82 (Tex. Crim. App. 2001). _____15

*Dears v. State*, 154 S.W.3d 610, 612 (Tex. Crim. App. 2005)_____ 13

*Guidry v. State*, 132 S.W.3d 611 (Tex. App.—Houston [1st Dist.] 2004, no
pet.). _____12

*Martinez v. State*, 74 S.W.3d 19 (Tex. Crim. App. 2002) _____9, 14

*Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010)_____ 10

*Reyes v. State*, 849 S.W.2d 812 (Tex. Crim. App. 1993) _____9

*State v. Gonzalez*, 855 S.W.2d 692 (Tex. Crim. App. 1993) _____8

*Strickland v. Washington*, 466 U.S. 668 (1984), _____10

*Trevino v. Thaler*, 133 S. Ct. 1911, 1915 (2013) (citation omitted)_____15

*United States v. Cavitt*, 550 F.3d 430 (5th Cir. 2008) _____10

*Vargas v. State*, No. 11-14-00283, at *2 (Tex. App.—Eastland Nov. 20, 2014,
pet. filed) (mem. op., not designated for publication)_____ 3, 7, 13

*Wilbur v. City of Mt. Vernon*, 989 F.Supp.2d 1122, 1124 (W.D. Wash. 2013)  11

**Rules**

TEX. R. APP. P. 43.6_____ 12

TEX. R. APP. P. 44.4_____ 12

TEX. R. APP. P. 66.3_____ 8

TEX. R. APP. P. 68.1_____ 1

TEX. R. APP. P. 68.4(d) _____ 1

TEX. R. APP. P. 9.4_____ 15

TEX. R. APP. P. 9.5(d) _____ 14

**Other Authorities**

ABA Standards Relating to Criminal Justice, § 4 _____ 9, 10

Dottie Carmichael et. al., *Guidelines for Indigent Defense Caseloads, A Report to the Texas Indigent Defense Commission,* TEXAS A&M UNIV. PUB. POLICY RESEARCH INST. (2015), *available at* http://tidc.texas.gov/media/31818/150122_weightedcl_final.pdf _____ 6

# No. _____

_____

In the Texas Court of Criminal Appeals
_____

Victor Vargas
*Appellant*,
v.

The State of Texas
*Appellee*.

_____

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW APPELLANT, VICTOR VARGAS, by and through his counsel and pursuant to TEX. R. APP. P. 68.1, and presents this Petition for Discretionary Review, and would show this Honorable Court the following:

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 68.4(d), Vargas waives oral argument because he is simply asking this Court to summarily grant this petition and remand the case with instructions to abate the case to the trial court to hold

1

a hearing on Vargas's timely filed, properly supported, motion for new trial.

## STATEMENT OF THE CASE

Vargas was indicted for possession of a controlled substance less than one gram. Represented by court appointed counsel, Artie Aguilar, Vargas entered a guilty plea. After Vargas received a probated felony sentence, undersigned counsel agreed to represent Vargas pro bono to file a motion for new trial attempting to reverse the guilty plea because it was both involuntary and the result of ineffective assistance of counsel. Tab #1, Ex. A, Aff. of Victor Vargas. Despite a motion for new trial and amended motion for new trial (both supported by affidavits alleging facts that, if found true by the trial court, would entitle Vargas to relief), the trial court refused to conduct a hearing, allowing the motion to overrule by operation of law.

## STATEMENT OF PROCEDURAL HISTORY

After the trial court allowed Vargas's motion to overrule, Vargas filed notice of appeal to the Eleventh Court of Appeals.[1] Specifically, Vargas sought to appeal the: "(1) denial of a hearing on his motion for new trial, and (2) the trial court's implicit legal ruling on his motion for new trial." Tab #4. In an unpublished opinion, the Eleventh Court of Appeals dismissed Appellant's appeal on November 20, 2014. Tab #6, *Vargas v. State*, No. 11-14-00283, at *2 (Tex. App.—Eastland Nov. 20, 2014, pet. filed) (mem. op., not designated for publication). Vargas filed a motion for rehearing on December 31, 2014. Tab #7. That motion was denied on January 22, 2015. Tab #8. This petition for discretionary review will be timely filed if filed on or before February 23, 2015.

---

[1] The Court of Appeals granted an extension of time to file the notice of appeal.

[2] *See also* Dottie Carmichael et. al., *Guidelines for Indigent Defense Caseloads, A Report to the Texas Indigent Defense Commission*, TEXAS A&M UNIV. PUB. POLICY RESEARCH INST.

## GROUND FOR REVIEW

When a motion for new trial is supported by sworn affidavits alleging matters indeterminable from the record, the trial court must conduct a hearing. Vargas timely filed a motion for new trial, supported by sworn affidavits alleging facts that, if true, would entitle him to relief. Did the court of appeals err by dismissing Vargas's appeal of the denial of a hearing on his motion for new trial?

## STATEMENT OF FACTS

Following his guilty plea, Vargas timely filed a motion for new trial supported, *inter alia*, by affidavits from Vargas himself and his mother, Darcy Vargas. Tab #1. In his affidavit Victor Vargas reveals how the stop of his vehicle and continued detention of him appeared to be illegal, as well as how Aguilar (court-appointed trial counsel) failed to discuss any options other than to plead guilty with him:

- "The officer then pulled me over because he believed that I 'looked fatigued.'"

- "After my November 2012 habeas hearing, I was unable to get in contact with Artie again until February of 2014."

- "From my original arrest on August 9, 2012, until July 23, 2014, almost all of the contact that I have ever had with Artie has been inside the court room. I have never seen any discovery (police reports, lab report, or video). I do not know if or when Artie got the discovery."

4

- "Artie told me that I had no choice but to either take the final deal or go to trial and get the maximum sentence. I asked him about whether the stop was legal. I asked him about the lab report and whether there was even enough to charge me. Artie never discussed any options other than pleading guilty with me."

- "Had Artie explained anything to me about the suppression hearing or affirmative links, and/or if I had had the opportunity to view the video and see the reports, I would not have pled guilty."

Tab 1, Exhibit A, Aff. of Victor Vargas. In the conclusion and prayer of his motion, Vargas asked the court to "set this matter for an evidentiary hearing," and then grant his motion. Tab 1.

Almost a month later, the trial court still had not set Vargas's motion for a hearing. Vargas filed a second request for the trial court to set a hearing. Tab #2.

Forty-two days after filing his original motion for new trial, Vargas filed an amended motion for new trial. Tab #3, First Amended Motion for New Trial. This amended motion was supported by all of the same exhibits from his original motion, as well as the following additional exhibits: (1) Contract for Indigent Defense in the 106th Judicial District Court of Texas (file marked December 9, 2013); (2) Letter from Judge Schildknecht to Joel Lieurance, Policy Monitor at TIDC (July 19, 2013); (3) Texas Indigent

5

Defense Commission; (4) Review of Gaines County's Indigent Defense Systems (June 11, 2013); (5) Affidavit of Philip Wischkaemper; and (6) Affidavit of Frank Sellers. In his affidavit, Wischkaemper, a 26-year veteran criminal lawyer who is responsible for training for the Lubbock County Private Defender's Office, opined that if the allegations in Vargas's affidavit were true, it would constitute ineffective assistance of counsel. Tab 3, Exhibit H. Wischkaemper also stated that Aguilar's 2012 caseload — 254 appointed felony cases that represented 60% of his practice — far exceeded the Lubbock Private Defender's Office's limit of 65 clients per appointed attorney. *Id.*[2] Finally, undersigned's affidavit detailed how Aguilar "declined" to speak with him or provide an affidavit about these allegations on multiple occasions. Tab 3, Exhibit I.

---

[2] *See also* Dottie Carmichael et. al., *Guidelines for Indigent Defense Caseloads, A Report to the Texas Indigent Defense Commission*, TEXAS A&M UNIV. PUB. POLICY RESEARCH INST. (2015), *available at* http://tidc.texas.gov/media/31818/150122_weightedcl_final.pdf.), at 34 (concluding that for reasonably effective representation attorneys should carry an annual full-time equivalent caseload of no more than the following: 236 Class B Misdemeanors, 216 Class A Misdemeanors, 174 State Jail Felonies, 144 Third Degree Felonies, 105 Second Degree Felonies, or 77 First Degree Felonies).

In the face of these uncontroverted affidavits and multiple requests, the trial court allowed the motion to overrule by operation of law. Vargas filed notice of appeal to the Eleventh Court of Appeals. Despite Vargas's notice of appeal essentially notifying the court that all he wanted was a hearing, not a full review of the merits, the appellate court asked Vargas to show cause as to why he should be allowed to continue his appeal:

> Upon reviewing the trial court's Certification of Defendant's Right of Appeal, it indicates Appellant waived his right of appeal. Appellant is requested to provide this Court with a response, in writing, showing grounds to continue this appeal. If the response is not filed on or before November 5, 2014, the appeal may be dismissed. Tab #5.

While in the midst of a four-week capital murder jury trial, undersigned overlooked that portion of the court's request. Tab #7, Motion for Rehearing. The court then dismissed Vargas's appeal claiming he had waived his right to an appeal at his guilty plea. Tab #6, *Vargas v. State*, No. 11-14-00283, at *2 (Tex. App.—Eastland Nov. 20, 2014, pet. filed) (mem. op., not designated for publication). Vargas filed a motion for rehearing asking the court to reinstate his appeal. Tab #7. After the court of appeals refused

7

to reinstate Vargas's appeal to remand the case to the trial court to conduct a hearing, Vargas filed this petition.

For the reasons that follow, the Court of Appeals erred by dismissing Vargas's appeal without remanding or abating the case to the trial court to conduct an evidentiary hearing on his motion for new trial. Therefore, discretionary review is warranted pursuant to Rules 66.3(a),[3] 66.3(c),[4] 66.3(d),[5] and 66.3(f).[6]

## ARGUMENT
### The court of appeals erred by dismissing Vargas's appeal instead of abating or remanding the case to the trial court to conduct an evidentiary hearing on his motion for new trial.

The standard of review for "[b]oth the granting and denying of a motion for new trial rest within the discretion of the trial court, and

---

[3] "[W]hether a court of appeals' decision conflicts with another court of appeals' decision on the same issue."

[4] "[W]hether a court of appeals has decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals . . . ."

[5] "[W]hether a court of appeals . . . appears to have misconstrued a statute, rule, regulation, or ordinance."

[6] "[W]hether a court of appeals has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by a lower court, as to call for an exercise of the Court of Criminal Appeals' power of supervision."

appellate courts ordinarily will not reverse that decision unless the trial court has abused its discretion." *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993). When a defendant's motion for new trial raises issues "not determinable from the record, which could entitle him to relief, the trial judge abuses [his or her] discretion in failing to hold a hearing." *Martinez v. State*, 74 S.W.3d 19, 21 (Tex. Crim. App. 2002). The purpose of the hearing is to "fully develop the issues raised in the motion." *Id.* To obtain a hearing, "the motion must be supported by an affidavit specifically showing the truth of the grounds for attack." *Id.* Not every element must be established "but rather must merely reflect that reasonable grounds exist for holding that such relief could be granted." *Id.*; *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993) (". . . affidavit is not required to reflect every component legally required to establish relief, but the motion for new trial or affidavit must reflect that reasonable grounds exist for holding that such relief could be granted.").

Vargas made multiple allegations that would entitle him to relief for Aguilar's ineffective assistance of counsel:

- Aguilar's failure to conduct an "appropriate investigation and study of the case," ABA Standards Relating to Criminal Justice,[7] § 4-6.1(b) (1991) [hereinafter "ABA Standards"].

- Aguilar's failure to "provide the [Vargas with] an understanding of the law in relation to the facts," *United States v. Cavitt*, 550 F.3d 430, 440-41 (5th Cir. 2008);

- Aguilar's failure to review or discuss discovery with Vargas;

- Aguilar's failure to file a motion to suppress;

- Aguilar's intentional overstatement of the penalty Vargas would face if he opted to go to trial (the maximum prison sentence), which caused "undue influence on [Vargas's] decision" to plead guilty. ABA Standards § 4-5.1;

- Aguilar's advising Vargas to plead guilty before "appropriate investigation and study of the case had been completed," ABA Standards § 4-3.2;

- All of the above was likely the result of Aguilar's excessive caseload, which systematically prevented him from being able to provide constitutionally effective assistance of counsel.[8]

---

[7] The Supreme Court has made clear that the inquiry into whether an attorney performed deficiently under *Strickland v. Washington*, 466 U.S. 668 (1984), "is necessarily linked to the legal community's practice and expectations." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010). Accordingly, the American Bar Association standards provide invaluable guidance on practice and expectations in representing criminal defendants. *See id.* Using these standards, it's equally clear that Aguilar's representation fell below an objective standard of reasonableness under then "prevailing professional norms." *Strickland*, 466 U.S. at 688.

[8] *See Wilbur v. City of Mt. Vernon*, 989 F.Supp.2d 1122, 1124 (W.D. Wash. 2013) (holding that indigent defendants were "systematically deprived of the assistance of

10

- Finally, "Had Artie explained anything to me about the suppression hearing or affirmative links, and/or if I had had the opportunity to view the video and see the reports, I would not have pled guilty. Instead, I would have insisted on going to trial — regardless of the outcome." Tab 1, Ex. A.

Vargas's motion for new trial and supporting exhibits were "sufficient to put the trial court on notice that reasonable grounds existed to believe that trial counsel's representation may have been ineffective." *Guidry v. State*, 132 S.W.3d 611, 613 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The Court of Appeals, however, appears to have concluded that Vargas was seeking review of the substantive issues in his case, as opposed to a ruling on the denial of a hearing. *See Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003) (discussing the difference between error in denying a motion for new trial and error in denying a *hearing* on the motion).

---

counsel at critical stages of the prosecution and that municipal policymakers have made deliberate choices regarding the funding, contracting, and monitoring of the public defense system that directly and predictably caused the deprivation," where public defenders were saddled with caseloads comparable to Aguilar's. *See also id.* (calling City's indigent defense a "meet and plead" system).

The Court of Appeals' misunderstanding of the relief Vargas was seeking — initially, a hearing on his motion for new trial — becomes more apparent when looking to the cases cited in its opinion dismissing the appeal. Tab #6, *Vargas v. State*, No. 11-14-00283, at *2 (Tex. App.—Eastland Nov. 20, 2014, pet. filed) (mem. op., not designated for publication (citing *Chavez v. State*, 183 S.W.3d 675, 680 (Tex. Crim. App. 2006); *Dears v. State*, 154 S.W.3d 610, 612 (Tex. Crim. App. 2005)). *Chavez* dealt with an appellate waiver following a negotiated plea bargain. 183 S.W.3d at 680. *Dears* involved the right to appeal from a negotiated probation-revocation plea. 154 S.W.3d at 612. Both cases sought review of substantive claims on direct appeal, as opposed to review of procedural defects. Neither case involved a defendant's right to a *hearing* on a properly filed, properly supported motion for new trial.

Upon receiving Vargas's notice of appeal seeking review of the "denial of a hearing on his motion for new trial," the Court of Appeals should have abated or remanded the case for a hearing. *See* TEX. R. APP. P. 43.6 (providing that "court of appeals may make any other appropriate

12

order that the law and the nature of the case require"); TEX. R. APP. P. 44.4 (providing that if trial court's error or failure to act prevents proper presentation of case on appeal and trial court can correct its error or failure to act, court of appeals "must not affirm or reverse," but "must direct the trial court to correct the error"). Accordingly, this Court should summarily grant this petition, reverse the lower court's dismissal, and remand this case "with instructions to abate the appeal and remand the cause to the trial court to conduct a hearing on appellant's motion for new trial." *Martinez v. State*, 74 S.W.3d 19, 22 (Tex. Crim. App. 2002).

## CONCLUSION AND PRAYER FOR RELIEF

The United States Supreme Court recently criticized Texas's appellate scheme for the difficulty it causes defendants wanting to raise ineffective assistance claims on direct review. *Trevino v. Thaler*, 133 S. Ct. 1911, 1915 (2013) (citation omitted) ("The structure and design of the Texas system in actual operation, however, make it 'virtually impossible' for an ineffective assistance claim to be presented on direct review."). And over a decade ago, this Court commented that claims of ineffective assistance and

involuntary guilty pleas should be raised through motions for new trial so that they "may be supported by information from sources broader than the appellate record." *See Cooper v. State*, 45 S.W.3d 77, 82 (Tex. Crim. App. 2001). By dismissing Vargas's appeal without ever giving him the benefit of a hearing on his motion, the Eleventh Court of Appeals has re-affirmed the Supreme Court's criticism — even when done correctly, review of an ineffective assistance claim is seemingly impossible.

WHEREFORE, PREMISES CONSIDERED, Vargas prays this Court reinstate his appeal and remand this case to the Court of Appeals with instructions that would allow Vargas a hearing on his motion for new trial.

Respectfully submitted,

Frank Sellers
Texas Bar No. 24080305
HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
P: 806.771.0700
F: 806.763.8199

14

E:  frank@hurleyguinn.com
*Attorneys for Appellant*

## CERTIFICATE OF SERVICE

Pursuant to Tex. R. App. P. 9.5(d), a copy of the foregoing was served on opposing counsel *via* ¨° ¤¬⁻² ± February 23, 2015.

_____
Frank Sellers

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 2,685 words (excluding the caption, identification of the parties, index, list of authorities, signature, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

_____
Frank Sellers

# Tabs

1. Original Motion for New Trial (filed Aug. 22, 2014)

2. Defendant's Second Request for Hearing (filed Sept. 19, 2014)

3. First Amended Motion for New Trial (Oct. 3, 2014)

4. Notice of Appeal

5. Order to Show Cause (Oct. 28, 2014)

6. Court of Appeals Opinion (issued Nov. 20, 2014)

7. Motion for Rehearing (filed Dec. 31, 2014)

8. Denial of Motion for Rehearing (Jan. 22, 2015)

# Tab #1

Original Motion for New Trial (filed Aug. 22, 2014)

No. 13-7245

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 106TH DISTRICT COURT |
| | § | |
| V. | § | OF |
| | § | |
| VICTOR VARGAS | § | DAWSON COUNTY, TEXAS |

FILED IN
11TH COURT OF APPEALS
EASTLAND, TEXAS
10/28/2014 9:00 PM
SHERRY WILLIAMSON
Clerk

## Motion for New Trial

## TO THE HONORABLE JUDGE SCHILDKNECHT:

NOW COMES Victor Vargas, Defendant, by and through his undersigned attorney, Frank Sellers, and pursuant to TEX. R. APP. P. 21, respectfully moves this Honorable Court to grant him a new trial for the reasons that follow.

### I. STATEMENT OF THE CASE

Victor Vargas was charged by indictment with possession of a controlled substance less than one gram. This Court appointed Artie Aguilar to represent Vargas. Although Vargas pled guilty, that plea was involuntary and the result of ineffective assistance of counsel. Undersigned counsel agreed to represent Vargas pro bono in an attempt to reverse his plea and obtain a new trial. This motion is timely filed if filed on or before August 22, 2014.

### II. SOLE GROUND FOR NEW TRIAL

**Ineffective Assistance of Counsel.** Vargas received ineffective assistance of counsel making his guilty plea involuntary. Prior to pleading guilty, Vargas's trial attorney never discussed any of the facts of his case with him, never showed him a police report,

never showed him the video of the stop, and never showed him the lab report. Because Vargas had legitimate defenses to the stop and the possession allegation that could have been raised before and during trial, this Court must grant him a new trial.

## III. ARGUMENT AND AUTHORITIES

### A. Facts

Vargas was arrested on August 9, 2012 by Texas Department of Public Safety Trooper Wally Garza for possession of a controlled substance less than one gram. He was indicted on February 13, 2013. The Court appointed Aguilar to represent Vargas. Prior to pleading guilty, Vargas was told only that he had received an offer of three years probation, and that if he did not take that, he would receive five years probation. Aguilar never showed Vargas any discovery whatsoever. Vargas pled guilty.

The discovery in this case was crucial. It revealed that Vargas was stopped because he travelled on the improved shoulder of Highway 84, and the trooper wanted to "check on the conditions of the driver." Exhibit C at 2. After pulling over, Trooper Garza tells Vargas he will receive a warning for driving on the white line. Video at 6:56. Nevertheless, Garza continued to detain Vargas and ask him questions completely unrelated to the initial reason for the stop. Garza eventually asked for, and obtained, consent to search. A drug dog subsequently arrived and did not appear to alert on anything in the vehicle. Apparently pursuant to the consent, however, Trooper Garza and another officer searched the trunk and found baggies of trace residue inside.

Vargas and his mother gave detailed affidavits explaining Aguilar's performance, professionalism, and behavior during his representation. For the sake of brevity, those affidavits are included as exhibits and incorporated with all other exhibits by reference. Importantly, as explained in his affidavit, Vargas did not want to plead guilty to this charge. Unfortunately, he felt he had no choice.

## B.  Standard of Review

A defendant may raise ineffective assistance of counsel in a motion for new trial, even though it is not a ground specifically enumerated in TEX. R. APP. P. 21.3. *State v. Provost*, 205 S.W.3d 561, 566 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The trial court's discretion in granting new trials "is almost the only protection to the citizen against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries, [and the trial] Court should never hesitate to use that discretion *whenever the ends of justice have not been attained by those verdicts.*" *Mullins v. State*, 37 Tex. 337, 339-40 (1872-1873) (emphasis added); *State v. Gonzales*, 855 S.W.2d 692, 694 (Tex. Crim. App. 1993). A trial court does not abuse its discretion unless the trial court granted a new trial in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *See State v. LaSalle*, 135 S.W.3d 94, 96 (Tex. App.—Corpus Christi 2003, no pet.).

## C.  Law on Ineffective Assistance of Counsel

The Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 10 of the Texas Constitution, guarantee each defendant the right to the

effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim. App. 1985). The guarantee of effective assistance of counsel embodied in the Sixth Amendment now extends to the plea-bargaining process. *Lafler v. Cooper,* 132 S. Ct. 1376, 1384 (2012). This guarantee includes the "effective assistance of competent counsel" *before* deciding whether to plead guilty. *Padilla v. Kentucky,* 559 U.S. 356, 364 (2010). To prevail on a claim of ineffective assistance of counsel, Defendant must first show that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for the attorney's deficiency, the result of the proceeding would have been different. *See Eddie v. State, supra,* 100 S.W.3d at 442, *citing Tong v. State,* 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Even a single error on counsel's part can warrant a finding of prejudice. *Andrews v. State,* 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

Proving prejudice only requires showing that the result of the proceeding would have been different by less than a preponderance of the evidence. *Strickland,* 466 U.S. at 694-96 ("The result of a proceeding can be rendered unreliable, and hence, the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."); *Porter v. McCollum,* 130 S.Ct. 447, 455-456 (2009) (per curiam) ("reasonable probability" standard requires neither certainty nor showing that "more likely than not" different outcome would have

occurred at guilt-innocence stage). Because this case deals with a guilty plea, "prejudice occurs if there is a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." *United States v. Juarez,* 672 F.3d 381, 385 (5th Cir. 2012) (citations and quotations omitted). For a guilty plea to be valid, it must have been a voluntary and intelligent choice among the alternative courses of action available. *Hill v. Lockhart,* 474 U.S. 52, 56 (1985).

**D. Vargas's Claim Meets Both Prongs of the *Strickland* Test**

*Deficient Performance*

To establish deficiency, Defendant must show that trial counsel was "not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Juarez,* 672 F. 3d at 386. This requires the Court to determine whether the representation fell below an objective standard of reasonableness under then "prevailing professional norms." *Strickland,* 466 U.S. at 688. This inquiry "is necessarily linked to the legal community's practice and expectations." *Padilla v. Kentucky,* 130 S. Ct. 1473, 1482 (2010). As the Supreme Court has long recognized, the American Bar Association standards provide invaluable guidance on practice and expectations in representing criminal defendants. *See id.*

The ABA Standards applicable here illustrate precisely why Aguilar's performance was deficient. The ABA Standards relating to defense counsel's duty to investigate provide:

Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards Relating to Criminal Justice, § 4-4.1(a) (1991) [hereinafter "ABA Standards"]. In the context of a guilty plea, the ABA Standards further provide, "Under no circumstances should defense counsel recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial." ABA Standards § 4-6.1(b); *see also id.* § 14-3.2 (1997) ("Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed."). Going further, the ABA Standards also set out what defense counsel should do in advising a client after such an investigation has been completed:

> (a) After informing himself or herself fully on the facts and the law, **defense counsel should advise the accused with complete candor concerning all aspects of the case,** including a candid estimate of the probable outcome.

> (b) Defense counsel should not intentionally understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused's decision as to his or her plea.

*Id.* § 4-5.1 (emphasis added).

Here, Aguilar's performance was deficient. He did not advise Vargas of anything other than what his guilty-plea options were. He never discussed the facts with him. No notes appear in the file. He never discussed or filed a motion to suppress. He never even showed Vargas any of the discovery. The Fifth Circuit has made clear, this is not acceptable conduct for defense attorneys. *Moore v. Johnson*, 185 F.3d 244, 261 (5th Cir. 1999) ("The Court is, therefore, not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all."). No justification exists for not discussing the facts with your client. This Court should not condone or invent one.

Finally, much like "informed consent" in the medical field, "[c]ounsel must ensure that guilty pleas are entered only as an informed and voluntary choice, by actually and substantially assisting the defendant in deciding whether to plead guilty." *United States v. Juarez*, 672 F.3d 381, 388 (5th Cir. 2012). Actual, substantial assistance can only happen when "appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial." ABA Standards § 4-6.1(b). Indeed, it is the lawyer's job to,

> provide the accused an understanding of the law in relation to the facts. The advice he gives need not be perfect, but it must be reasonably competent. His advice should permit the accused to make an informed and conscious choice. In other words, if the quality of counsel's service falls below a certain minimum level, the client's guilty plea cannot be knowing and voluntary because it will not represent an informed choice.

And a lawyer who is not familiar with the facts and law relevant to his client's case cannot meet that required minimal level.

*United States v. Cavitt*, 550 F.3d 430, 440-41 (5th Cir. 2008) (citations and quotations omitted). Aguilar's performance was deficient.

## Prejudice

The second part of the *Strickland* analysis requires Vargas to show that Aguilar's performance prejudiced him. Vargas must demonstrate that there is a "reasonable probability" that but for Aguilar's errors, he "would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This is more than a mere possibility but "less than a preponderance of the evidence that the error affected the trial." *United States v. Juarez*, 672 F.3d 381, 388 (5th Cir. 2012) (citation omitted).

Vargas had legitimate potentially exonerating defenses. First, the stop was questionable at best, if not outright illegal. Second, the continued detention of Vargas was unreasonable. *United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011) (holding that trooper's asking questions unrelated to initial reason for the stop illegally prolonged traffic stop). Third, the fact that the "affirmative links" doctrine was never discussed with Vargas is devastating, especially given that multiple people had access to and drove Vargas's vehicle. Finally, Vargas was not actually in possession of any drugs. No

proof existed that he knew he possessed anything other than empty baggies containing "trace," immeasurable amounts of a controlled substance.

Vargas is not required to prove his innocence, or even that he would have received a better outcome. Rather, he is only required to prove that he would not have actually pled guilty had he been made aware of his options by a standard less than a preponderance of the evidence. Vargas's affidavit makes clear that he would not have pled guilty and far exceeds this standard. Vargas was prejudiced.

### E. Vargas's ineffective assistance claim was not waived by his guilty plea.

Vargas anticipates the State will argue that any claims of ineffective assistance of counsel were waived when he pled guilty to the offense, but this is no longer the law. The Supreme Court has recently addressed ineffective assistance of counsel in the context of guilty pleas. *Padilla v. Kentucky*, 559 U.S. 356 (2010); *Missouri v. Frye*, 132 S.Ct. 1399 (2012). The *Padilla* court explained that, "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla*, 559 U.S. at 373. There, the Court held that an attorney's failure to properly advise the defendant of collateral immigration consequences stemming from a guilty plea constituted ineffective assistance. *Id.* at 375. In doing so the Court necessarily overruled prior authority holding that, "once a guilty plea has been entered, all nonjurisdictional defects in the proceedings against a defendant are waived." *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983). Any remaining doubt over

the calculus of the Court's ruling in *Padilla* was removed by *Frye*: "[*Padilla*] also rejected the argument made by petitioner in this case that a knowing and voluntary plea supersedes errors by defense counsel." *Frye*, 123 S.Ct. at 1406. In other words, the Supreme Court now routinely rejects *Estelle*'s logic that if a plea is "voluntary, it follows that claims of ineffectiveness unrelated to the guilty plea are waived." *Estelle*, 711 F.2d at 682 (denying ineffective assistance claims based on failure to investigate prior to advising defendant to plead guilty). And the Fifth Circuit has followed suit. *United States v. Juarez*, 672 F.3d 381 (5th Cir. 2012).

In *Juarez*, the Court held that an attorney's failure to investigate a potential defense was not cured by a subsequent guilty plea. *Id.* at 389. There, Juarez pled guilty both to lying about his U.S. citizenship on an application to purchase firearms and to illegal re-entry. *Id.* at 384. Although Juarez's mother was a naturalized citizen, Juarez's trial counsel never advised him that derivative citizenship was a defense to both of these offenses. *Id.* at 385-86. Trial counsel also "did not know that Juarez could be a U.S. citizen as other people did not inform him of this possibility." *Id.* at 385. Although the legal interpretation of whether Juarez was able to qualify for the derivative citizenship defense was unsettled, the Fifth Circuit held that at the time of Juarez's pleas, "a derivative citizenship defense was plausible." *Id.* at 387. The *Juarez* court concluded,

> Juarez's guilty pleas were not entered knowingly or voluntarily because [trial counsel] advised him without investigating derivative citizenship. "[A defendant] who does not receive reasonably effective assistance of

counsel in connection with his decision to plead guilty cannot be said to have made that decision either intelligently or voluntarily."

*Id.* at 390 (quoting *Mason v. Balcom*, 531 F.2d 717, 725 (5th Cir.1976)).

Much like trial counsel in *Juarez* had a duty to investigate the facts and law underlying a "plausible" defense, Aguilar had a duty to investigate the facts and law underlying legitimate, potentially exonerating defenses for Vargas. Because Aguilar failed to do this — a decision contrary to established federal precedent and unsupported by any reasonable argument — Vargas was denied constitutionally effective assistance of counsel.

## III.   CONCLUSION & PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court set this matter for an evidentiary hearing and at the close thereof, grant this motion for new trial, and vacate the judgment and sentence in this case.

Respectfully submitted,

Hurley, Guinn & Sellers

By: _____
Frank Sellers
Texas Bar No. 24080305

1805 13th Street
Lubbock, Texas 79401
P: 806.771.0700
F: 806.763.8199
ATTORNEYS FOR DEFENDANT

## Certificate of Service

I certify that today, August 22, 2014, a copy of the foregoing was *mailed* and *faxed* to the Dawson County District Attorney's Office.

_____
Frank Sellers

## Certificate of Presentment

I certify that today, August 22, 2014, a copy of the foregoing was *faxed* and *emailed* to the Judge of this Court, along with a blank Order Setting Hearing.

_____
Frank Sellers

# Exhibit A
Affidavit of Victor Vargas

# AFFIDAVIT

THE STATE OF TEXAS                          §
                                            §
COUNTY OF Brazoria                          §

Before me, the undersigned authority, personally appeared Victor Vargas, who upon his oath deposed and stated the following:

My name is Victor Vargas. I am over the age of 18, of sound mind, competent to make this affidavit, and have personal knowledge of the facts below. I have prepared this affidavit with the help of my new lawyer, Frank Sellers.

I was driving from Lubbock, TX to San Angelo, TX on August 9, 2012. I was in a lowered Cadillac Coupe Deville that had previously been used by my brother and friend. As I was driving on Highway 87, I noticed an officer on the other side of the road. The officer drove up beside me and remained directly next to my vehicle for a short period of time. The officer then pulled me over because he believed that I "looked fatigued." After the officer explained to me that I would receive a warning and receiving the same, the officer asked for consent to search. Thinking there was nothing to hide, I gave the officer this consent.

There were three to four large suitcase-type bags located in the trunk of the vehicle. Small plastic baggies were found in one bag that also contained my tattoo equipment. There were many clean, unused small plastic baggies within this larger bag. However, two small green baggies were mixed in amongst the clean baggies. Upon inspecting these two green baggies, the officer detected a tiny amount of what he believed was drug residue on the inside. I was then arrested for felony possession of a controlled substance less than 1 gram. I was held in Dawson County Jail with a $10,000 bond. I was unable to get a bond because I was an out of town traveler and considered a flight risk. My only option was to wait in jail until my attorney and I could sort everything out.

While in jail, I received a letter from Artie Aguilar notifying me that he would be serving as my court appointed lawyer in this matter. When I received this letter I had my wife, Crystal Vargas, contact Artie almost immediately. After many attempts, she was unable to reach him. After about 70 days in jail Crystal tried many more times to contact Artie, each time was unsuccessful. Crystal was finally able to reach Artie. But Artie told Crystal that he couldn't talk to her because all the information in my case was confidential.

Other than Artie's first letter, I had not heard from him in any way while I was in jail. After almost 90 days I wrote a letter to Artie, informing him that I had not been indicted and that I wanted to file a writ of habeas corpus. I never received a letter in return from Artie, but two weeks later received notice that I would be having a hearing for habeas relief. Artie and I were both present for this hearing. This was the first time I had spoken to Artie aside from the initial letter he sent me. In November 2012, the judge granted me habeas relief because I still had not yet been indicted. With some stipulations, I was released from jail.

After my release, I called and sent letters to Artie hoping to resolve my legal issues. Also, I was planning a move from San Angelo to Houston early in 2013 and knew that—as a condition of my release—I would need to inform both my attorney and the county. Each time I tried to reach Artie and inform him of this move I was unsuccessful. I reached Artie's secretary (his father) multiple times and left messages. However, I never received a return phone call or any letters from Artie. After my November 2012 habeas hearing, I was unable to get in contact with Artie again until February of 2014.

In February of 2014, I was pulled over for having expired license plates in Houston and subsequently arrested due to a pending indictment in Dawson County. Artie had not notified me of this indictment. I was never told that there was even a possibility of trial. At this time, my wife and mother (Darcy Vargas) began calling Artie's office in hopes of getting more details on the indictment. Both were unsuccessful on nearly every attempt. My mother was finally able to get a hold of Artie, only to be cussed out for calling too much and then hung up on.

The next time I saw Artie was in April of 2014 at my arraignment in Dawson County. I was told that I would need to come back and enter my plea in June of 2014 at 9:00 A.M. Although I now lived in Houston, I drove to Dawson County and arrived at the scheduled time. I was told that by Artie that the District Attorney wasn't ready at all and that they didn't have anything prepared. This hearing was rescheduled and I was forced to drive all the way back to Houston.

The next court date should have been July 2, 2014. Artie told me that he was going to try to set up a way where I could avoid having to drive in from Houston again. In late June, I received a call from Artie saying that I had received a second plea offer. At this time, I told Artie that I didn't even knew of the first plea offer. Artie told me that I had been previously been offered a plea of 5 years state jail confinement with 4 years of or community supervision. I do not know when Artie received the first offer. Artie told me that he had "already told them that you weren't going to take it."

The second plea offer was for 2 years of state jail confinement with 3 years of community supervision. I asked Artie if he would be able to get anything less. He told me that I was lucky they offered me this because for a while they didn't want to come down from 5 years. Once again, I was unaware that prior negotiations and/or offers had ever taken place. I was basically told to take it or leave it on this second offer. Artie also told me that he would be able to move my court date from July 2, 2014, to July 23, 2014. After speaking with my wife, I decided that I had no choice but to take the second offer.

From my original arrest on August 9, 2012, until July 23, 2014, almost all of the contact that I have ever had with Artie has been inside the court room. I have never seen any discovery (police reports, lab report, or video). I do not know if or when Artie got the discovery. Throughout this entire process, Artie has been nearly impossible to reach.

Artie told me that I had no choice but to either take the final deal or go to trial and get the maximum sentence. I asked him about whether the stop was legal. I asked him about the lab report and whether there was even enough to charge me. Artie never discussed any options other than pleading guilty with me.

**Affidavit of Victor Vargas — Page 2**

While leaving the courthouse after my plea, attorney Frank Sellers overheard my Mom and I arguing about the plea deal I had just been forced to take. Mr. Sellers inquired about my limited knowledge of the facts of my case. He agreed to help me file a motion for new trial without any cost to me.

Mr. Sellers received the discovery from Artie. He then showed it to me. This was the first time I had seen a police report, lab report, and video. He also explained to me that the stop and consent to search my vehicle appeared to be unconstitutional. He said that these were legitimate defenses that could have been raised both before trial in front of the judge at a suppression hearing, as well as in front of the jury. Additionally, he explained the legal concept of "affirmative links," requiring the State to link me to anything in the car because multiple people had access to the vehicle.

I am not guilty of the charge I pled guilty to. Had Artie explained anything to me about the suppression hearing or affirmative links, and/or if I had had the opportunity to view the video and see the reports, I would not have pled guilty. Instead, I would have insisted on going to trial — regardless of the outcome.

_Victor Vargas_
Victor Vargas

Subscribed and sworn to before me on August 14, 2014, by Victor Vargas.

MAYRA AVILA
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-16-18

_Notary Public, State of Texas_

**Affidavit of Victor Vargas — Page 3**

# Exhibit B
## Affidavit of Darcy Vargas

# AFFIDAVIT

THE STATE OF TEXAS                          §
                                            §
COUNTY OF BRAZORIA                          §

Before me, the undersigned authority, personally appeared Darcy Vargas, who upon her oath deposed and stated the following:

"My name is Darcy Vargas. I am over the age of 18, of sound mind, competent to make this affidavit, and have personal knowledge of the facts below. I have prepared this affidavit with the help of my son's new lawyer, Frank Sellers.

I, Darcy Vargas, have been involved in this case ever since my son Victor was arrested in Houston and informed that he had a warrant in Dawson County. Prior to the arrest in Houston, I had called Artie Aguilar maybe once or twice before. This previous call was just to notify Artie that Victor planned to move in with me in Houston. Because nobody was able to get a hold of Artie, Victor and I decided the best thing to do was to send a letter to his office with the address of Victor's new residence in Houston.

After Victor's arrest, I called Artie many times hoping to get some information about the warrant in Dawson County. I called his office many, many times with no answer. I was often unable to leave voicemails because the phone would just keep ring endlessly. After many failed attempts, I was finally able to reach a male who seemed to be acting as Artie's secretary. I cannot recall if this man told me his name or not. I told the secretary that I needed to speak with Artie immediately because we were not aware that a warrant had been issued in Dawson County.

Within a day or two, I spoke with Artie for the first time. He called in the afternoon and asked what I wanted, to which I said we needed information on Victor's case. Artie responded that there had been a sealed indictment and that it was not his responsibility to inform Victor about it. After a brief conversation about why we weren't made aware of the sealed indictment, Artie finally asked me, "What do you want?" I answered that I just wanted information, records, or anything that could help get my son out of jail in Houston. I will never forget his response. He responded, "Access Denied. Now what do you want?" Once again I requested the same information. Artie then said, "Look lady, quit being a bitch." Shocked by how unprofessional he was, I responded, "Excuse me? You did not just call me the B-Word." Artie then said, "Well lady, you heard me" and hung up the phone on me. I found this disrespectful conduct particularly surprising coming from a lawyer.

In June of 2014, Artie called me and said that I needed to have Victor call him because he had been given a plea offer. Victor called Artie back and was able to get a hold of Artie. This is when Victor was told of the offer that he eventually accepted.

Before accepting this plea, neither Victor nor I were able to view any police reports, any lab reports, or the video of Victor's stop and arrest. I found Mr. Aguilar's behavior unacceptable and of lowest caliber of any professional I have ever dealt with. His legal work was not much better."

_Darcy Vargas_
Darcy Vargas

Subscribed and sworn to before me on August ⏟JL⏟, 2014, by Darcy Vargas.



Notary Public, State of Texas

MAYRA AVILA
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-18-18

**Affidavit of Darcy Vargas — Page 2**

# Exhibit C
Trooper Garza's Report

THP-1 (5/04)

**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**TEXAS HIGHWAY PATROL DIVISION**
**OFFENSE REPORT**

____ TRAFFIC
__X__ CRIMINAL
____ SCHOOL NOTIFICATION
REQUIRED (ART. 15.27 CCP)

**REPORT DATE:** 08/09/12

| FILE TITLE | INVESTIGATING OFFICER: |
|---|---|
| 1. Vargas, Victor James | TYPED NAME: Wally Garza    ID-NR: 12989 |
| 2. 522 e. 24th Street | SIGNATURE: |
| 3. San Angelo, TX 76903 | REGION/DISTRICT/SGT. AREA: 4A02 |
| 4. W / M | APPROVING SUPERVISOR: |
| 5. | TYPED NAME: Sgt. Jason Anzaldua    ID-NR: 10356 |

SID #
ID #   TX: 29404996
OTHER:

DL #
DOB   10/11/1984

SIGNATURE:

**RPT-RE:**   1.) Possession of Controlled Substance in PG-1 < 1gram (SJF)

---

**COMPLETE IF TRAFFIC OFFENSE AND CHEMICAL TEST IS OFFERED:**

TEST OFFERED: BREATH ___ BLOOD ___ URINE ___ NONE ___    TEST GIVEN: BREATH ___ BLOOD ___ URINE ___ REFUSED ___ NONE ___

TEST RESULT: 1) _____ 2) _____    DIC-23 SUBMITTED: YES ___ NO ___    OPERATOR ID # _____

---

| DEFENDANT(S) | OFFENSE(S) | COUNTY | DATE/TIME |
|---|---|---|---|
| Vargas, Victor James | Possession of Controlled Substance in PG-1 <1 gram (SJF) HSC Sec.481.115 (b) | Dawson | 08/09/2012 1:50 pm |

**Synopsis:**

On Thursday August 9th, 2012 and at approximately 1:50 pm I, Trooper Wally Garza, conducted a traffic stop on a Beige/1997/Cadillac/4-Dr Car bearing TXLP-DK4T836 for driving on the improved shoulder. The driver was identified through Texas ID#: 29404996 to be Vargas, Victor James. Vargas was subsequently arrested for Possession of Controlled Substance in PG-1 <1gram (SJF) after a vehicle search resulted in the discovery of (2) clear blue plastic baggies containing a white crystal like powder. The substance was field tested and was positive for Methamphetamine. Vargas was transported to Dawson County jail in Lamesa,TX. The vehicle was released and towed by De La Garza to 602 S.Dallas Ave in Lamesa,TX.

THP-1 Continuation (8/04)

**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**TEXAS HIGHWAY PATROL DIVISION**
**OFFENSE REPORT**

Page: __2 of 3__

| | |
|---|---|
| FILE TITLE: | COUNTY: |
| INVESTIGATING OFFICER: | REPORT DATE: 08/09/12 |

**Details:**

1. On Thursday August 9th, 2012 and at approximately 1:50pm I, Trooper W.Garza, was working routine patrol on US87 approximately 2 miles North of Lamesa, TX.
2. I observed a Beige/1997/Cadillac/4-Dr Car bearing TXLP-Dk4T836 drive on the improved shoulder as it was traveling southbound.
3. I made a traffic stop on the vehicle in order to check on the conditions of the driver.
4. I approached the passenger side door of the vehicle.
5. I greeted the driver and advised him of the reason for the traffic stop.
6. The driver verbally identified himself as Vargas, Victor James DOB: 10/11/1984 SSN#: 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.
7. During the roadside interview with Vargas, I observed indicators of possible criminal activity.
8. Vargas' breathing appeared to be labored as evident through the quick rise and fall of his abdomen.
9. I asked Vargas where he was headed to and he replied, "San Angelo".
10. I asked Vargas where he was coming from and he stated, "Lubbock".
11. I asked Vargas how long he had been in Lubbock and he stated, "Since Saturday".
12. I asked Vargas if he had traveled alone and he replied, "No, my wife came with me but she left back home early".
13. I asked Vargas to exit his vehicle and he did so.
14. After a check of weapons on his person, I asked Vargas to have a seat in my patrol car while I prepared his enforcement action (warning).
15. While continuing the roadside interview, I observed Vargas's carotid artery pulsating on the side of his neck.
16. I asked Vargas why his wife had left earlier than he did and he stated, "We had an argument and her sister took her back to San Angelo".
17. After the traffic stop was completed, verbal consent to search the vehicle was requested and granted by Vargas.
18. During the vehicle search, a blue duffle bag was located inside the trunk area.
19. The blue duffle bag contained tattoo tools and gear.
20. Inside the blue duffle bag, a clear plastic bag containing several 1 gram empty baggies was discovered.
21. Upon further inspection of this clear plastic bag, (4) clear blue baggies were also discovered.
22. Two of the blue clear plastic baggies contained a useable amount of a white crystal like powder believed to be Methamphetamine.
23. I asked Vargas to come to the trunk area and he did so.
24. I asked Vargas who the blue duffle bag belonged to and he stated, "It's mine, that's where I keep my tattoo stuff".
25. I asked him about the clear plastic bag containing the baggies including the clear blue ones with the white crystal like powder but Vargas denied any knowledge.
26. Vargas was placed under arrest and secured in the front passenger side seat of my patrol car.
27. After a vehicle inventory (HQ-109), the vehicle was released and towed by Albert Martinez to 602 S.Dallas Ave in Lamesa,TX.
28. The substance was field tested and was positive for Methamphetamine and will be sent to Midland DPS Crime Lab for final analysis.
29. Vargas was booked in for Possession of Controlled Substance PG-1 < 1g (SJF).

THP-1 Continuation (8/04)     **TEXAS DEPARTMENT OF PUBLIC SAFETY**     Page:  3 of 3
                              **TEXAS HIGHWAY PATROL DIVISION**
                              **OFFENSE REPORT**

| FILE TITLE: | COUNTY: |
|---|---|
| INVESTIGATING OFFICER: | REPORT DATE:  08/09/12 |

**Witnesses:**

*Name & Address:*                          *Will Testify To:*

Texas Department of Public Safety          All aspects to the case
Highway Patrol
Trooper Wally Garza
608 N. Main Ave.
Lamesa, TX. 79331
(806) 872-9494

**Description and Custody of Evidence:**

*Description:*                             *Disposition:*

  1.  THP-1                        1.  Turned in to the District Attorney
  2.  DVD                          2.  Attached to THP-1 Case Report
  3.  Photos                       3.  Attached to THP-1 Case Report

**Victims:**

*Name & Address:*
N/A

**Vehicles:**

*Description:*                             *Disposition:*
Beige/1997/Cadillac/4-Dr Car bearing TXLP-Dk4T836    released and towed by Albert Martinez to 602
                                          S.Dallas Ave in Lamesa,TX

**Weapons:**

*Description:*                             *Disposition:*
N/A

# Exhibit D
# DPS Lab Report

 

# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
PO Box 4367
Midland, TX 79704
Voice 432-498-2190  Fax 432-498-2358
MidlandCrimeLab@dps.texas.gov



STEVEN C. MCCRAW
DIRECTOR
DAVID C. BAKER
CHERYL MacBRIDE
DEPUTY DIRECTORS



COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
ADA BROWN
ALLAN B. POLUNSKY

## Controlled Substance Analysis Laboratory Report
### Issue Date:    December 28, 2012

Wally Garza
Texas Highway Patrol
606 N Main
Lamesa, TX 79331

Laboratory # MID-1208-01606
Agency # TX12660DYB006
County: Dawson
Offense Date: 08/09/2012

Suspect(s):   Vargas, Victor James  (DOB 10/11/84)

Requested Analysis:  Examine for the presence of Controlled Substances

Submission Information:

01: 9x12 yellow envelope on August 13, 2012 by Garza, Wally VIA Certified Mail 70112970000425712709

Evidence Description, Results of Analysis and Interpretation:

01: Properly Sealed 9x12 yellow envelope
    01-01-AA: Exhibit#1 Blue ziploc containing white residue
        Contains Methamphetamine
        Trace  net weight
        1 of 1 items were sampled for analysis

This report has been electronically prepared and approved by:

Marissa Silva
Forensic Scientist
Texas DPS Midland Crime Laboratory

ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS - LAB ACCREDITATION BOARD

COURTESY · SERVICE · PROTECTION

TXDPS L2 01.12

# Tab #2

Defendant's Second Request for Hearing (filed Sept. 19, 2014)

No. 13-7245

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 106TH DISTRICT COURT |
| | § | |
| V. | § | OF |
| | § | |
| VICTOR VARGAS | § | DAWSON COUNTY, TEXAS |

**Defendant's Second Request for Hearing on Motion for New Trial**

## TO THE HONORABLE JUDGE SCHILDKNECHT:

NOW COMES Victor Vargas, Defendant, by and through his undersigned *pro bono* counsel, Frank Sellers, and asks this Court to set Defendant's Motion for a New Trial for hearing before the October 6, 2014 deadline.

When a defendant's motion for new trial raises issues "not determinable from the record, which could entitle him to relief, the trial judge abuses [his or her] discretion in failing to hold a hearing." *Martinez v. State*, 74 S.W.3d 19, 21 (Tex. Crim. App. 2002). The purpose of the hearing is to "fully develop the issues raised in the motion." *Id.* To obtain a hearing, "the motion must be supported by an affidavit specifically showing the truth of the grounds for attack." *Id.* Not every element must be established "but rather must merely reflect that reasonable grounds exist for holding that such relief could be granted." *Id.; Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993) ("affidavit is not required to reflect every component legally required to

establish relief, but the motion for new trial or affidavit must reflect that reasonable grounds exist for holding that such relief could be granted.").

Bad legal advice or no legal advice constitutes ineffective assistance. *Ex Parte Moussazadeh*, 361 S.W.3d 684, 692 (Tex. Crim. App. 2012) (misinforming defendant about parole eligibility ineffective); *Ex parte Gallegos*, 511 S.W.2d 510, 513 (Tex. Crim. App. 1974) ("In applying the reasonably effective assistance standard to the facts of the instant case, we conclude . . . that petitioner Gallegos was denied the effective assistance of counsel when counsel failed to advise Gallegos how the facts of his case related to the Texas law of robbery, thus preventing the guilty plea from being knowingly and voluntarily entered.").

The federal courts agree. In *Cavitt*, defense counsel advised Mr. Cavitt to plead guilty following a traffic stop drug case with Fourth Amendment issues. *United States v. Cavitt*, 550 F.3d 430, 441 (5th Cir. 2008). This advice, however, came before the defense received the video of the stop. *Id.* When defense counsel did receive the video, he refused to let the defendant view it before deciding to plead guilty. *Id.* The Fifth Circuit held that these were matters indeterminable from the record but had an appreciable chance of success — both the ineffective assistance claim and the suppression issue. The *Cavitt* court reversed and sent the case back to the district court and required a hearing. *Id.*

This Court must do the same. Matters raised are indeterminable from the record. No one knows what was said during the Aguilar's representation of Defendant. Defendant's affidavit, however, makes clear that not much if any advice was given, except to plead guilty, while refusing to let Defendant view the video of his traffic stop. Like in the cases cited above, Defendant's affidavit establishes matters that reasonably rise to the level of ineffective assistance of his court-appointed counsel. Worse, Aguilar has compounded the issue by refusing twice to provide an affidavit or even speak with Vargas's undersigned counsel. The law is clear. A hearing is required.

WHEREFORE, Defendant requests this Court to set this matter for a hearing before the statutory time limit runs out where he can present evidence and, more importantly, where Aguilar can do what he has refused to do thus far: answer to these accusations of inexcusably ineffective assistance of counsel.

Respectfully submitted,

**Hurley, Guinn & Sellers**

By: _____

Frank Sellers
Texas Bar No. 24080305

1805 13th Street
Lubbock, Texas 79401
P: 806.771.0700
F: 806.763.8199
PRO BONO COUNSEL FOR DEFENDANT

## Certificate of Service

I certify that today, September 19, 2014, a copy of the foregoing was *mailed* and *faxed* to the Dawson County District Attorney's Office.

_____
Frank Sellers

## Certificate of Presentment

I certify that today, September 19, 2014, a copy of the foregoing was *faxed* and *emailed* to the Judge of this Court.

_____
Frank Sellers

# Tab #3

First Amended Motion for New Trial (Oct. 3, 2014)



No. 13-7245

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 106TH DISTRICT COURT |
| | § | |
| V. | § | OF |
| | § | |
| VICTOR VARGAS | § | DAWSON COUNTY, TEXAS |

## First Amended Motion for New Trial

### TO THE HONORABLE JUDGE SCHILDKNECHT:

NOW COMES Victor Vargas, Defendant, by and through his undersigned attorney, Frank Sellers, and pursuant to TEX. R. APP. P. 21, respectfully moves this Honorable Court to grant him a new trial for the reasons that follow.

### I.    STATEMENT OF THE CASE

Victor Vargas was charged by indictment with possession of a controlled substance less than one gram. This Court appointed Artie Aguilar to represent Vargas. Although Vargas pled guilty, that plea was involuntary and the result of ineffective assistance of counsel. Undersigned counsel agreed to represent Vargas pro bono in an attempt to reverse his plea and obtain a new trial.

### II.    SOLE GROUND FOR NEW TRIAL

**Ineffective Assistance of Counsel.** Vargas received ineffective assistance of counsel making his guilty plea involuntary. Prior to pleading guilty, Vargas's trial attorney never discussed any of the facts of his case with him, never showed him a police report, never showed him the video of the stop, and never showed him the lab report. Because

Vargas had legitimate defenses to the stop and the possession allegation that could have been raised before and during trial, this Court must grant him a new trial.

## III. ARGUMENT AND AUTHORITIES

### A. Facts

Vargas was arrested on August 9, 2012 by Texas Department of Public Safety Trooper Wally Garza for possession of a controlled substance less than one gram. He was indicted on February 13, 2013. The Court appointed Aguilar to represent Vargas. Prior to pleading guilty, Vargas was told only that he had received an offer of three years probation, and that if he did not take that, he would receive five years probation. Aguilar never showed Vargas any discovery whatsoever. Vargas pled guilty.

The discovery in this case was crucial. It revealed that Vargas was stopped because he travelled on the improved shoulder of Highway 84, and the trooper wanted to "check on the conditions of the driver." Exhibit C at 2. After pulling over, Trooper Garza tells Vargas he will receive a warning for driving on the white line. Video at 6:56. Nevertheless, Garza continued to detain Vargas and ask him questions completely unrelated to the initial reason for the stop. Garza eventually asked for, and obtained, consent to search. A drug dog subsequently arrived and did not appear to alert on anything in the vehicle. Apparently pursuant to the consent, however, Trooper Garza and another officer searched the trunk and found baggies of trace residue inside.

Vargas and his mother gave detailed affidavits explaining Aguilar's performance, professionalism, and behavior during his representation. For the sake of brevity, those affidavits are included as exhibits and incorporated with all other exhibits by reference. Importantly, as explained in his affidavit, Vargas did not want to plead guilty to this charge. Unfortunately, he felt he had no choice.

## B. Standard of Review

A defendant may raise ineffective assistance of counsel in a motion for new trial, even though it is not a ground specifically enumerated in TEX. R. APP. P. 21.3. *State v. Provost*, 205 S.W.3d 561, 566 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The trial court's discretion in granting new trials "is almost the only protection to the citizen against the illegal or oppressive verdicts of prejudiced, careless, or ignorant juries, [and the trial] Court should never hesitate to use that discretion *whenever the ends of justice have not been attained by those verdicts*." *Mullins v. State*, 37 Tex. 337, 339-40 (1872-1873) (emphasis added); *State v. Gonzales*, 855 S.W.2d 692, 694 (Tex. Crim. App. 1993). A trial court does not abuse its discretion unless the trial court granted a new trial in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *See State v. LaSalle*, 135 S.W.3d 94, 96 (Tex. App.—Corpus Christi 2003, no pet.).

## C. Law on Ineffective Assistance of Counsel

The Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 10 of the Texas Constitution, guarantee each defendant the right to the

effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim. App. 1985). The guarantee of effective assistance of counsel embodied in the Sixth Amendment now extends to the plea-bargaining process. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). This guarantee includes the "effective assistance of competent counsel" *before* deciding whether to plead guilty. *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). To prevail on a claim of ineffective assistance of counsel, Defendant must first show that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for the attorney's deficiency, the result of the proceeding would have been different. *See Eddie v. State, supra,* 100 S.W.3d at 442, *citing Tong v. State,* 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Even a single error on counsel's part can warrant a finding of prejudice. *Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

Proving prejudice only requires showing that the result of the proceeding would have been different by less than a preponderance of the evidence. *Strickland*, 466 U.S. at 694-96 ("The result of a proceeding can be rendered unreliable, and hence, the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."); *Porter v. McCollum*, 130 S.Ct. 447, 455-456 (2009) (per curiam) ("reasonable probability" standard requires neither certainty nor showing that "more likely than not" different outcome would have

occurred at guilt-innocence stage). Because this case deals with a guilty plea, "prejudice occurs if there is a reasonable probability that, but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial." *United States v. Juarez*, 672 F.3d 381, 385 (5th Cir. 2012) (citations and quotations omitted). For a guilty plea to be valid, it must have been a voluntary and intelligent choice among the alternative courses of action available. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985).

**D. Vargas's Claim Meets Both Prongs of the *Strickland* Test**

*Deficient Performance*

To establish deficiency, Defendant must show that trial counsel was "not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Juarez*, 672 F. 3d at 386. This requires the Court to determine whether the representation fell below an objective standard of reasonableness under then "prevailing professional norms." *Strickland*, 466 U.S. at 688. This inquiry "is necessarily linked to the legal community's practice and expectations." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010). As the Supreme Court has long recognized, the American Bar Association standards provide invaluable guidance on practice and expectations in representing criminal defendants. *See id.*

The ABA Standards applicable here illustrate precisely why Aguilar's performance was deficient. The ABA Standards relating to defense counsel's duty to investigate provide:

Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards Relating to Criminal Justice, § 4-4.1(a) (1991) [hereinafter "ABA Standards"]. In the context of a guilty plea, the ABA Standards further provide, "Under no circumstances should defense counsel recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial." ABA Standards § 4-6.1(b); *see also id.* § 14-3.2 (1997) ("Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.").  Going further, the ABA Standards also set out what defense counsel should do in advising a client after such an investigation has been completed:

> (a) After informing himself or herself fully on the facts and the law, **defense counsel should advise the accused with complete candor concerning all aspects of the case**, including a candid estimate of the probable outcome.

> (b) Defense counsel should not intentionally understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused's decision as to his or her plea.

*Id.* § 4-5.1 (emphasis added).

Here, Aguilar's performance was deficient. He did not advise Vargas of anything other than what his guilty-plea options were. He never discussed the facts with him. No notes appear in the file. He never discussed or filed a motion to suppress. He never even showed Vargas any of the discovery. The Fifth Circuit has made clear, this is not acceptable conduct for defense attorneys. *Moore v. Johnson*, 185 F.3d 244, 261 (5th Cir. 1999) ("The Court is, therefore, not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all."). No justification exists for not discussing the facts with your client. This Court should not condone or invent one.

Finally, much like "informed consent" in the medical field, "[c]ounsel must ensure that guilty pleas are entered only as an informed and voluntary choice, by actually and substantially assisting the defendant in deciding whether to plead guilty." *United States v. Juarez*, 672 F.3d 381, 388 (5th Cir. 2012). Actual, substantial assistance can only happen when "appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial." ABA Standards § 4-6.1(b). Indeed, it is the lawyer's job to,

> provide the accused an understanding of the law in relation to the facts. The advice he gives need not be perfect, but it must be reasonably competent. His advice should permit the accused to make an informed and conscious choice. In other words, if the quality of counsel's service falls below a certain minimum level, the client's guilty plea cannot be knowing and voluntary because it will not represent an informed choice.

And a lawyer who is not familiar with the facts and law relevant to his client's case cannot meet that required minimal level.

*United States v. Cavitt*, 550 F.3d 430, 440-41 (5th Cir. 2008) (citations and quotations omitted). Aguilar's performance was deficient.

*Prejudice*

The second part of the *Strickland* analysis requires Vargas to show that Aguilar's performance prejudiced him. Vargas must demonstrate that there is a "reasonable probability" that but for Aguilar's errors, he "would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This is more than a mere possibility but "less than a preponderance of the evidence that the error affected the trial." *United States v. Juarez*, 672 F.3d 381, 388 (5th Cir. 2012) (citation omitted).

Vargas had legitimate potentially exonerating defenses. First, the stop was questionable at best, if not outright illegal. Second, the continued detention of Vargas was unreasonable. *United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011) (holding that trooper's asking questions unrelated to initial reason for the stop illegally prolonged traffic stop). Third, the fact that the "affirmative links" doctrine was never discussed with Vargas is devastating, especially given that multiple people had access to and drove Vargas's vehicle. Finally, Vargas was not actually in possession of any drugs. No

proof existed that he knew he possessed anything other than empty baggies containing "trace," immeasurable amounts of a controlled substance.

Vargas is not required to prove his innocence, or even that he would have received a better outcome. Rather, he is only required to prove that he would not have actually pled guilty had he been made aware of his options by a standard less than a preponderance of the evidence. Vargas's affidavit makes clear that he would not have pled guilty and far exceeds this standard. Vargas was prejudiced.

### E. Vargas's ineffective assistance claim was not waived by his guilty plea.

Vargas anticipates the State will argue that any claims of ineffective assistance of counsel were waived when he pled guilty to the offense, but this is no longer the law. The Supreme Court has recently addressed ineffective assistance of counsel in the context of guilty pleas. *Padilla v. Kentucky*, 559 U.S. 356 (2010); *Missouri v. Frye*, 132 S.Ct. 1399 (2012). The *Padilla* court explained that, "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla*, 559 U.S. at 373. There, the Court held that an attorney's failure to properly advise the defendant of collateral immigration consequences stemming from a guilty plea constituted ineffective assistance. *Id.* at 375. In doing so the Court necessarily overruled prior authority holding that, "once a guilty plea has been entered, all nonjurisdictional defects in the proceedings against a defendant are waived." *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983). Any remaining doubt over

the calculus of the Court's ruling in *Padilla* was removed by *Frye*: "[*Padilla*] also rejected the argument made by petitioner in this case that a knowing and voluntary plea supersedes errors by defense counsel." *Frye*, 123 S.Ct. at 1406. In other words, the Supreme Court now routinely rejects *Estelle*'s logic that if a plea is "voluntary, it follows that claims of ineffectiveness unrelated to the guilty plea are waived." *Estelle*, 711 F.2d at 682 (denying ineffective assistance claims based on failure to investigate prior to advising defendant to plead guilty). And the Fifth Circuit has followed suit. *United States v. Juarez*, 672 F.3d 381 (5th Cir. 2012).

In *Juarez*, the Court held that an attorney's failure to investigate a potential defense was not cured by a subsequent guilty plea. *Id.* at 389. There, Juarez pled guilty both to lying about his U.S. citizenship on an application to purchase firearms and to illegal re-entry. *Id.* at 384. Although Juarez's mother was a naturalized citizen, Juarez's trial counsel never advised him that derivative citizenship was a defense to both of these offenses. *Id.* at 385-86. Trial counsel also "did not know that Juarez could be a U.S. citizen as other people did not inform him of this possibility." *Id.* at 385. Although the legal interpretation of whether Juarez was able to qualify for the derivative citizenship defense was unsettled, the Fifth Circuit held that at the time of Juarez's pleas, "a derivative citizenship defense was plausible." *Id.* at 387. The *Juarez* court concluded,

> Juarez's guilty pleas were not entered knowingly or voluntarily because [trial counsel] advised him without investigating derivative citizenship. "[A defendant] who does not receive reasonably effective assistance of

counsel in connection with his decision to plead guilty cannot be said to have made that decision either intelligently or voluntarily."

*Id.* at 390 (quoting *Mason v. Balcom,* 531 F.2d 717, 725 (5th Cir.1976)).

Much like trial counsel in *Juarez* had a duty to investigate the facts and law underlying a "plausible" defense, Aguilar had a duty to investigate the facts and law underlying legitimate, potentially exonerating defenses for Vargas. Because Aguilar failed to do this — a decision contrary to established federal precedent and unsupported by any reasonable argument — Vargas was denied constitutionally effective assistance of counsel.

## III. CONCLUSION & PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court set this matter for an evidentiary hearing and at the close thereof, grant this motion for new trial, and vacate the judgment and sentence in this case.

Respectfully submitted,

**Hurley, Guinn & Sellers**

By: _____
Frank Sellers
Texas Bar No. 24080305

1805 13th Street
Lubbock, Texas 79401
P: 806.771.0700
F: 806.763.8199
ATTORNEYS FOR DEFENDANT

**Certificate of Service**

     I certify that today, October 1, 2014, a copy of the foregoing was *mailed* to the Dawson County District Attorney's Office.

Frank Sellers

**Certificate of Presentment**

     I certify that today, October 1, 2014, a copy of the foregoing was *emailed* to the Judge of this Court, along with a blank Order Setting Hearing.

Frank Sellers

# INDEX OF EXHIBITS

A. Affidavit of Victor Vargas

B. Affidavit of Darcy Vargas

C. Trooper Garza's Report

D. DPS Lab Report

E. Contract for Indigent Defense in the 106th Judicial District Court of Texas (file marked December 9, 2013)

F. Letter from Judge Schildknecht to Joel Lieurance, Policy Monitor at TIDC (July 19, 2013)

G. Texas Indigent Defense Commission, Review of Gaines County's Indigent Defense Systems (June 11, 2013)

H. Affidavit of Philip Wischkaemper

I. Affidavit of Frank Sellers

**Exhibit A**
Affidavit of Victor Vargas

# AFFIDAVIT

THE STATE OF TEXAS              §

COUNTY OF Brazoria     §

                §

Before me, the undersigned authority, personally appeared Victor Vargas, who upon his oath deposed and stated the following:

My name is Victor Vargas. I am over the age of 18, of sound mind, competent to make this affidavit, and have personal knowledge of the facts below. I have prepared this affidavit with the help of my new lawyer, Frank Sellers.

I was driving from Lubbock, TX to San Angelo, TX on August 9, 2012. I was in a lowered Cadillac Coupe Deville that had previously been used by my brother and friend. As I was driving on Highway 87, I noticed an officer on the other side of the road. The officer drove up beside me and remained directly next to my vehicle for a short period of time. The officer then pulled me over because he believed that I "looked fatigued." After the officer explained to me that I would receive a warning and receiving the same, the officer asked for consent to search. Thinking there was nothing to hide, I gave the officer this consent.

There were three to four large suitcase-type bags located in the trunk of the vehicle. Small plastic baggies were found in one bag that also contained my tattoo equipment. There were many clean, unused small plastic baggies within this larger bag. However, two small green baggies were mixed in amongst the clean baggies. Upon inspecting these two green baggies, the officer detected a tiny amount of what he believed was drug residue on the inside. I was then arrested for felony possession of a controlled substance less than 1 gram. I was held in Dawson County Jail with a $10,000 bond. I was unable to get a bond because I was an out of town traveler and considered a flight risk. My only option was to wait in jail until my attorney and I could sort everything out.

While in jail, I received a letter from Artie Aguilar notifying me that he would be serving as my court appointed lawyer in this matter. When I received this letter I had my wife, Crystal Vargas, contact Artie almost immediately. After many attempts, she was unable to reach him. After about 70 days in jail Crystal tried many more times to contact Artie, each time was unsuccessful. Crystal was finally able to reach Artie. But Artie told Crystal that he couldn't talk to her because all the information in my case was confidential.

Other than Artie's first letter, I had not heard from him in any way while I was in jail. After almost 90 days I wrote a letter to Artie, informing him that I had not been indicted and that I wanted to file a writ of habeas corpus. I never received a letter in return from Artie, but two weeks later received notice that I would be having a hearing for habeas relief. Artie and I were both present for this hearing. This was the first time I had spoken to Artie aside from the initial letter he sent me. In November 2012, the judge granted me habeas relief because I still had not yet been indicted. With some stipulations, I was released from jail.

After my release, I called and sent letters to Artie hoping to resolve my legal issues. Also, I was planning a move from San Angelo to Houston early in 2013 and knew that—as a condition of my release—I would need to inform both my attorney and the county. Each time I tried to reach Artie and inform him of this move I was unsuccessful. I reached Artie's secretary (his father) multiple times and left messages. However, I never received a return phone call or any letters from Artie. After my November 2012 habeas hearing, I was unable to get in contact with Artie again until February of 2014.

In February of 2014, I was pulled over for having expired license plates in Houston and subsequently arrested due to a pending indictment in Dawson County. Artie had not notified me of this indictment. I was never told that there was even a possibility of trial. At this time, my wife and mother (Darcy Vargas) began calling Artie's office in hopes of getting more details on the indictment. Both were unsuccessful on nearly every attempt. My mother was finally able to get a hold of Artie, only to be cussed out for calling too much and then hung up on.

The next time I saw Artie was in April of 2014 at my arraignment in Dawson County. I was told that I would need to come back and enter my plea in June of 2014 at 9:00 A.M. Although I now lived in Houston, I drove to Dawson County and arrived at the scheduled time. I was told that by Artie that the District Attorney wasn't ready at all and that they didn't have anything prepared. This hearing was rescheduled and I was forced to drive all the way back to Houston.

The next court date should have been July 2, 2014. Artie told me that he was going to try to set up a way where I could avoid having to drive in from Houston again. In late June, I received a call from Artie saying that I had received a second plea offer. At this time, I told Artie that I didn't even knew of the first plea offer. Artie told me that I had been previously been offered a plea of 5 years state jail confinement with 4 years of or community supervision. I do not know when Artie received the first offer. Artie told me that he had "already told them that you weren't going to take it."

The second plea offer was for 2 years of state jail confinement with 3 years of community supervision. I asked Artie if he would be able to get anything less. He told me that I was lucky they offered me this because for a while they didn't want to come down from 5 years. Once again, I was unaware that prior negotiations and/or offers had ever taken place. I was basically told to take it or leave it on this second offer. Artie also told me that he would be able to move my court date from July 2, 2014, to July 23, 2014. After speaking with my wife, I decided that I had no choice but to take the second offer.

From my original arrest on August 9, 2012, until July 23, 2014, almost all of the contact that I have ever had with Artie has been inside the court room. I have never seen any discovery (police reports, lab report, or video). I do not know if or when Artie got the discovery. Throughout this entire process, Artie has been nearly impossible to reach.

Artie told me that I had no choice but to either take the final deal or go to trial and get the maximum sentence. I asked him about whether the stop was legal. I asked him about the lab report and whether there was even enough to charge me. Artie never discussed any options other than pleading guilty with me.

While leaving the courthouse after my plea, attorney Frank Sellers overheard my Mom and I arguing about the plea deal I had just been forced to take. Mr. Sellers inquired about my limited knowledge of the facts of my case. He agreed to help me file a motion for new trial without any cost to me.

Mr. Sellers received the discovery from Artie. He then showed it to me. This was the first time I had seen a police report, lab report, and video. He also explained to me that the stop and consent to search my vehicle appeared to be unconstitutional. He said that these were legitimate defenses that could have been raised both before trial in front of the judge at a suppression hearing, as well as in front of the jury. Additionally, he explained the legal concept of "affirmative links," requiring the State to link me to anything in the car because multiple people had access to the vehicle.

I am not guilty of the charge I pled guilty to. Had Artie explained anything to me about the suppression hearing or affirmative links, and/or if I had had the opportunity to view the video and see the reports, I would not have pled guilty. Instead, I would have insisted on going to trial — regardless of the outcome.


_____
Victor Vargas


Subscribed and sworn to before me on August 14, 2014, by Victor Vargas.

MAYRA AVILA
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-16-18

_____
Notary Public, State of Texas

# Exhibit B
Affidavit of Darcy Vargas

# AFFIDAVIT

THE STATE OF TEXAS                              §
                                                §
COUNTY OF Brazoria                              §

Before me, the undersigned authority, personally appeared Darcy Vargas, who upon her oath deposed and stated the following:

"My name is Darcy Vargas. I am over the age of 18, of sound mind, competent to make this affidavit, and have personal knowledge of the facts below. I have prepared this affidavit with the help of my son's new lawyer, Frank Sellers.

I, Darcy Vargas, have been involved in this case ever since my son Victor was arrested in Houston and informed that he had a warrant in Dawson County. Prior to the arrest in Houston, I had called Artie Aguilar maybe once or twice before. This previous call was just to notify Artie that Victor planned to move in with me in Houston. Because nobody was able to get a hold of Artie, Victor and I decided the best thing to do was to send a letter to his office with the address of Victor's new residence in Houston.

After Victor's arrest, I called Artie many times hoping to get some information about the warrant in Dawson County. I called his office many, many times with no answer. I was often unable to leave voicemails because the phone would just keep ring endlessly. After many failed attempts, I was finally able to reach a male who seemed to be acting as Artie's secretary. I cannot recall if this man told me his name or not. I told the secretary that I needed to speak with Artie immediately because we were not aware that a warrant had been issued in Dawson County.

Within a day or two, I spoke with Artie for the first time. He called in the afternoon and asked what I wanted, to which I said we needed information on Victor's case. Artie responded that there had been a sealed indictment and that it was not his responsibility to inform Victor about it. After a brief conversation about why we weren't made aware of the sealed indictment, Artie finally asked me, "What do you want?" I answered that I just wanted information, records, or anything that could help get my son out of jail in Houston. I will never forget his response. He responded, "Access Denied. Now what do you want?" Once again I requested the same information. Artie then said, "Look lady, quit being a bitch." Shocked by how unprofessional he was, I responded, "Excuse me? You did not just call me the B-Word." Artie then said, "Well lady, you heard me" and hung up the phone on me. I found this disrespectful conduct particularly surprising coming from a lawyer.

In June of 2014, Artie called me and said that I needed to have Victor call him because he had been given a plea offer. Victor called Artie back and was able to get a hold of Artie. This is when Victor was told of the offer that he eventually accepted.

Before accepting this plea, neither Victor nor I were able to view any police reports, any lab reports, or the video of Victor's stop and arrest. I found Mr. Aguilar's behavior unacceptable and of lowest caliber of any professional I have ever dealt with. His legal work was not much better."



Darcy Vargas

Subscribed and sworn to before me on August _11_, 2014, by Darcy Vargas.



Notary Public, State of Texas

**MAYRA AVILA**
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-18-18

**Affidavit of Darcy Vargas — Page 2**

# Exhibit C
Trooper Garza's Report

THP-1 (8/04)

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS HIGHWAY PATROL DIVISION
### OFFENSE REPORT

_____ TRAFFIC

__X__ CRIMINAL

_____ SCHOOL NOTIFICATION
REQUIRED (ART. 15.27 CCP)

**REPORT DATE:  08/09/12**

| FILE TITLE | INVESTIGATING OFFICER: |
|---|---|
| 1.  Vargas, Victor James | TYPED NAME:  Wally Garza     ID-NR:  12989 |
| 2.  522 e. 24th Street | SIGNATURE: |
| 3.  San Angelo, TX 76903 | REGION/DISTRICT/SGT. AREA:  4A02 |
| 4.  W / M | APPROVING SUPERVISOR: |
| 5. | TYPED NAME:  Sgt. Jason Anzaldua     ID-NR:  10356 |
| SID #   DL # | |
| ID #   TX: 29404996   DOB   10/11/1984 | SIGNATURE: |
| OTHER: | |

RPT-RE:   1.) Possession of Controlled Substance in PG-1 < 1gram (SJF)

---

**COMPLETE IF TRAFFIC OFFENSE AND CHEMICAL TEST IS OFFERED:**

TEST OFFERED:  BREATH ___ BLOOD ___ URINE ___ NONE ___  TEST GIVEN:  BREATH ___ BLOOD ___ URINE ___ REFUSED ___ NONE ___

TEST RESULT:  1) _____ 2) _____  DIC-23 SUBMITTED:  YES ___ NO ___  OPERATOR ID # _____

---

| DEFENDANT(S) | OFFENSE(S) | COUNTY | DATE/TIME |
|---|---|---|---|
| Vargas, Victor James | Possession of Controlled Substance in PG-1 <1 gram (SJF) HSC Sec.481.115 (b) | Dawson | 08/09/2012 1:50 pm |

## Synopsis:

On Thursday August 9th, 2012 and at approximately 1:50 pm I, Trooper Wally Garza, conducted a traffic stop on a Beige/1997/Cadillac/4-Dr Car bearing TXLP-DK4T836 for driving on the improved shoulder. The driver was identified through Texas ID#: 29404996 to be Vargas, Victor James. Vargas was subsequently arrested for Possession of Controlled Substance in PG-1 <1gram (SJF) after a vehicle search resulted in the discovery of (2) clear blue plastic baggies containing a white crystal like powder. The substance was field tested and was positive for Methamphetamine. Vargas was transported to Dawson County jail in Lamesa,TX. The vehicle was released and towed by De La Garza to 602 S.Dallas Ave in Lamesa,TX.

**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**TEXAS HIGHWAY PATROL DIVISION**
**OFFENSE REPORT**

| | |
|---|---|
| FILE TITLE: | COUNTY: |
| INVESTIGATING OFFICER: | REPORT DATE:   08/09/12 |

## Details:

1. On Thursday August 9th, 2012 and at approximately 1:50pm I, Trooper W.Garza, was working routine patrol on US87 approximately 2 miles North of Lamesa, TX.
2. I observed a Beige/1997/Cadillac/4-Dr Car bearing TXLP-Dk4T836 drive on the improved shoulder as it was traveling southbound.
3. I made a traffic stop on the vehicle in order to check on the conditions of the driver.
4. I approached the passenger side door of the vehicle.
5. I greeted the driver and advised him of the reason for the traffic stop.
6. The driver verbally identified himself as Vargas, Victor James DOB: 10/11/1984 SSN#: 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.
7. During the roadside interview with Vargas, I observed indicators of possible criminal activity.
8. Vargas' breathing appeared to be labored as evident through the quick rise and fall of his abdomen.
9. I asked Vargas where he was headed to and he replied, "San Angelo".
10. I asked Vargas where he was coming from and he stated, "Lubbock".
11. I asked Vargas how long he had been in Lubbock and he stated, "Since Saturday".
12. I asked Vargas if he had traveled alone and he replied, "No, my wife came with me but she left back home early".
13. I asked Vargas to exit his vehicle and he did so.
14. After a check of weapons on his person, I asked Vargas to have a seat in my patrol car while I prepared his enforcement action (warning).
15. While continuing the roadside interview, I observed Vargas's carotid artery pulsating on the side of his neck.
16. I asked Vargas why his wife had left earlier than he did and he stated, "We had an argument and her sister took her back to San Angelo".
17. After the traffic stop was completed, verbal consent to search the vehicle was requested and granted by Vargas.
18. During the vehicle search, a blue duffle bag was located inside the trunk area.
19. The blue duffle bag contained tattoo tools and gear.
20. Inside the blue duffle bag, a clear plastic bag containing several 1 gram empty baggies was discovered.
21. Upon further inspection of this clear plastic bag, (4) clear blue baggies were also discovered.
22. Two of the blue clear plastic baggies contained a useable amount of a white crystal like powder believed to be Methamphetamine.
23. I asked Vargas to come to the trunk area and he did so.
24. I asked Vargas who the blue duffle bag belonged to and he stated, "It's mine, that's where I keep my tattoo stuff".
25. I asked him about the clear plastic bag containing the baggies including the clear blue ones with the white crystal like powder but Vargas denied any knowledge.
26. Vargas was placed under arrest and secured in the front passenger side seat of my patrol car.
27. After a vehicle inventory (HQ-109), the vehicle was released and towed by Albert Martinez to 602 S.Dallas Ave in Lamesa,TX.
28. The substance was field tested and was positive for Methamphetamine and will be sent to Midland DPS Crime Lab for final analysis.
29. Vargas was booked in for Possession of Controlled Substance PG-1 < 1g (SJF).

| FILE TITLE: | COUNTY: |
|---|---|
| INVESTIGATING OFFICER: | REPORT DATE:   08/09/12 |

## Witnesses:

*Name & Address:*                          *Will Testify To:*

Texas Department of Public Safety          All aspects to the case
Highway Patrol
Trooper Wally Garza
608 N. Main Ave.
Lamesa, TX. 79331
(806) 872-9494

## Description and Custody of Evidence:

*Description:*                             *Disposition:*

1.  THP-1                                  1.  Turned in to the District Attorney
2.  DVD                                    2.  Attached to THP-1 Case Report
3.  Photos                                 3.  Attached to THP-1 Case Report

## Victims:

*Name & Address:*
N/A

## Vehicles:

*Description:*                             *Disposition:*
Beige/1997/Cadillac/4-Dr Car bearing TXLP-Dk4T836    released and towed by Albert Martinez to 602
                                           S.Dallas Ave in Lamesa,TX

## Weapons:

*Description:*                             *Disposition:*
N/A

# Exhibit D
DPS Lab Report

 

# TEXAS DEPARTMENT OF PUBLIC SAFETY



CRIME LABORATORY
PO Box 4367
Midland, TX 79704
Voice 432-498-2190  Fax 432-498-2358
MidlandCrimeLab@dps.texas.gov



STEVEN C. MCCRAW
DIRECTOR
DAVID O. BAKER
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
ADA BROWN
ALLAN B POLUNSKY

## Controlled Substance Analysis Laboratory Report
### Issue Date:    December 28, 2012

Wally Garza
Texas Highway Patrol
608 N Main
Lamesa, TX 79331

**Laboratory # MID-1208-01608**
**Agency # TX12660DYB008**
**County: Dawson**
**Offense Date: 08/09/2012**

**Suspect(s):**   Vargas, Victor James  (DOB 10/11/84)

**Requested Analysis:** Examine for the presence of Controlled Substances

**Submission Information:**

   01: 9x12 yellow envelope on August 13, 2012 by Garza, Wally VIA Certified Mail 70112970000425712709

**Evidence Description, Results of Analysis and Interpretation:**

01: Properly Sealed 9x12 yellow envelope
   01-01-AA: Exhibit#1 Blue ziploc containing white residue
      Contains Methamphetamine
      Trace  net weight
      1 of 1 items were sampled for analysis


This report has been electronically prepared and approved by:

Marissa Silva
Forensic Scientist
Texas DPS Midland Crime Laboratory

ACCREDITED BY THE AMERICAN SOCIETY OF CRIME LABORATORY DIRECTORS - LAB ACCREDITATION BOARD

COURTESY · SERVICE · PROTECTION

TxDPS 12 21.12

# Exhibit E

*Contract for Indigent Defense in the 106th Judicial District Court of Texas*
*(file marked December 9, 2013)*

# CONTRACT FOR INDIGENT DEFENSE
## IN
### THE 106TH JUDICIAL DISTRICT COURT OF TEXAS
### DAWSON, GAINES, GARZA AND LYNN COUNTIES

1. **INTRODUCTION**

The county of Dawson ("COUNTY") and The Law Offices of Arthur Aguilar, Jr. ("ATTORNEY") are the parties to this agreement. The District Judge of the 106th Judicial District ("DISTRICT JUDGE") is the appointing authority approving ATTORNEY to represent indigent criminal defendants in COUNTY. This agreement establishes conditions under which ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY.

2. **SCOPE OF WORK**

ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only. Under this contract, a felony will be considered to be any criminal offense that carries a possible punishment of confinement in excess of one year or that is classified as a State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE. ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed. Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106th Judicial District. However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code. Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case. ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract pursuant to the provisions of the 106th Judicial District's Local Indigent Defense Plan, including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List. DISTRICT JUDGE will monitor ATTORNEY's caseload under this contract to ensure that the quality and effectiveness of ATTORNEY's representation of defendants is not compromised and that each defendant is being provided effective representation. If DISTRICT JUDGE finds that ATTORNEY's representation is being compromised or is falling below that which is expected by the Court, DISTRICT JUDGE will make adjustments to ATTORNEY's caseload. ATTORNEY's caseload under this contract shall not exceed 400 actual cases over the entire four counties of the 106th Judicial District.

## 3. CONTRACT PERIOD

This agreement shall commence on January 1, 2014, and shall terminate September 30, 2014, unless terminated earlier by either party. The parties shall have an option to renew the contract for additional years, and prior to July 1, 2014, the parties will revisit the contract to consider any desired modifications to the terms and conditions of this contract.

## 4. CONSIDERATION

The parties agree that if this contract covered the legal representation for indigent criminal defendants in all four counties of the 106th Judicial District, the total consideration for legal representation at the trial court level would be $49,500.00 for the nine month contract period.

The consideration for legal representation at the trial court level under this contract between COUNTY and ATTORNEY is COUNTY's pro rata portion of $49,500.00, payable in monthly installments, based on indigent defense provided under the 2013 Contract for Indigent Defense in each of the four counties of the 106th Judicial District. COUNTY agrees to pay ATTORNEY for services at the trial court level a monthly amount for COUNTY's pro rata share as follows:

| | | |
|---|---|---|
| Dawson County | $18,062.55 for contract | $ 2,006.95 monthly |
| Gaines County | $ 16,844.85 for contract | $ 1,871.65 monthly |
| Garza County | $ 9,207.00 for contract | $ 1,023.00 monthly |
| Lynn County | $ 5,385.60 for contract | $ 598.40 monthly |

The above amount is the total consideration to be paid by COUNTY for legal representation of indigent criminal defendants at the trial court level for all cases opened during the term of this contract, and ATTORNEY shall furnish at his own cost all equipment, travel, office space, office supplies, secretaries, salaries of any kind, and any and all other trial court expenses except as provided otherwise in this contract.

In consideration for ATTORNEY's appellate representation of COUNTY's indigent criminal defendants under this contract, COUNTY agrees to pay additional ATTORNEY's fees for legal services at the rate accepted in this area for such services and approved by DISTRICT JUDGE. If ATTORNEY is required to travel to the appellate court for representation under this contract, COUNTY agrees to pay ATTORNEY's actual expenses for lodging and mileage at the prevailing state rate after approval by DISTRICT JUDGE.

COUNTY shall not be obligated for any other additional amount or expenses unless specifically designated in this agreement or required by law, detailed in the Request to Pay Counsel, and approved by DISTRICT JUDGE.

If the renewal option is exercised, COUNTY's designated monthly percentage will be adjusted to reflect the number of COUNTY's cases under the contract in trial court

compared to the number of trial court level cases under the contract in the entire 106th Judicial District during the previous contract.

5. **EXPERTS, INVESTIGATORS, AND INTERPRETERS**
ATTORNEY will obtain prior approval of expenses for investigation and for experts by filing a motion in the 106th Judicial District Court, stating the need for such assistance and the estimated expense. Investigative or expert expenses incurred with prior court approval shall be reimbursed as provided in the order granting approval. Investigative or expert expenses incurred without prior approval shall be reimbursed only if necessarily and reasonably incurred. ATTORNEY will arrange for interpreters when the need exists. Expenses for interpreters shall be paid by COUNTY after approval by DISTRICT JUDGE.

6. **CHANGE OF VENUE**
If there is a change of venue which moves a case from the boundaries of the 106th Judicial District, then ATTORNEY will be allowed his actual expenses in regard to lodging, meals, court fees or costs, copy machine fees, or any other fees approved by DISTRICT JUDGE in the original jurisdiction. Any such expenses should be discussed, if at all possible, with DISTRICT JUDGE prior to incurring the same. In such cases, any travel (mileage fees) outside the 106th Judicial District will be paid at the prevailing state rate. All other fees designated herein will be the responsibility of and paid by the County of original jurisdiction.

7. **ASSIGNMENT**
ATTORNEY may employ an associate attorney(s) to assist in representing defendants under this contract with the prior consent and approval of DISTRICT JUDGE, but only at ATTORNEY's sole expense. ATTORNEY shall not assign its entire rights under this contract or delegate the entire performance of its duties under this contract.

8. **CONFLICTS**
ATTORNEY will notify the office of DISTRICT JUDGE as soon as ATTORNEY is aware of ethical conflicts between indigent defendants and will file a Motion to Withdraw and be responsible to set the case for a hearing regarding the ethical conflict for consideration if deemed necessary by the Court.

9. **REPORTS**
ATTORNEY shall compile a year-end report giving the number of indigent defendants served, the number of individual cases handled, the types of cases, the disposition of the cases handled, and any other reporting information required to be in compliance with the law. Such report shall identify the cases by county and shall include cases for the other contracting counties in the 106th Judicial District as well as COUNTY's cases. For approval and payment, ATTORNEY shall provide itemized interim progress reports to COUNTY and DISTRICT JUDGE as requested for indigent defense expenditure reports. Payment shall be made by COUNTY after approval by DISTRICT JUDGE.

10. **ATTORNEY'S PRIVATE PRACTICE**

It is agreed that ATTORNEY may maintain a private practice. It is further agreed and understood that ATTORNEY's private practice will not interfere in any material manner with the indigent criminal defense cases provided for in this contract.

11. **TERMINATION**

If COUNTY wishes to terminate this contract, COUNTY may determine that desire by a majority vote of the Commissioners Court of COUNTY. Either party may terminate with 90 days notice by Certified Mail to the other party. ATTORNEY shall complete all cases that are open as of the date of the termination notice unless relieved or replaced by DISTRICT JUDGE.

12. **AMENDMENTS**

Any alterations, additions or deletions in the terms and conditions of this contract shall be by written amendment approved by DISTRICT JUDGE and executed by ATTORNEY and the Commissioners Court of COUNTY.

13. **SEVERABILITY**

If any provision of this contract is construed to be illegal or invalid, such construction will not affect the legality or validity of any of its other provisions. The illegal or invalid provision will be deemed severable and stricken from the contract as if it had never been incorporated herein, but all other provisions will continue.

14. **SURVIVAL OF TERMS**

Termination of this contract for any reason shall not release either party from any liabilities or obligations set forth in this contract that the parties have expressly agreed in writing shall survive any such termination or which by their nature would be intended to be applicable following such termination.

15. **INDEPENDENT CONTRACTOR**

It is agreed that ATTORNEY is an independent contractor and that this contract does not create an employment relationship between COUNTY and ATTORNEY. ATTORNEY, not COUNTY, will be responsible for appropriate payment of social security taxes and federal income taxes applicable to the consideration received by ATTORNEY under this contract.

COUNTY shall not be liable or responsible and shall be saved and held harmless by ATTORNEY from and against any and all suits, actions, claims or liability of any character arising out of the performance of ATTORNEY under this contract, including claims and damages arising from acts of negligence or acts of malpractice of ATTORNEY.

16. **NO WAIVER OF SOVEREIGN IMMUNITY**

THE PARTIES EXPRESSLY AGREE THAT NO PROVISION OF THIS CONTRACT IS IN ANY WAY INTENDED TO CONSTITUTE A WAIVER BY COUNTY OR THE

STATE OF TEXAS OF ANY IMMUNITIES FROM SUIT OR FROM LIABILITY THAT COUNTY OR THE STATE OF TEXAS MAY HAVE BY OPERATION OF LAW.

17. GOVERNING LAW AND JURISDICTION

This contract shall be construed in accordance with and governed by the laws of the State of Texas, except for its provisions regarding conflicts of laws. The venue of any suit brought for any breach of this contract is fixed in any court of competent jurisdiction in Dawson County, Texas. All payments under the contract shall be due and payable at ATTORNEY's office in Lubbock, Texas. This contract represents the entire agreement between the parties. No prior agreement of understanding, oral or otherwise, of the parties or their agents will be valid or enforceable unless embodied in this contract. The County Judge of COUNTY has signed this agreement pursuant to the authority placed in him by the Commissioners Court. Any signatory executing this contract on behalf of either ATTORNEY or COUNTY warrants and guarantees that he has authority to execute this contract on behalf of ATTORNEY or COUNTY and to validly and legally bind ATTORNEY and COUNTY to the provisions of this contract.

EXECUTED IN MULTIPLE ORIGINALS ON THE DATES SHOWN.

COUNTY:

Foy O'Brien, County Judge

ATTEST:

Gloria Vera By. Rebecca Aguilar    Date: 12-10-13
Gloria Vera, County Clerk, Dawson County

ATTORNEY:

THE LAW OFFICES OF ARTHUR AGUILAR, JR.

By: _____

Date: 12-5-13

APPOINTING AUTHORITY:

Carter T. Schildknecht, District Judge

Date: December 4, 2013

CONTRACT FOR INDIGENT DEFENSE - DAWSON COUNTY                    PAGE 5

# CONTRACT FOR INDIGENT DEFENSE
## IN
## THE 106TH JUDICIAL DISTRICT COURT OF TEXAS
## DAWSON, GAINES, GARZA AND LYNN COUNTIES

1. **INTRODUCTION**

The county of Gaines ("COUNTY") and The Law Offices of Arthur Aguilar, Jr. ("ATTORNEY") are the parties to this agreement. The District Judge of the 106th Judicial District ("DISTRICT JUDGE") is the appointing authority approving ATTORNEY to represent indigent criminal defendants in COUNTY. This agreement establishes conditions under which ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY.

2. **SCOPE OF WORK**

ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only. Under this contract, a felony will be considered to be any criminal offense that carries a possible punishment of confinement in excess of one year or that is classified as a State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE. ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed. Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106th Judicial District. However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code. Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case. ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract pursuant to the provisions of the 106th Judicial District's Local Indigent Defense Plan, including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List. DISTRICT JUDGE will monitor ATTORNEY's caseload under this contract to ensure that the quality and effectiveness of ATTORNEY's representation of defendants is not compromised and that each defendant is being provided effective representation. If DISTRICT JUDGE finds that ATTORNEY's representation is being compromised or is falling below that which is expected by the Court, DISTRICT JUDGE will make adjustments to ATTORNEY's caseload. ATTORNEY's caseload under this contract shall not exceed 400 actual cases over the entire four counties of the 106th Judicial District.

3. **CONTRACT PERIOD**

This agreement shall commence on January 1, 2014, and shall terminate September 30, 2014, unless terminated earlier by either party. The parties shall have an option to renew the contract for additional years, and prior to July 1, 2014, the parties will revisit the contract to consider any desired modifications to the terms and conditions of this contract.

4. **CONSIDERATION**

The parties agree that if this contract covered the legal representation for indigent criminal defendants in all four counties of the 106th Judicial District, the total consideration for legal representation at the trial court level would be $49,500.00 for the nine month contract period.

The consideration for legal representation at the trial court level under this contract between COUNTY and ATTORNEY is COUNTY's pro rata portion of $49,500.00, payable in monthly installments, based on indigent defense provided under the 2013 Contract for Indigent Defense in each of the four counties of the 106th Judicial District. COUNTY agrees to pay ATTORNEY for services at the trial court level a monthly amount for COUNTY's pro rata share as follows:

| Dawson County | $18,062.55 for contract | $ 2,006.95 monthly |
| Gaines County | $ 16,844.85 for contract | $ 1,871.65 monthly |
| Garza County | $ 9,207.00 for contract | $ 1,023.00 monthly |
| Lynn County | $ 5,385.60 for contract | $ 598.40 monthly |

The above amount is the total consideration to be paid by COUNTY for legal representation of indigent criminal defendants at the trial court level for all cases opened during the term of this contract, and ATTORNEY shall furnish at his own cost all equipment, travel, office space, office supplies, secretaries, salaries of any kind, and any and all other trial court expenses except as provided otherwise in this contract.

In consideration for ATTORNEY's appellate representation of COUNTY's indigent criminal defendants under this contract, COUNTY agrees to pay additional ATTORNEY's fees for legal services at the rate accepted in this area for such services and approved by DISTRICT JUDGE. If ATTORNEY is required to travel to the appellate court for representation under this contract, COUNTY agrees to pay ATTORNEY's actual expenses for lodging and mileage at the prevailing state rate after approval by DISTRICT JUDGE.

COUNTY shall not be obligated for any other additional amount or expenses unless specifically designated in this agreement or required by law, detailed in the Request to Pay Counsel, and approved by DISTRICT JUDGE.

If the renewal option is exercised, COUNTY's designated monthly percentage will be adjusted to reflect the number of COUNTY's cases under the contract in trial court

compared to the number of trial court level cases under the contract in the entire 106ᵗʰ Judicial District during the previous contract.

5. **EXPERTS, INVESTIGATORS, AND INTERPRETERS**
ATTORNEY will obtain prior approval of expenses for investigation and for experts by filing a motion in the 106ᵗʰ Judicial District Court, stating the need for such assistance and the estimated expense. Investigative or expert expenses incurred with prior court approval shall be reimbursed as provided in the order granting approval. Investigative or expert expenses incurred without prior approval shall be reimbursed only if necessarily and reasonably incurred. ATTORNEY will arrange for interpreters when the need exists. Expenses for interpreters shall be paid by COUNTY after approval by DISTRICT JUDGE.

6. **CHANGE OF VENUE**
If there is a change of venue which moves a case from the boundaries of the 106ᵗʰ Judicial District, then ATTORNEY will be allowed his actual expenses in regard to lodging, meals, court fees or costs, copy machine fees, or any other fees approved by DISTRICT JUDGE in the original jurisdiction. Any such expenses should be discussed, if at all possible, with DISTRICT JUDGE prior to incurring the same. In such cases, any travel (mileage fees) outside the 106ᵗʰ Judicial District will be paid at the prevailing state rate. All other fees designated herein will be the responsibility of and paid by the County of original jurisdiction.

7. **ASSIGNMENT**
ATTORNEY may employ an associate attorney(s) to assist in representing defendants under this contract with the prior consent and approval of DISTRICT JUDGE, but only at ATTORNEY's sole expense. ATTORNEY shall not assign its entire rights under this contract or delegate the entire performance of its duties under this contract.

8. **CONFLICTS**
ATTORNEY will notify the office of DISTRICT JUDGE as soon as ATTORNEY is aware of ethical conflicts between indigent defendants and will file a Motion to Withdraw and be responsible to set the case for a hearing regarding the ethical conflict for consideration if deemed necessary by the Court.

9. **REPORTS**
ATTORNEY shall compile a year-end report giving the number of indigent defendants served, the number of individual cases handled, the types of cases, the disposition of the cases handled, and any other reporting information required to be in compliance with the law. Such report shall identify the cases by county and shall include cases for the other contracting counties in the 106ᵗʰ Judicial District as well as COUNTY's cases. For approval and payment, ATTORNEY shall provide itemized interim progress reports to COUNTY and DISTRICT JUDGE as requested for indigent defense expenditure reports. Payment shall be made by COUNTY after approval by DISTRICT JUDGE.

10. **ATTORNEY'S PRIVATE PRACTICE**
It is agreed that ATTORNEY may maintain a private practice. It is further agreed and understood that ATTORNEY's private practice will not interfere in any material manner with the indigent criminal defense cases provided for in this contract.

11. **TERMINATION**
If COUNTY wishes to terminate this contract, COUNTY may determine that desire by a majority vote of the Commissioners Court of COUNTY. Either party may terminate with 90 days notice by Certified Mail to the other party. ATTORNEY shall complete all cases that are open as of the date of the termination notice unless relieved or replaced by DISTRICT JUDGE.

12. **AMENDMENTS**
Any alterations, additions or deletions in the terms and conditions of this contract shall be by written amendment approved by DISTRICT JUDGE and executed by ATTORNEY and the Commissioners Court of COUNTY.

13. **SEVERABILITY**
If any provision of this contract is construed to be illegal or invalid, such construction will not affect the legality or validity of any of its other provisions. The illegal or invalid provision will be deemed severable and stricken from the contract as if it had never been incorporated herein, but all other provisions will continue.

14. **SURVIVAL OF TERMS**
Termination of this contract for any reason shall not release either party from any liabilities or obligations set forth in this contract that the parties have expressly agreed in writing shall survive any such termination or which by their nature would be intended to be applicable following such termination.

15. **INDEPENDENT CONTRACTOR**
It is agreed that ATTORNEY is an independent contractor and that this contract does not create an employment relationship between COUNTY and ATTORNEY. ATTORNEY, not COUNTY, will be responsible for appropriate payment of social security taxes and federal income taxes applicable to the consideration received by ATTORNEY under this contract.

COUNTY shall not be liable or responsible and shall be saved and held harmless by ATTORNEY from and against any and all suits, actions, claims or liability of any character arising out of the performance of ATTORNEY under this contract, including claims and damages arising from acts of negligence or acts of malpractice of ATTORNEY.

16. **NO WAIVER OF SOVEREIGN IMMUNITY**
THE PARTIES EXPRESSLY AGREE THAT NO PROVISION OF THIS CONTRACT IS IN ANY WAY INTENDED TO CONSTITUTE A WAIVER BY COUNTY OR THE

STATE OF TEXAS OF ANY IMMUNITIES FROM SUIT OR FROM LIABILITY THAT COUNTY OR THE STATE OF TEXAS MAY HAVE BY OPERATION OF LAW.

17. **GOVERNING LAW AND JURISDICTION**

This contract shall be construed in accordance with and governed by the laws of the State of Texas, except for its provisions regarding conflicts of laws. The venue of any suit brought for any breach of this contract is fixed in any court of competent jurisdiction in Gaines County, Texas. All payments under the contract shall be due and payable at ATTORNEY's office in Lubbock, Texas. This contract represents the entire agreement between the parties. No prior agreement of understanding, oral or otherwise, of the parties or their agents will be valid or enforceable unless embodied in this contract. The County Judge of COUNTY has signed this agreement pursuant to the authority placed in him by the Commissioners Court. Any signatory executing this contract on behalf of either ATTORNEY or COUNTY warrants and guarantees that he has authority to execute this contract on behalf of ATTORNEY or COUNTY and to validly and legally bind ATTORNEY and COUNTY to the provisions of this contract.

**EXECUTED IN MULTIPLE ORIGINALS ON THE DATES SHOWN.**

COUNTY:

_____
Lance Celander, County Judge

ATTEST:

_____
Vicki Phillips, County Clerk, Gaines County

Date: 12-9-13

ATTORNEY:

THE LAW OFFICES OF ARTHUR AGUILAR, JR.

By: _____

Date: 1-5-13

APPOINTING AUTHORITY:

_____
Carter T. Schildknecht, District Judge

Date: December 4, 2013

# 106TH JUDICIAL DISTRICT

## CURRENT CONTRACT FOR 2013
### PRO RATA SHARE DETERMINED BY INDIGENT DEFENSE
### PROVIDED FOR EACH COUNTY UNDER THE 2012 CONTRACT

|          |         | COST FOR 2013 CONTRACT |
|----------|---------|------------------------|
| District |         | $66,000.00             |
| Dawson   | 33.33%  | 21,997.80              |
| Gaines   | 44.78%  | 29,554.80              |
| Garza    | 15.42%  | 10,177.20              |
| Lynn     | 6.47%   | 4,270.20               |

## ESTIMATED SAVINGS UNDER 2013 CONTRACT
### (Annualized, taking into consideration multiple cases for
### some defendants, jury trials, contested revocation hearings, and mileage.)

|          | COST UNDER CONTRACT | ESTIMATED COST WITHOUT CONTRACT | ANNUAL SAVINGS |
|----------|---------------------|---------------------------------|----------------|
| District | $66,000.00          | $114,200.00                     | $48,200.00     |
| Dawson   | 21,997.80           | 40,000.00                       | 18,002.20      |
| Gaines   | 29,554.80           | 51,000.00                       | 21,445.20      |
| Garza    | 10,177.20           | 16,000.00                       | 5,822.80       |
| Lynn     | 4,270.20            | 7,200.00                        | 2,929.80       |

## DEFENDANTS SERVED UNDER THE CURRENT
## 2013 CONTRACT FOR INDIGENT DEFENSE
### (Annualized)

| COUNTY | NUMBER OF CASES DISPOSED | % OF TOTAL |
|--------|--------------------------|------------|
| Dawson | 104                      | 36.49      |
| Gaines | 97                       | 34.03      |
| Garza  | 53                       | 18.60      |
| Lynn   | <u>31</u>                | 10.88      |
|        | 285                      |            |

## PRO RATA SHARE BY COUNTY FOR PROPOSED CONTRACT FOR
## JANUARY 1, 2014 THROUGH SEPTEMBER 30, 2014

|          | COST FOR 9 MO. CONTRACT | MONTHLY    |
|----------|-------------------------|------------|
| District | $49,500.00              | $5,500.00  |
| Dawson   | 18,062.55               | 2,006.95   |
| Gaines   | 16,844.85               | 1,871.65   |
| Garza    | 9,207.00                | 1,023.00   |
| Lynn     | 5,385.60                | 598.40     |

CONTRACT FOR INDIGENT DEFENSE
IN
THE 106TH JUDICIAL DISTRICT COURT OF TEXAS
DAWSON, GAINES, GARZA AND LYNN COUNTIES

1.  INTRODUCTION

The county of Garza ("COUNTY") and The Law Offices of Arthur Aguilar, Jr. ("ATTORNEY") are the parties to this agreement. The District Judge of the 106th Judicial District ("DISTRICT JUDGE") is the appointing authority approving ATTORNEY to represent indigent criminal defendants in COUNTY. This agreement establishes conditions under which ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY.

2.  SCOPE OF WORK

ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only. Under this contract, a felony will be considered to be any criminal offense that carries a possible punishment of confinement in excess of one year or that is classified as a State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE. ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed. Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106th Judicial District. However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code. Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case. ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract pursuant to the provisions of the 106th Judicial District's Local Indigent Defense Plan, including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List. DISTRICT JUDGE will monitor ATTORNEY's caseload under this contract to ensure that the quality and effectiveness of ATTORNEY's representation of defendants is not compromised and that each defendant is being provided effective representation. If DISTRICT JUDGE finds that ATTORNEY's representation is being compromised or is falling below that which is expected by the Court, DISTRICT JUDGE will make adjustments to ATTORNEY's caseload. ATTORNEY's caseload under this contract shall not exceed 400 actual cases over the entire four counties of the 106th Judicial District.

3.  **CONTRACT PERIOD**

This agreement shall commence on January 1, 2014, and shall terminate September 30, 2014, unless terminated earlier by either party. The parties shall have an option to renew the contract for additional years, and prior to July 1, 2014, the parties will revisit the contract to consider any desired modifications to the terms and conditions of this contract.

4.  **CONSIDERATION**

The parties agree that if this contract covered the legal representation for indigent criminal defendants in all four counties of the 106th Judicial District, the total consideration for legal representation at the trial court level would be $49,500.00 for the nine month contract period.

The consideration for legal representation at the trial court level under this contract between COUNTY and ATTORNEY is COUNTY's pro rata portion of $49,500.00, payable in monthly installments, based on indigent defense provided under the 2013 Contract for Indigent Defense in each of the four counties of the 106th Judicial District. COUNTY agrees to pay ATTORNEY for services at the trial court level a monthly amount for COUNTY's pro rata share as follows:

| | | |
|---|---|---|
| Dawson County | $18,062.55 for contract | $ 2,006.95 monthly |
| Gaines County | $ 16,844.85 for contract | $ 1,871.65 monthly |
| Garza County | $ 9,207.00 for contract | $ 1,023.00 monthly |
| Lynn County | $ 5,385.60 for contract | $ 598.40 monthly |

The above amount is the total consideration to be paid by COUNTY for legal representation of indigent criminal defendants at the trial court level for all cases opened during the term of this contract, and ATTORNEY shall furnish at his own cost all equipment, travel, office space, office supplies, secretaries, salaries of any kind, and any and all other trial court expenses except as provided otherwise in this contract.

In consideration for ATTORNEY's appellate representation of COUNTY's indigent criminal defendants under this contract, COUNTY agrees to pay additional ATTORNEY's fees for legal services at the rate accepted in this area for such services and approved by DISTRICT JUDGE. If ATTORNEY is required to travel to the appellate court for representation under this contract, COUNTY agrees to pay ATTORNEY's actual expenses for lodging and mileage at the prevailing state rate after approval by DISTRICT JUDGE.

COUNTY shall not be obligated for any other additional amount or expenses unless specifically designated in this agreement or required by law, detailed in the Request to Pay Counsel, and approved by DISTRICT JUDGE.

If the renewal option is exercised, COUNTY's designated monthly percentage will be adjusted to reflect the number of COUNTY's cases under the contract in trial court

compared to the number of trial court level cases under the contract in the entire 106th Judicial District during the previous contract.

5.  **EXPERTS, INVESTIGATORS, AND INTERPRETERS**
    ATTORNEY will obtain prior approval of expenses for investigation and for experts by filing a motion in the 106th Judicial District Court, stating the need for such assistance and the estimated expense. Investigative or expert expenses incurred with prior court approval shall be reimbursed as provided in the order granting approval. Investigative or expert expenses incurred without prior approval shall be reimbursed only if necessarily and reasonably incurred. ATTORNEY will arrange for interpreters when the need exists. Expenses for interpreters shall be paid by COUNTY after approval by DISTRICT JUDGE.

6.  **CHANGE OF VENUE**
    If there is a change of venue which moves a case from the boundaries of the 106th Judicial District, then ATTORNEY will be allowed his actual expenses in regard to lodging, meals, court fees or costs, copy machine fees, or any other fees approved by DISTRICT JUDGE in the original jurisdiction. Any such expenses should be discussed, if at all possible, with DISTRICT JUDGE prior to incurring the same. In such cases, any travel (mileage fees) outside the 106th Judicial District will be paid at the prevailing state rate. All other fees designated herein will be the responsibility of and paid by the County of original jurisdiction.

7.  **ASSIGNMENT**
    ATTORNEY may employ an associate attorney(s) to assist in representing defendants under this contract with the prior consent and approval of DISTRICT JUDGE, but only at ATTORNEY's sole expense. ATTORNEY shall not assign its entire rights under this contract or delegate the entire performance of its duties under this contract.

8.  **CONFLICTS**
    ATTORNEY will notify the office of DISTRICT JUDGE as soon as ATTORNEY is aware of ethical conflicts between indigent defendants and will file a Motion to Withdraw and be responsible to set the case for a hearing regarding the ethical conflict for consideration if deemed necessary by the Court.

9.  **REPORTS**
    ATTORNEY shall compile a year-end report giving the number of indigent defendants served, the number of individual cases handled, the types of cases, the disposition of the cases handled, and any other reporting information required to be in compliance with the law. Such report shall identify the cases by county and shall include cases for the other contracting counties in the 106th Judicial District as well as COUNTY's cases. For approval and payment, ATTORNEY shall provide itemized interim progress reports to COUNTY and DISTRICT JUDGE as requested for indigent defense expenditure reports. Payment shall be made by COUNTY after approval by DISTRICT JUDGE.

12/20/2013 FRI 14:08  FAX 8068278810 106th District Judge                    ☑003/005

10. **ATTORNEY'S PRIVATE PRACTICE**
It is agreed that ATTORNEY may maintain a private practice. It is further agreed and understood that ATTORNEY's private practice will not interfere in any material manner with the indigent criminal defense cases provided for in this contract.

11. **TERMINATION**
If COUNTY wishes to terminate this contract, COUNTY may determine that desire by a majority vote of the Commissioners Court of COUNTY. Either party may terminate with 90 days notice by Certified Mail to the other party. ATTORNEY shall complete all cases that are open as of the date of the termination notice unless relieved or replaced by DISTRICT JUDGE.

12. **AMENDMENTS**
Any alterations, additions or deletions in the terms and conditions of this contract shall be by written amendment approved by DISTRICT JUDGE and executed by ATTORNEY and the Commissioners Court of COUNTY.

13. **SEVERABILITY**
If any provision of this contract is construed to be illegal or invalid, such construction will not affect the legality or validity of any of its other provisions. The illegal or invalid provision will be deemed severable and stricken from the contract as if it had never been incorporated herein, but all other provisions will continue.

14. **SURVIVAL OF TERMS**
Termination of this contract for any reason shall not release either party from any liabilities or obligations set forth in this contract that the parties have expressly agreed in writing shall survive any such termination or which by their nature would be intended to be applicable following such termination.

15. **INDEPENDENT CONTRACTOR**
It is agreed that ATTORNEY is an independent contractor and that this contract does not create an employment relationship between COUNTY and ATTORNEY. ATTORNEY, not COUNTY, will be responsible for appropriate payment of social security taxes and federal income taxes applicable to the consideration received by ATTORNEY under this contract.

COUNTY shall not be liable or responsible and shall be saved and held harmless by ATTORNEY from and against any and all suits, actions, claims or liability of any character arising out of the performance of ATTORNEY under this contract, including claims and damages arising from acts of negligence or acts of malpractice of ATTORNEY.

16. **NO WAIVER OF SOVEREIGN IMMUNITY**
THE PARTIES EXPRESSLY AGREE THAT NO PROVISION OF THIS CONTRACT IS IN ANY WAY INTENDED TO CONSTITUTE A WAIVER BY COUNTY OR THE

STATE OF TEXAS OF ANY IMMUNITIES FROM SUIT OR FROM LIABILITY THAT COUNTY OR THE STATE OF TEXAS MAY HAVE BY OPERATION OF LAW.

17. GOVERNING LAW AND JURISDICTION

This contract shall be construed in accordance with and governed by the laws of the State of Texas, except for its provisions regarding conflicts of laws. The venue of any suit brought for any breach of this contract is fixed in any court of competent jurisdiction in Garza County, Texas. All payments under the contract shall be due and payable at ATTORNEY's office in Lubbock, Texas. This contract represents the entire agreement between the parties. No prior agreement of understanding, oral or otherwise, of the parties or their agents will be valid or enforceable unless embodied in this contract. The County Judge of COUNTY has signed this agreement pursuant to the authority placed in him by the Commissioners Court. Any signatory executing this contract on behalf of either ATTORNEY or COUNTY warrants and guarantees that he has authority to execute this contract on behalf of ATTORNEY or COUNTY and to validly and legally bind ATTORNEY and COUNTY to the provisions of this contract.

EXECUTED IN MULTIPLE ORIGINALS ON THE DATES SHOWN.

COUNTY:

_____
Lee Norman, County Judge

ATTEST:

_____
Jim Plummer, County Clerk, Garza County

Date: 12/9/2013

ATTORNEY:

THE LAW OFFICES OF ARTHUR AGUILAR, JR.

By: _____

Date: 12-5-13

APPOINTING AUTHORITY:

_____
Carter T. Schildknecht, District Judge

Date: December 4, 2013

CONTRACT FOR INDIGENT DEFENSE - GARZA COUNTY                    PAGE 5

CONTRACT FOR INDIGENT DEFENSE
IN
THE 106TH JUDICIAL DISTRICT COURT OF TEXAS
DAWSON, GAINES, GARZA AND LYNN COUNTIES

1.  **INTRODUCTION**
    The county of Lynn ("COUNTY") and The Law Offices of Arthur Aguilar, Jr. ("ATTORNEY") are the parties to this agreement. The District Judge of the 106th Judicial District ("DISTRICT JUDGE") is the appointing authority approving ATTORNEY to represent indigent criminal defendants in COUNTY. This agreement establishes conditions under which ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY.

2.  **SCOPE OF WORK**
    ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only. Under this contract, a felony will be considered to be any criminal offense that carries a possible punishment of confinement in excess of one year or that is classified as a State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE. ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed. Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106th Judicial District. However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code. Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case. ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract pursuant to the provisions of the 106th Judicial District's Local Indigent Defense Plan, including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List. DISTRICT JUDGE will monitor ATTORNEY's caseload under this contract to ensure that the quality and effectiveness of ATTORNEY's representation of defendants is not compromised and that each defendant is being provided effective representation. If DISTRICT JUDGE finds that ATTORNEY's representation is being compromised or is falling below that which is expected by the Court, DISTRICT JUDGE will make adjustments to ATTORNEY's caseload. ATTORNEY's caseload under this contract shall not exceed 400 actual cases over the entire four counties of the 106th Judicial District.

3.  **CONTRACT PERIOD**
    This agreement shall commence on January 1, 2014, and shall terminate September 30, 2014, unless terminated earlier by either party. The parties shall have an option to renew the contract for additional years, and prior to July 1, 2014, the parties will revisit the contract to consider any desired modifications to the terms and conditions of this contract.

4.  **CONSIDERATION**
    The parties agree that if this contract covered the legal representation for indigent criminal defendants in all four counties of the 106th Judicial District, the total consideration for legal representation at the trial court level would be $49,500.00 for the nine month contract period.

    The consideration for legal representation at the trial court level under this contract between COUNTY and ATTORNEY is COUNTY's pro rata portion of $49,500.00, payable in monthly installments, based on indigent defense provided under the 2013 Contract for Indigent Defense in each of the four counties of the 106th Judicial District. COUNTY agrees to pay ATTORNEY for services at the trial court level a monthly amount for COUNTY's pro rata share as follows:

    | | | |
    |---|---|---|
    | Dawson County | $18,062.55 for contract | $ 2,006.95 monthly |
    | Gaines County | $ 16,844.85 for contract | $ 1,871.65 monthly |
    | Garza County | $ 9,207.00 for contract | $ 1,023.00 monthly |
    | Lynn County | $ 5,385.60 for contract | $ 598.40 monthly |

    The above amount is the total consideration to be paid by COUNTY for legal representation of indigent criminal defendants at the trial court level for all cases opened during the term of this contract, and ATTORNEY shall furnish at his own cost all equipment, travel, office space, office supplies, secretaries, salaries of any kind, and any and all other trial court expenses except as provided otherwise in this contract.

    In consideration for ATTORNEY's appellate representation of COUNTY's indigent criminal defendants under this contract, COUNTY agrees to pay additional ATTORNEY's fees for legal services at the rate accepted in this area for such services and approved by DISTRICT JUDGE. If ATTORNEY is required to travel to the appellate court for representation under this contract, COUNTY agrees to pay ATTORNEY's actual expenses for lodging and mileage at the prevailing state rate after approval by DISTRICT JUDGE.

    COUNTY shall not be obligated for any other additional amount or expenses unless specifically designated in this agreement or required by law, detailed in the Request to Pay Counsel, and approved by DISTRICT JUDGE.

    If the renewal option is exercised, COUNTY's designated monthly percentage will be adjusted to reflect the number of COUNTY's cases under the contract in trial court

compared to the number of trial court level cases under the contract in the entire 106th Judicial District during the previous contract.

5. **EXPERTS, INVESTIGATORS, AND INTERPRETERS**
ATTORNEY will obtain prior approval of expenses for investigation and for experts by filing a motion in the 106th Judicial District Court, stating the need for such assistance and the estimated expense. Investigative or expert expenses incurred with prior court approval shall be reimbursed as provided in the order granting approval. Investigative or expert expenses incurred without prior approval shall be reimbursed only if necessarily and reasonably incurred. ATTORNEY will arrange for interpreters when the need exists. Expenses for interpreters shall be paid by COUNTY after approval by DISTRICT JUDGE.

6. **CHANGE OF VENUE**
If there is a change of venue which moves a case from the boundaries of the 106th Judicial District, then ATTORNEY will be allowed his actual expenses in regard to lodging, meals, court fees or costs, copy machine fees, or any other fees approved by DISTRICT JUDGE in the original jurisdiction. Any such expenses should be discussed, if at all possible, with DISTRICT JUDGE prior to incurring the same. In such cases, any travel (mileage fees) outside the 106th Judicial District will be paid at the prevailing state rate. All other fees designated herein will be the responsibility of and paid by the County of original jurisdiction.

7. **ASSIGNMENT**
ATTORNEY may employ an associate attorney(s) to assist in representing defendants under this contract with the prior consent and approval of DISTRICT JUDGE, but only at ATTORNEY's sole expense. ATTORNEY shall not assign its entire rights under this contract or delegate the entire performance of its duties under this contract.

8. **CONFLICTS**
ATTORNEY will notify the office of DISTRICT JUDGE as soon as ATTORNEY is aware of ethical conflicts between indigent defendants and will file a Motion to Withdraw and be responsible to set the case for a hearing regarding the ethical conflict for consideration if deemed necessary by the Court.

9. **REPORTS**
ATTORNEY shall compile a year-end report giving the number of indigent defendants served, the number of individual cases handled, the types of cases, the disposition of the cases handled, and any other reporting information required to be in compliance with the law. Such report shall identify the cases by county and shall include cases for the other contracting counties in the 106th Judicial District as well as COUNTY's cases. For approval and payment, ATTORNEY shall provide itemized interim progress reports to COUNTY and DISTRICT JUDGE as requested for indigent defense expenditure reports. Payment shall be made by COUNTY after approval by DISTRICT JUDGE.

10. **ATTORNEY'S PRIVATE PRACTICE**
It is agreed that ATTORNEY may maintain a private practice. It is further agreed and understood that ATTORNEY's private practice will not interfere in any material manner with the indigent criminal defense cases provided for in this contract.

11. **TERMINATION**
If COUNTY wishes to terminate this contract, COUNTY may determine that desire by a majority vote of the Commissioners Court of COUNTY. Either party may terminate with 90 days notice by Certified Mail to the other party. ATTORNEY shall complete all cases that are open as of the date of the termination notice unless relieved or replaced by DISTRICT JUDGE.

12. **AMENDMENTS**
Any alterations, additions or deletions in the terms and conditions of this contract shall be by written amendment approved by DISTRICT JUDGE and executed by ATTORNEY and the Commissioners Court of COUNTY.

13. **SEVERABILITY**
If any provision of this contract is construed to be illegal or invalid, such construction will not affect the legality or validity of any of its other provisions. The illegal or invalid provision will be deemed severable and stricken from the contract as if it had never been incorporated herein, but all other provisions will continue.

14. **SURVIVAL OF TERMS**
Termination of this contract for any reason shall not release either party from any liabilities or obligations set forth in this contract that the parties have expressly agreed in writing shall survive any such termination or which by their nature would be intended to be applicable following such termination.

15. **INDEPENDENT CONTRACTOR**
It is agreed that ATTORNEY is an independent contractor and that this contract does not create an employment relationship between COUNTY and ATTORNEY. ATTORNEY, not COUNTY, will be responsible for appropriate payment of social security taxes and federal income taxes applicable to the consideration received by ATTORNEY under this contract.

COUNTY shall not be liable or responsible and shall be saved and held harmless by ATTORNEY from and against any and all suits, actions, claims or liability of any character arising out of the performance of ATTORNEY under this contract, including claims and damages arising from acts of negligence or acts of malpractice of ATTORNEY.

16. **NO WAIVER OF SOVEREIGN IMMUNITY**
THE PARTIES EXPRESSLY AGREE THAT NO PROVISION OF THIS CONTRACT IS IN ANY WAY INTENDED TO CONSTITUTE A WAIVER BY COUNTY OR THE

STATE OF TEXAS OF ANY IMMUNITIES FROM SUIT OR FROM LIABILITY THAT COUNTY OR THE STATE OF TEXAS MAY HAVE BY OPERATION OF LAW.

17. **GOVERNING LAW AND JURISDICTION**

This contract shall be construed in accordance with and governed by the laws of the State of Texas, except for its provisions regarding conflicts of laws. The venue of any suit brought for any breach of this contract is fixed in any court of competent jurisdiction in Lynn County, Texas. All payments under the contract shall be due and payable at ATTORNEY's office in Lubbock, Texas. This contract represents the entire agreement between the parties. No prior agreement of understanding, oral or otherwise, of the parties or their agents will be valid or enforceable unless embodied in this contract. The County Judge of COUNTY has signed this agreement pursuant to the authority placed in him by the Commissioners Court. Any signatory executing this contract on behalf of either ATTORNEY or COUNTY warrants and guarantees that he has authority to execute this contract on behalf of ATTORNEY or COUNTY and to validly and legally bind ATTORNEY and COUNTY to the provisions of this contract.

**EXECUTED IN MULTIPLE ORIGINALS ON THE DATES SHOWN.**

COUNTY:

Mike Braddock, County Judge

ATTEST:

Susan Tipton, County Clerk, Lynn County

Date: _Dec. 9th 2013_

ATTORNEY:

THE LAW OFFICES OF ARTHUR AGUILAR, JR.

By: _____

Date: _12 - 5 - 13_

APPOINTING AUTHORITY:

Carter T. Schildknecht, District Judge

Date: _December 4, 2013_

FILED
AT _10:00A_ M O'CLOCK

DEC 09 2013

SUSAN TIPTON, LYNN COUNTY CLERK

# Exhibit F

*Letter from Judge Schildknecht to Joel Lieurance, Policy Monitor at TIDC*
*(July 19, 2013)*

JANA FURLOW, COURT ADMINISTRATOR
ROSA OLVERA, COURT COORDINATOR
TERESA POPNOE, COURT SECRETARY
J'LYN SAUSEDA, COURT REPORTER
JON KEY, COURT BAILIFF



### 106th Judicial District

CARTER T. SCHILDKNECHT
DISTRICT JUDGE

PHONE: 806/872-3740
FAX: 806/872-7810
*Physical Address:*
400 SOUTH 1ST, SUITE 301
*Mailing Address:*
P.O. BOX 1268
LAMESA, TEXAS 79331
email: djudge@co.dawson.tx.us



July 19, 2013

Joel Lieurance, Policy Monitor
Texas Indigent Defense Commission
209 West 14th Street, Room 202
Austin, TX 78701

Re: *Responses to the June 11, 2013, Review of Gaines County's Indigent Defense System as applied to the 106th District Court, Gaines County, Texas*

Dear Mr. Lieurance:

In response to the report of the monitoring review of Gaines County's indigent processes, I am addressing each of the recommendations that applies to the District Court.

"<u>Core Requirement 4. Appoint counsel promptly.</u>

**Recommendation 3:** Gaines County and the 106th District Court must implement procedures to ensure that determinations of indigence in felony cases fall within the time frames set by the FDA."

The Indigent Defense Plan for the 106th District Court includes specific provisions for prompt magistration and assistance in completing the necessary forms for requesting appointment of counsel. Included as a part of these provisions is the statement as follows: "The magistrate shall, within 24 hours, transmit the felony defendant's 'Request for Appointment of Counsel and Determination of Indigence' to the District Judge." Transmit means to send or transfer from one person or place to another. Except on rare occasion, the requesting defendant has an attorney appointed on the same day the request is received in the District Judge's office, and with the exception of weekends or holidays, that is the next day after the request is transmitted.

I do not understand exactly how the monitor arrived at the figures presented in the Monitoring Review Report. No one discussed with me anything about the determination of indigence or the timely appointment of counsel. In our office files we keep the requests for appointed counsel. No one reviewed these. In Gaines County we have many defendants who initially indicate that they or their family are intending to retain an attorney and do not want to ask for an appointed attorney. Some of these defendants later request an appointed attorney. One of my questions is how the date of the request for counsel was determined.

DAWSON                    GAINES                    GARZA                    LYNN

I will speak with the appropriate officials in Gaines County to be sure they understand and will follow the provisions in the Indigent Defense Plan for assistance in completing the necessary forms for requesting appointed counsel and for transmitting them to the District Court.

"**Core Requirement 5. Institute a fair, neutral and non-discriminatory attorney selection process.**

**Recommendation 8:** The parties to the contract for felony defense services must follow the terms of the contract according to the contract's caseload limitations. Excessive caseloads could compromise the quality of representation provided for indigent clients."

The 106th District Court is very lenient toward indigent defendants and appoints counsel for defendants with annual average income up to and including 200% of the Federal poverty guidelines, which substantially exceeds the 125% requirement set out by the State.

Except on rare occasion, the Court appoints counsel the same day the Court receives an application requesting appointed counsel. Because of the prompt appointment of counsel following request, many times a defendant retains counsel within a few days after having counsel appointed. Also, in numerous cases, appointed counsel immediately withdraws because of a legal conflict discovered during the initial intake interview. These cases, although the appointed attorney's representation is brief, are counted in the appointed attorney's caseload.

The 106th District Court also may appoint counsel in the interest of justice when a defendant wants to proceed with his case more quickly than he can retain an attorney or for some other justifiable reason. There are times when this happens during arraignment in open court. In these cases, at the defendant's request, the appointed attorney's representation may be very brief but still count in his caseload.

As stated in your Monitoring Review Report dated June 11, 2013, "The NAC standards are a good starting point in assessing caseloads but should not be accepted as universal standards." The provision of criminal defense services does not lend itself to pure numerical analysis. Arbitrary standards set outside the Court's discretion infringe on the independence of the judiciary. The judge sitting in a case is in the best position to evaluate and determine if an attorney's quality of representation is compromised. This can occur with a retained attorney as well as with an appointed attorney. I have removed attorneys from the appointment list when I felt that the attorney did not provide the quality of representation that the court expects. I have never felt that the contracting attorney's representation fell below that which the court expects. In fact, because of the priority that the contracting attorney places on his work as appointed counsel in this court, I have found that his representation of clients is more timely, efficient, and many times exceeds the quality and effectiveness of other attorneys, appointed or retained.

Page Three
Joel Lieurance, Policy Monitor
Texas Indigent Defense Commission
July 19, 2013


Late in 2011, this court felt harassed and pressured by Fiscal Monitor Carol Conner to add additional language about caseload limitations to our contracts. In response to that pressure, I added the language, "the ABA's recommended caseload limitations," to our contracts. That specific language will be removed from future contracts and more appropriate language will be added that requires the judge to monitor caseloads to determine if the quality and effectiveness of representation is compromised in any manner.

**"Recommendation 9: The County must ensure that procedures are in place to meet the requirements of 1 TAC § 174.25 and Article 26.05(c) so that itemized fee vouchers are submitted and approved by the appointment authority prior to payment by the financial officer."**

To comply, the District Judge will ensure that fee vouchers for the District Court are submitted to the judge for approval prior to payment by the financial officer.

A copy of a letter dated February 10, 2012, that I wrote to Wesley Shackelford, Deputy Director/Special Counsel, Texas Indigent Defense Commission, addressing this same issue is enclosed.

Sincerely,

Carter T. Schildknecht
106th Judicial District Judge

Enclosure: Letter dated February 10, 2012, to Wesley Shackelford

c:      The Honorable Lance Celander, Gaines County Judge
        Mr. Rick Dollahan, Gaines County Auditor
        The Honorable Tammy Clark, Justice of the Peace, Precinct 1
        The Honorable B. W. Baucum, Justice of the Peace, Precinct 2
        Mr. Arthur Aguilar, Jr., Contract Defender
        Mr. James D. Bethke, Executive Director, Texas Indigent Defense Commission

JANA FURLOW, COURT ADMINISTRATOR
ROSA OLVERA, COURT COORDINATOR
MILLIE COHORN, COURT SECRETARY
J'LYN SAUSEDA, COURT REPORTER



PHONE: 806/872-3740
FAX: 806/872-7810
*Physical Address:*
400 SOUTH 1ST, SUITE 301
*Mailing Address:*
P.O. BOX 1268
LAMESA, TEXAS 79331
email: djudge@co.dawson.tx.us

# 106ᵗʰ Judicial District

## CARTER T. SCHILDKNECHT
### DISTRICT JUDGE

February 10, 2012

COPY

Mr. Wesley Shackelford
Deputy Director/Special Counsel
*via fax: 512-463-5724*

Re:     *Contract Defender Program / Dawson, Gaines, Garza, Lynn Counties*

Dear Mr. Shackelford:

I am writing in response to your letter to Arthur Aguilar, Jr. dated January 27, 2012, which was copied to me. I hope that this letter will help you to understand the program and the contracts between Mr. Aguilar and the four counties in the 106ᵗʰ Judicial District. Previously I have provided to Carol Conner all materials requested by her and have discussed this program and contract at length with you by telephone and also with Jim Bethke in person in my office during a visit on January 12, 2012.

It appears to me that because our program does not fit the mold that other counties are using, there is either an inability or unwillingness to understand how our program satisfies the requirements of CCP 26.05 and TAC §§174.10 - 174.25.

I have thoroughly reviewed CCP 26.05 and the TAC §174 provisions. When the contracts are issued for 2013, I am willing to amend the language by adding the provision you request covering submitting a fee voucher to me prior to payment. I will do that to comply with the requirements even though my position is that it is already satisfied by the contract language as it exists. A voucher is a document that serves to recognize a liability and authorize the disbursement of cash that shows on its face the fact, authority, and purpose of disbursement. A careful reading of item number 4 in our contract shows that payment is determined by services performed during the prior year as itemized in the year-end report required in item number 9 of our contract. By signing each contract as the appointing authority when it is presented to each commissioners court, I am approving that payment according to the services that had been itemized to me as required in item number 9.

DAWSON                    GAINES                    GARZA                    LYNN

Nowhere in CCP 26.05 or TAC §§174.10 - 174.25 can I find the requirement for a monthly voucher. The only time I find the word "monthly" is in Texas Government Code §71.0351 referred to in TAC §174.10(5), which provides for reports to be sent to the OCA "on a monthly, quarterly, or annual basis." However, §71.0351 was repealed effective September 1, 2011. Our county financial officers report to me that they currently receive all the information they need from Mr. Aguilar to complete their indigent defense expenditure reports.

Please understand that from the inception of the Texas Fair Defense Act, this court and the counties covered by it have taken very seriously our legal and ethical obligations to provide legal representation for indigent defendants and to pay counsel appropriately for those services. This is and should be the guiding principle behind indigent defense policies and standards.

Sincerely,

Carter T. Schildknecht

c:      Jim Bethke, Executive Director,
        Texas Indigent Defense Commission - *via fax 512-463-5724*
        Arthur Aguilar, Jr. - *via fax 806-687-3502*

# Exhibit G

*Texas Indigent Defense Commission, Review of Gaines*
*County's Indigent Defense Systems*
*(June 11, 2013)*



# Review of Gaines County's Indigent Defense Systems

# June 11, 2013



Texas Indigent Defense Commission
209 W. 14th Street, Room 202 (Price Daniel Building)
Austin, Texas 78701
Direct: 512.463.8015   Fax: 512.463.5724
Main line: 512.936.6994 Toll free in Texas: 866.499.0656
On the web: http://www.courts.state.tx.us/tidc

**OFFICERS:**

| | |
|---|---|
| Honorable Sharon Keller | Chair – Presiding Judge, Court of Criminal Appeals |
| Honorable Olen Underwood | Vice-Chair – Presiding Judge, 2nd Administrative Judicial Region of Texas |

**EX OFFICIO MEMBERS:**

| | |
|---|---|
| Honorable Sharon Keller | Austin, Presiding Judge, Court of Criminal Appeals |
| Honorable Wallace Jefferson | Austin, Chief Justice, Supreme Court |
| Honorable Roberto Alonzo | Dallas, State Representative |
| Honorable Abel Herrero | Robstown, State Representative |
| Honorable Sherry Radack | Houston, Chief Justice, First Court of Appeal |
| Honorable Royce West | Dallas, State Senator |
| Honorable John Whitmire | Houston, State Senator |

**MEMBERS APPOINTED BY GOVERNOR:**

| | |
|---|---|
| Honorable Jon Burrows | Temple, Bell County Judge |
| Mr. Don Hase | Attorney, Ball & Hase, Arlington |
| Mr. Anthony Odiorne | Burnet, Assistant Public Defender, Regional Public Defender for Capital Cases |
| Honorable Olen Underwood | Conroe, Presiding Judge, 2nd Administrative Judicial Region of Texas |
| Honorable B. Glen Whitley | Hurst, Tarrant County Judge |

**STAFF:**

| | |
|---|---|
| James D. Bethke | Director |
| Edwin Colfax | Project Manager |
| West Garrett | Research Specialist |
| Dominic Gonzales | Grant Program Specialist |
| Marissa Kubinski | Administrative Assistant |
| Joel Lieurance | Research Specialist, Policy Monitor |
| Wesley Shackelford | Deputy Director/Special Counsel |
| Terri Tuttle | Executive Assistant/Information Specialist |
| Sharon Whitfield | Budget and Accounting Analyst |
| Bryan Wilson | Grants Administrator |

**MISSION**

The Texas Indigent Defense Commission provides financial and technical support to counties to develop and maintain quality, cost-effective indigent defense systems that meet the needs of local communities and the requirements of the Constitution and state law.

# Contents

Purpose of Review ................................................................................................................... 4

Methodology ........................................................................................................................... 4

Summary of Commendations / Recommendations ................................................................. 5

Overview of Gaines County's Indigent Defense System ....................................................... 8

Program Assessment ............................................................................................................. 10

   Core Requirement 1.  Conduct prompt and accurate magistration proceedings. .............................. 10

   Core Requirement 2. Determine indigence according to standards directed by the indigent defense plan. ............................................................................................................................................ 12

   Core Requirement 3.  Establish minimum attorney qualifications. .................................................. 14

   Core Requirement 4.  Appoint counsel promptly. ..................................................................... 16

   Core Requirement 5.  Institute a fair, neutral, and non-discriminatory attorney selection process.... 23

      Comparison of the Contract with Contract Defender Rules ............................................. 24

      Comparison of the Public Defender's Written Procedures with Article 26.044 ........................... 31

   Core Requirement 6.  Promulgate standard attorney fee schedule and payment process. ............... 33

   Statutory Data Reporting ...................................................................................................... 33

   County Indigent Defense Plans ............................................................................................ 34

Conclusion ............................................................................................................................ 34

Appendix A – District Court Indigent Defense Plan ........................................................... 35

Appendix B – County Court Indigent Defense Plan ............................................................ 42

Appendix C – Juvenile Indigent Defense Plan .................................................................... 53

Appendix D – Defender Contract ......................................................................................... 63

Appendix E – Regional Public Defender's Written Procedures and Budget …………………………69

## Purpose of Review

The Commission is required to monitor local jurisdictions' compliance with the Fair Defense Act ("FDA").[1] The purpose of this review is to promote local compliance and accountability with the requirements of the FDA through evidence-based practices and to provide technical assistance to improve processes where needed. In addition, this review process is designed to assist the local jurisdiction in developing procedures to monitor its own compliance with its indigent defense plan and the FDA.

## Core Requirements of the Fair Defense Act

1. Conduct prompt and accurate magistration proceedings:
    - Inform and explain right to counsel to accused;
    - Provide reasonable assistance to accused in completing necessary forms to request counsel;
    - Maintain magistrate processing records.
2. Determine indigence according to standards directed by the indigent defense plan.
3. Establish minimum attorney qualifications.
4. Appoint counsel promptly.
5. Institute a fair, neutral, and non-discriminatory attorney selection process.
6. Promulgate a standard attorney fee schedule and payment process.

## Methodology

The policy monitoring site review for Gaines County ("the County") was conducted by Joel Lieurance and Wesley Shackelford in conjunction with a review of Dawson County between February 19 and February 22, 2013. Joel Lieurance returned on May 13, 2013 to review some additional case files. Throughout this report all references to Commission staff use the term "monitor." The monitor met with the following persons: the district judge; the county judge; a justice-of-the-peace; the auditor's office; the regional public defender; and the felony contract defender. The monitor observed a misdemeanor arraignment docket. The monitor examined the following records:

- Local indigent defense plans;
- Contract with the felony contract defender;
- Regional public defender employee handbook;
- Magistrate's warning forms (obtained from the offices of the two justices-of-the-peace) to determine the time from arrest to magistration and to determine whether all Article 15.17 requirements are part of standard procedures;
- Case file records including but not limited to:
    - Affidavits of indigence and orders appointing counsel as well as letters indicating retention of an attorney or withdrawal of an attorney; and
    - Forms noting case dispositions, plea agreements, waivers of counsel, and orders of dismissal.

---

[1] Tex. Gov't Code § 79.037(b).

## Summary of Commendations / Recommendations

The Commission staff compared County procedures with the requirements of the Fair Defense Act (FDA) and found that the County's written procedures are laudable, but in many instances, the plans do not describe actual practices. For instance, the local indigent defense plans require that procedures for requesting counsel be explained to all unrepresented defendants, set a standard of indigence that applies to all defendants whether they bond or not, and require the timely appointment of counsel. However, procedures for requesting counsel are not explained to misdemeanor defendants, and determinations of indigence are often untimely. In order to meet the requirements of both state law and its local plans, the County must: promptly transmit requests for counsel to the appointing authority; promptly rule on requests for counsel; ensure that waivers of counsel meet the requirements of Article 1.051 of the Code of Criminal Procedure; and ensure that all terms of the contract for felony representation are followed.

The commendations and recommendations from the report are listed below. The County does not need to respond to the report's commendations but must respond to how it will address each recommendation.

### Core Requirement 1.  Conduct prompt and accurate magistration proceedings.
**Commendation:**
- Gaines County has procedures in place to ensure that arrestees receive timely Article 15.17 hearings.

**Recommendations:**

**1:** Gaines County must implement procedures to ensure assistance in completing the necessary forms for requesting counsel at the time of the Article 15.17 hearing.

**2:** Gaines County must implement procedures to transmit all requests for counsel to the appointing authority within 24 hours of the request.

### Core Requirement 2. Determine indigence according to standards directed by the indigent defense plan. (For this core requirement, the monitor only examined whether the local indigent defense plans meet statutory requirements, not whether the plans are followed.)

**Commendations:**
- The district court's felony indigence determination standards, as stated in its indigent defense plan, meet relevant statutory requirements.
- The county court's misdemeanor indigence determination standards, as stated in its indigent defense plan, meet relevant statutory requirements.
- The county court's juvenile indigence determination standards, as stated in its indigent defense plan, meet relevant statutory requirements.

### Core Requirement 3.  Establish minimum attorney qualifications.
**Commendations:**
- The district court has procedures for managing the attorney appointment list for felony cases and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plan.
- The county court has procedures for managing the attorney appointment list for misdemeanor cases and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plan.

- The county court has procedures for managing the attorney appointment list for juvenile cases and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plan.

**Core Requirement 4.  Appoint counsel promptly.** (The analysis for this core requirement may be affected by the actual implementation of Core Requirement 2.)

**Commendations:**
- Gaines County's practice of ensuring that counsel is present at all juvenile detention hearings meets the requirements set in Section 51.10 of the Family Code.
- Gaines County's appointment practices in instances when a juvenile is served with a petition meet the requirements of Section 51.101 of the Family Code.

**Recommendations:**

**3:** Gaines County and the 106th District Court must implement procedures to ensure that determinations of indigence in felony cases fall within the time frames set by the FDA.

**4:** Gaines County must implement procedures to ensure timely determinations of indigence in misdemeanor cases. In particular, the court must rule upon all requests for counsel.

**5:** Gaines County must implement procedures to ensure that the court rules upon requests for counsel prior to granting any waiver of counsel. The procedure must provide that the court may not direct or encourage the defendant to communicate with the attorney representing the state until the court advises of the right to counsel and explains the process for requesting counsel. Article 1.051(f-1)(1), Code of Criminal Procedure prohibits an attorney representing the state from initiating or encouraging a waiver of counsel  from an unrepresented defendant.

**6:** Pro se pleas must include written waivers of counsel as required by Article 1.051(f), Code of Criminal Procedure.

**7:** The county court must follow the procedures set in its indigent defense plan and in Article 1.051(f-2) and explain the procedures for requesting counsel to defendants appearing in court without counsel.

**Core Requirement 5.  Institute a fair, neutral, and non-discriminatory attorney selection process.**
**Commendations:**
- The contract solicitation process meets the Commission's requirements as set in 1 TAC §§ 174.12 - 174.15.
- The contract attorney met and exceeded the annual criminal CLE requirements set in the contract.
- Based upon the monitor's review of case files, the contract defender's duration of representation meets the requirements set in the contract and which are established under Article 26.04(j)(2) of the Code of Criminal Procedure.
- The contract defender appeared to follow the requirements of the contract by filing a motion to withdraw whenever a conflict of interest arose.
- The contract for felony defense services meets all of the Commission's requirements set in 1 TAC §§ 174.10 - 174.25.
- The public defender's caseload falls within the maximum thresholds set in its office manual (and in line with national standards). Keeping caseloads below this cap allows for zealous and effective representation of indigent clients.
- Both attorneys in the public defender's office met and exceeded their annual criminal law CLE requirements.

- The public defender's operational manual and proposed budget contain all of the elements required by Article 26.044(c-1) of the Code of Criminal Procedure.

**Recommendations:**

**8:** The parties to the contract for felony defense services must follow the terms of the contract according to the contract's caseload limitations. Excessive caseloads could compromise the quality of representation provided for indigent clients.

**9:** The County must ensure that procedures are in place to meet the requirements of 1 TAC § 174.25 and Article 26.05(c) so that itemized fee vouchers are submitted and approved by the appointing authority prior to payment by the financial officer.

## Core Requirement 6.   Promulgate standard attorney fee schedule and payment process.

The items covered by this core requirement were addressed in Core Requirement 5.

## Statutory Data Reporting

**Commendation:**

- As mandated by Section 79.036 of the Texas Government Code, the Gaines County Auditor's Office completed the annual indigent defense expenditure report.

## County Indigent Defense Plans

**Commendation:**

- As mandated by Section 79.036 of the Texas Government Code, Gaines County completed its indigent defense plans that describe the procedures for appointment of counsel in criminal and juvenile cases. All required elements were included in the plans.

## Overview of Gaines County's Indigent Defense System

**Figure 1: Fair Defense Act Timeline Model for Counties with Populations Under 250,000**



Adults arrested in Gaines County are brought to the Gaines County Jail and receive Article 15.17 hearings every morning. Article 15.17 hearings are conducted by either a justice-of-the-peace or by the county judge. When a person requests counsel at the Article 15.17 hearing, the arrestee is given an affidavit of indigence. The arrestee completes the affidavit in his/her cell and submits it to jail staff. If the arrestee was arrested on a misdemeanor charge, the request and paperwork are carried to the county judge's office. If the arrestee was arrested on a felony charge, the request and paperwork are mailed via US Postal Service to the district judge.

In felony cases, persons who appear in court without counsel are told of the procedures for requesting counsel and are able to request counsel. In misdemeanor cases, persons who appear in court without counsel are not told of the procedures for requesting counsel prior to any communications with the prosecutor but are instead told to communicate with the prosecutor and to negotiate a plea deal if possible.

For felony defendants deemed indigent, a contract defender is appointed unless there is a conflict of interest, in which case, private assigned counsel is appointed. For misdemeanor defendants, the regional public defender based at Texas Tech University is appointed unless there is a conflict of interest, in which case, private assigned counsel is appointed.

A summary of indigent defense statistics, which were submitted by the County to the Commission through the Office of Court Administration (OCA), follows on the next page. The tables show appointment rates for the court systems as well as respective expenditure data.

**Table 1: Indigent Defense Statistics for Gaines County**

| Gaines County | 2001 Baseline | 2009 | 2010 | 2011 | 2012 | Texas 2012 |
|---|---|---|---|---|---|---|
| Population Estimate | 14,329 | 15,491 | 17,526 | 17,526 | 17,526 | 25,145,561 |
| Felony Cases Added | | 158 | 128 | 138 | 134 | 265,164 |
| Felony Cases Paid | | 90 | 63 | 60 | 80 | 187,191 |
| Felony Appointment Rate | | 56.96% | 49.22% | 43.48% | 59.70% | 70.59% |
| Felony Attorney Fees | | $27,167 | $24,224 | $23,162 | $21,642 | $96,565,159 |
| Total Felony Expenditures | | $28,192 | $25,924 | $24,937 | $25,967 | $109,246,777 |
| Misdemeanor Cases Added | | 658 | 656 | 613 | 442 | 548,348 |
| Misdemeanor Cases Paid | | 41 | 69 | 60 | 64 | 219,094 |
| Misdemeanor Appointment Rate | | 6.23% | 10.52% | 9.79% | 14.48% | 39.96% |
| Misdemeanor Attorney Fees | | $9,224 | $17,088 | $15,246 | $4,963 | $34,602,430 |
| Total Misdemeanor Expenditures | | $9,224 | $17,088 | $15,507 | $4,963 | $35,376,847 |
| Juvenile Cases Added | | 32 | 34 | 29 | 12 | 33,195 |
| Juvenile Cases Paid | | 29 | 43 | 32 | 25 | 50,544 |
| Juvenile Attorney Fees | | $11,262 | $13,867 | $9,069 | $5,295 | $10,116,013 |
| Total Juvenile Expenditures | | $11,262 | $13,867 | $9,069 | $5,295 | $10,824,846 |
| Total Attorney Fees | $18,324 | $52,420 | $55,419 | $48,547 | $33,494 | $146,421,392 |
| Total ID Expenditures | $27,984 | $72,198 | $62,532 | $68,718 | $50,719 | $207,539,623 |
| Increase In Total Expenditures over Baseline | | 158.00% | 123.45% | 145.56% | 81.24% | 133.95% |
| Total ID Expenditures per Population | $1.95 | $4.66 | $3.57 | $3.92 | $2.89 | $8.25 |
| Formula + Equalization Grant Disbursement | | $11,856 | $11,766 | $13,215 | $12,517 | $16,389,199 |
| Recoupment of Fees from Defendants | | $6,911 | $4,928 | $6,348 | $8,853 | $12,289,163 |

9

## Program Assessment

In the assessment that follows, the core requirements of the FDA are listed with a description of statutory provisions and are compared to the County's performance with regard to each requirement. If the monitor found that the County met the respective requirement, a box to the left of the provision is checked. The local processes are then described, and commendations and recommendations are made regarding these processes. The local indigent defense plans are listed in Appendix A (district court plan), Appendix B (county court plan), and Appendix C (juvenile plan).

## Core Requirement 1. Conduct prompt and accurate magistration proceedings.

### Local Practices Compared to Adult Statutory Provisions

☑ The accused must be brought before a magistrate within 48 hours of arrest.[2]
   - A person arrested for a misdemeanor without a warrant must be released on bond in an amount no more than $5,000 not later than 24 hours after arrest if a magistrate has not determined probable cause by that time.[3]

☑ The magistrate must inform and explain the right to counsel and the right to appointed counsel to the accused.[4]

☐ The magistrate must ensure that reasonable assistance in completing forms necessary to request counsel is provided to the accused.[5]

☑ A record must be made of the following:
   - the magistrate informing the accused of the accused's right to request appointment of counsel;
   - the magistrate asking whether accused wants to request appointment of counsel;
   - and whether the person requested court appointed counsel.[6]

☐ If authorized to appoint counsel, the magistrate must do so within one working day after receipt of request for counsel in counties with a population of 250,000 or more and within three working days in counties under 250,000.[7]

☐ If not authorized to appoint counsel, the magistrate must transmit or cause to be transmitted to the appointing authority an accused's request for counsel within 24 hours of the request being made.[8]

---

[2] Tex. Code Crim. Proc. art. 14.06(a).

[3] Tex. Code Crim. Proc. art. 17.033.

[4] Tex. Code Crim. Proc. art. 15.17(a).

[5] *Id.* This box is not checked because assistance in completing forms is not provided at the time of the hearing.

[6] Tex. Code Crim. Proc. art. 15.17(e).

[7] Tex. Code Crim. Proc. art. 15.17(a). This box is not checked, because the magistrate is not the appointing authority.

[8] *Id.* This box is not check because there appears to be issues with promptly transmitting requests to the appointing authority.

**Jurisdiction's Process**

Gaines County uses centralized magistrate warnings where all arrestees in the County are brought to the Gaines County Jail so that probable cause can be determined, bond can be set, and requests for counsel can be taken. The Article 15.17 hearings are conducted by the two justices-of-the-peace and the county judge, with one justice-of-the-peace conducting the majority of the hearings. The hearings are conducted daily, often at about 9:00 a.m.

According to Judicial Council Monthly Court Activity Report data submitted by the justice courts to the Office of Court Administration (OCA) for FY2012 (October 2011 – September 2012), the two justices-of-the-peace conducted Article 15.17 hearings for 288 misdemeanor arrestees and 183 felony arrestees. According to this same data source, 126 of the 288 (or 44%) misdemeanor arrestees requested counsel at the Article 15.17 hearings, and 99 of the 183 (or 54%) felony arrestees requested counsel.[9]

**Timeliness of Warnings**

The monitor analyzed the timeliness of a sample of Article 15.17 hearings conducted during FY2012 (October 2011 – September 2012). All forms used in this sample were from hearings conducted by the precinct #1 justice-of-the-peace. Based on the data the monitor examined, the monitor was not able to ascertain the number of hours from arrest until the Article 15.17 hearing. However, in many of the case files examined, the monitor was able to ascertain the date of arrest and the date of the hearing. In this way, the monitor assumed that if the hearing occurred within two days of arrest, the hearings were timely. Similarly, if the hearings occurred more than two days after arrest, the hearings were not timely.[10] All records reviewed appeared to involve timely Article 15.17 hearings.

**Table 2: Gaines County Times to Article 15.17 Hearing**

|  | Sample Size | Percent |
|---|---|---|
| Number of records examined[11] | 64 |  |
| Article 15.17 hearing occurs x days after arrest: |  |  |
| 0 days | 14 | 21.9% |
| 1 day | 49 | 76.6% |
| 2 days | 1 | 1.6% |
| **Timely Hearings** | **64** | **100%** |

**Commendation:** Gaines County has procedures in place to ensure that arrestees receive timely Article 15.17 hearings.

**Handling Requests for Counsel**

According to a justice-of-the-peace and jail staff, when persons request counsel at the Article 15.17 hearing, the affidavit of indigence is given to the arrestee requesting counsel. The arrestee goes back to his/her cell and completes the form at his/her convenience. After completing the form, the

---

[9] See http://card.txcourts.gov/ReportSelection.aspx for data reported to OCA. Data showing requests for counsel at the justice court level can be found under the justice court activity detail.

[10] This assumption means that the 48 hour time limit is actually extended for purposes of deeming a warning late.

[11] The total number of records listed only includes those records where the time from arrest until the Article 15.17 hearing could be determined.

inmate signals for jail staff to take the form. Jail staff then put it into an outbox. If the arrest was for a misdemeanor offense, the request is walked down the street and given to the county judge. If the arrest was for a felony offense, the request is mailed via US Postal Service to the district judge's office in Dawson County.

Article 15.17(a) of the Code of Criminal Procedure requires, "… The magistrate shall ensure that reasonable assistance in completing the necessary forms for requesting appointment of counsel is provided to the person at the same time. …" Gaines County must implement procedures for ensuring assistance in completing the necessary forms for requesting counsel at the time of the Article 15.17 hearing.

---

**Recommendation 1:** Gaines County must implement procedures to ensure assistance in completing the necessary forms for requesting counsel at the time of the Article 15.17 hearing.

---

Article 15.17(a) of the Code of Criminal Procedure further requires, "…If the magistrate is not authorized to appoint counsel, the magistrate shall without unnecessary delay, but not later than 24 hours after the person arrested requests appointment of counsel, transmit, or cause to be transmitted to the court or to the courts' designee authorized under Article 26.04 to appoint counsel in the county, the forms requesting the appointment of counsel. …" Gaines County must implement procedures to transmit all requests for counsel to the appointing authority within 24 hours of the request. These new procedures require methods that can reliably transmit requests within 24 hours of the request being made (such as email or fax as opposed to a letter sent through the US Postal Service).

---

**Recommendation 2:** Gaines County must implement procedures to transmit all requests for counsel to the appointing authority within 24 hours of the request.

---

## Core Requirement 2. Determine indigence according to standards directed by the indigent defense plan. [12]

### Local Indigent Defense Plan Compared to Adult Statutory Provisions

☑ Provide detailed procedures used to determine whether a defendant is indigent.[13]

☑ State the financial standard(s) to determine whether a defendant is indigent.[14]

☑ List factors the court will consider when determining whether a defendant is indigent.[15]

---

[12] The policy monitor does not evaluate this core requirement by determining whether persons applying for counsel are appropriately deemed indigent or non-indigent, but rather by examining whether the jurisdiction's indigent defense plan meets relevant statutes.

[13] Tex. Code Crim. Proc. art. 26.04(l)-(r).

[14] Tex. Code Crim. Proc. art. 26.04(l).

[15] Tex. Code Crim. Proc. art. 26.04(m).

**District Court's Plan**

According to the district court's indigent defense plan (see Appendix A), in determining indigence, the district judge considers the factors listed in Article 26.04(m). The judge does not consider whether the defendant has posted bail, except to the extent that it reflects the defendant's financial circumstances. The financial standard used is that a defendant whose income is less than 200% of the Federal Poverty Guidelines is considered indigent. Defendants receiving any of the following assistance services are also considered indigent: food stamps; Medicaid; Temporary Assistance for Needy Families; public housing; or Supplemental Security Income.

> **Commendation:** The district court's felony indigence determination standards, as stated in its indigent defense plan, meet relevant statutory requirements.

**County Court's Plan**

According to the county court's indigent defense plan (see Appendix B), the financial standard considers that a defendant whose income is less than 100% of the Federal Poverty Guidelines is indigent. Defendants receiving any of the following assistance services are also considered indigent: food stamps; Medicaid; Temporary Assistance for Needy Families; public housing; or Supplemental Security Income. The judge does not consider whether the defendant has posted bail.

> **Commendation:** The county court's misdemeanor indigence determination standards, as stated in its indigent defense plan, meet relevant statutory requirements.

**Local Indigent Defense Plan Compared to Juvenile Statutory Provisions**

- ☑ Detail procedures used to determine whether a child's parent(s) or other person(s) responsible for child's support are indigent.[16]
- ☑ State financial standard(s) to determine whether a child's parent(s) or other person(s) responsible for child's support are indigent.[17]
- ☑ List factors courts will consider when determining whether a child's parent(s) or other person(s) responsible for child's support are indigent.[18]

**Jurisdiction's Plan**

According to the County's juvenile indigent defense plan (see Appendix C), all juveniles charged by petition are presumed to be indigent unless the state pleads and proves otherwise. The financial standard of indigence looks to persons responsible for the support of the juvenile and considers them indigent if they have an income less than 100% of the Federal Poverty Guidelines. Persons receiving food stamps, Medicaid, Temporary Assistance for Needy Families, Supplemental Security Income, or public housing are also considered indigent.

> **Commendation:** The county court's juvenile indigence determination standards, as stated in its indigent defense plan, meet relevant statutory requirements.

---

[16] Tex. Fam. Code § 51.102(b)(1). Tex. Code Crim. Proc. art. 26.04(l)-(r).

[17] Tex. Code Crim. Proc. art. 26.04(l).

[18] Tex. Code Crim. Proc. art. 26.04(m).

# Core Requirement 3.  Establish minimum attorney qualifications.

## Local Practices Compared to Adult Statutory Provisions

☑ Establish objective qualification standards for attorneys to be on an appointment list.[19]
  - Standards must require attorneys to complete at least six hours of continuing legal education pertaining to criminal law during each 12-month reporting period or be currently certified in criminal law by the Texas Board of Legal Specialization.[20]

☑ Attorneys must be approved by a majority of the judges who established the appointment list to be placed on the appointment list.[21]

## Jurisdiction's Process (Felony Courts):

The district court uses a contract defender to provide representation for indigent felony defendants. If there is a conflict of interest, the case is assigned to one of the attorneys who applied to be on the appointment list.

The monitor found that the felony court appeared to have procedures for managing the attorney appointment list and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plans.

> **Commendation:** The district court has procedures for managing the attorney appointment list for felony cases and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plan.

## Misdemeanor Courts

The county court uses the Caprock Public Defender Office to provide representation for indigent misdemeanor defendants. If there is a conflict of interest, the case is assigned to one of the attorneys who applied to be on the appointment list.

The monitor found that the misdemeanor court appeared to have procedures for managing the attorney appointment list and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plans.

> **Commendation:** The county court has procedures for managing the attorney appointment list for misdemeanor cases and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plan.

---

[19] Tex. Code Crim. Proc. art. 26.04(d).

[20] 1 TAC §§174.1-174.4.

[21] Tex. Code Crim. Proc. art. 26.04(d). The monitor did not examine actual attorney applications to be on the appointment list. The box is checked because the courts clearly had appointment lists that they followed.

**Local Practices Compared to Juvenile Statutory Provisions**

☑ Establish objective qualification standards for attorneys for three levels of conduct.[22]
- Conduct indicating a need for supervision or delinquent conduct (no TYC possible);
- Delinquent conduct (TYC possible); and
- Determinate sentence or discretionary transfer to criminal court proceedings have been initiated.

☑ Standards must require attorneys to complete at least six hours of continuing legal education pertaining to juvenile law during each 12-month reporting period or be currently certified in juvenile law by the Texas Board of Legal Specialization.[23]

☑ Attorneys must be approved by a majority of the Juvenile Board or judges on the Juvenile Board to be placed on or removed from the appointment list.[24]

**Jurisdiction's Process (Juvenile Courts):**

The county court uses two attorneys to provide representation for juvenile defendants. The monitor found that the juvenile court appeared to have procedures for managing the attorney appointment list and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plans.

> **Commendation:** The county court has procedures for managing the attorney appointment list for juvenile cases and for ensuring that all attorneys on the list met their annual CLE requirements as described in the indigent defense plan.

---

[22] Tex. Fam. Code § 51.102(a),(b)(2).

[23] 1 TAC §§174.1-174.4.

[24] Tex. Fam. Code § 51.102(a), Tex. Code Crim. Proc. art. 26.04(d). The monitor did not examine actual attorney applications to be on the appointment list. The box is checked because the courts clearly had appointment lists that they followed.

# Core Requirement 4. Appoint counsel promptly.

## Local Practices Compared to Adult Statutory Provisions

☐ Incarcerated persons: After receipt of a request for counsel, counsel must be appointed within one working day in counties with a population of 250,000 or more and within three working days in counties under 250,000.[25]

☐ Persons out of custody: Counsel must be appointed at the defendant's first court appearance or when adversarial judicial proceedings are initiated, whichever comes first.[26]

☐ All unrepresented defendants must be advised of the right to counsel and the procedures for obtaining counsel.[27]

## Jurisdiction's Process
### Felony Appointments:

The monitor examined 32 felony cases that were filed in FY2012 to determine the timeliness of felony appointments. Of these 32 cases, 22 were initially represented by appointed counsel, nine by retained counsel, and one was pro se.[28] The monitor could ascertain the timeliness of indigence determinations in seventeen of the 32 cases.[29] In those cases where the monitor could ascertain the timeliness of determinations of indigence, the monitor found that four of the cases had determinations of indigence made within the FDA guidelines (three working days plus 24 hours allowed in transmitting the request for counsel). This percent of timely indigence determinations (24% timely) falls outside of the Commission's threshold for presuming that a jurisdiction's processes are timely. The sample size used for this determination is small. If the jurisdiction wishes the monitor to re-examine this issue with a larger sample size, the monitor is willing to go back to the jurisdiction at a later date and attempt to obtain a larger sample size. See the following table for a summary of the timeliness of determinations of indigence found in the monitor's sample.

**Table 3: Times to Indigence Determination in Felony Cases**

| Gaines Felony Appointment Sample Data | Sample Size | Number from sample | Percent |
|---|---|---|---|
| Number of Indigence Determinations Examined | 17 | | |
| Appointment / Denial of Indigence Occurred in: | | | |
|    0 work days | | 1 | 5.9% |
|    1 work day + 24 hour transfer | | 0 | 0% |
|    2 work days + 24 hour transfer | | 1 | 5.9% |
|    3 work days + 24 hour transfer | | 2 | 11.8% |
| **Timely determinations of indigence** | | **4** | **23.5%** |
| Untimely determinations of indigence | | 13 | 76.5.0% |

---

[25] Tex. Code Crim. Proc. art. 1.051(c). This box is not checked because the monitor's sample of appointments was less than 90% timely.

[26] Tex. Code Crim. Proc. art. 1.051(j). *Rothgery v. Gillespie County*, 554 U.S. 191 (2008). This box is not checked because the monitor's sample of appointments was less than 90% timely.

[27] Tex. Code Crim. Proc. art. 1.051(f-2). This box is not checked because the procedures examined did not meet the requirements of Article 1.051.

[28] The pro se was dismissed.

[29] Some cases from the sample involved the appointment of counsel, but the monitor was unable to obtain a matching Article 15.17 warning form that indicated whether counsel was requested at the hearing.

Of the thirteen sample cases that were not timely, eight determinations of indigence were made between four and six working days after request (with an allowance of 24 hours to transmit the requests). One request was ruled upon nine working days after request; another at sixteen working days; two were ruled upon more than twenty working days after the request; and one file had a request with no determination of indigence. One possible reason for many of the late appointments involves the procedures for transferring the requests to the district judge. According to Gaines County jail personnel, forms for requesting counsel are not completed at the time of magistrate warnings but at a later time. The forms are then sent by US Postal Service to the district judge. These steps likely cause delays so that by the time the district judge receives a request, the determination of indigence is already due.

> **Recommendation 3:** Gaines County and the 106th District Court must implement procedures to ensure that determinations of indigence in felony cases fall within the time frames set by the FDA.

**Misdemeanor Appointments:**

The monitor examined 120 misdemeanor cases that were filed in FY2012 to determine the timeliness of misdemeanor appointments. Of these 120 cases, eight[30] were initially represented by appointed counsel, seventeen by retained counsel, and 95 were pro se.[31] The monitor could ascertain the timeliness of indigence determinations in fifteen of the cases that were examined. In those cases where the monitor could ascertain the timeliness of determinations of indigence, the monitor found that four of the cases had determinations of indigence made within the FDA guidelines (three working days plus 24 hours allowed in transmitting the request for counsel). This 27% percent of timely indigence determinations falls outside of the Commission's 90% threshold for presuming that a jurisdiction's processes are timely. The sample size used for this analysis was small. If the jurisdiction wishes the monitor to re-examine this issue with a larger sample size, the monitor is willing to go back to the jurisdiction at a later date and attempt to obtain a larger sample size. See the following table for a summary of the timeliness of determinations of indigence found in the monitor's sample.

**Table 4: Times to Indigence Determination in Misdemeanor Cases[32]**

| Gaines Misdemeanor Appointment Sample Data | Sample Size | Number from sample | Percent |
|---|---|---|---|
| Number of Indigence Determinations Examined | 15 | | |
| Appointment / Denial of Indigence Occurred in: | | | |
| 0 work days | | 2 | 13.3% |
| 1 work day + 24 hour transfer | | 1 | 6.7% |
| 2 work days + 24 hour transfer | | 0 | 0% |
| 3 work days + 24 hour transfer | | 1 | 6.7% |
| **Timely determinations of indigence** | | **4** | **26.7%** |
| Untimely determinations of indigence | | 11 | 73.3% |

---

[30] The sample in Table 4 does not include three instances in which counsel was appointed, but the monitor could not determine the time from request until appointment.

[31] Of the 95 pro se cases, 22 were dismissed (12 for paying restitution on theft cases) and 34 were still active.

[32] These determinations of indigence included five appointments of counsel and ten instances in which there were no rulings on the request for counsel.

Of the eleven sample cases that were not timely, ten cases involved a request for counsel with no ruling on the request. One request was ruled upon six working days after request.

> **Recommendation 4:** Gaines County must implement procedures to ensure timely determinations of indigence in misdemeanor cases. In particular, the court must rule upon all requests for counsel.

**Other Findings from Misdemeanor Case Files:**

Of the 120 misdemeanor case files examined, four involved instances where an arrestee requested counsel, but in which there was no determination of indigence listed in the case file, and where the defendant pled to either probation or a term of confinement. Article 1.051(f-1) of the Code of Criminal Procedure disallows communications between the attorney representing the state and persons with pending requests for counsel. Article 1.051(f-1) states:

*… the attorney representing the state may not:*
>*(2) communicate with a defendant who has requested the appointment of counsel, unless the court or the court's designee authorized under Article 26.04 to appoint counsel for indigent defendants in the county has denied the request and, subsequent to the denial, the defendant:*
>>*(A) has been given a reasonable opportunity to retain and has failed to retain private counsel; or*
>>*(B) waives or has waived the opportunity to retain private counsel.*

The fact that four persons agreed to pleas while having pending requests for counsel is an indication that Gaines County does not have procedures in place that prevent a defendant with a pending request for counsel from communicating with the prosecutor.

In the review of case files, the monitor noticed that waivers of counsel were part of the plea packet. The fact that a waiver was part of the plea packet is an indication that the plea agreement occurred prior to the waiver. Under Article 1.051(f-1) of the Code of Criminal Procedure:

*In any adversary judicial proceeding that may result in punishment by confinement, the attorney representing the state may not:*
>*(1) initiate or encourage an attempt to obtain from a defendant who is not represented by counsel a waiver of the right to counsel; …*

Article 1.051(g) of the Code of Criminal Procedure further states:

*(g) If a defendant wishes to waive the right to counsel for purposes of entering a guilty plea or proceeding to trial, the court shall advise the defendant of the nature of the charges against the defendant and, if the defendant is proceeding to trial, the dangers and disadvantages of self-representation. If the court determines that the waiver is voluntarily and intelligently made, the court shall provide the defendant with a statement substantially in the following form, which, if signed by the defendant, shall be filed with and become part of the record of the proceedings:*
*"I have been advised this _____ day of _____, 2___, by the (name of court) Court of my right to representation by counsel in the case pending against me. I have been further advised that if I am unable to afford counsel, one will be appointed for me free of charge. Understanding my right to have counsel appointed for me free of charge if I am not financially able to employ counsel, I wish to waive that right and request the court to proceed with my case without an attorney being appointed for me. I hereby waive my right to counsel. (signature of defendant)"*

The current procedures do not seem to allow the court to determine if the waiver is voluntarily and intelligently made prior to the pro se plea agreement. Rather, the waivers appear to be initiated by the prosecutor.

> **Recommendation 5:** Gaines County must implement procedures to ensure that the court rules upon requests for counsel prior to granting any waiver of counsel. The procedure must provide that the court may not direct or encourage the defendant to communicate with the attorney representing the state until the court advises of the right to counsel and explains the process for requesting counsel. Article 1.051(f-1)(1), Code of Criminal Procedure prohibits an attorney representing the state from initiating or encouraging a waiver of counsel from an unrepresented defendant.

In the examination of misdemeanor case files, the monitor also found one case that included a pro se plea with no waiver of counsel. Article 1.051(f) of the Code of Criminal Procedure states:

> *A defendant may voluntarily and intelligently waive in writing the right to counsel. A waiver obtained in violation of Subsection (f-1) or (f-2) is presumed invalid.*

> **Recommendation 6:** Pro se pleas must include written waivers of counsel as required by Article 1.051(f), Code of Criminal Procedure.

**Other Areas of Concern:**
Four case files included waivers of arraignment signed by an attorney acting as bondsman. In three of these four cases, the defendants went on to plead pro se. There were no withdrawals of counsel by the attorney acting as bondsman in any of these four cases. Another case file included a waiver of counsel where the defendant was represented by retained counsel. The fact that a defendant had retained counsel and signed the waiver shows a lack of knowledge or inattentiveness.

**Observations of a Misdemeanor Arraignment Docket:**
The monitor observed a misdemeanor arraignment docket. At this docket, the county judge made a roll call. The judge announced that he would leave the room, and noted that defendants without an attorney should speak to the prosecutor to see if they could work out a deal. He said that he would later return to dispose cases in which a deal had been worked out. The judge did not explain the procedures for requesting counsel. The judge then left the room and returned to dispose cases in which a plea had been arranged. Article 1.051(f-2) of the Code of Criminal Procedure states:

> *In any adversary judicial proceeding that may result in punishment by confinement, the court may not direct or encourage the defendant to communicate with the attorney representing the state until the court advises the defendant of the right to counsel and the procedure for requesting appointed counsel and the defendant has been given a reasonable opportunity to request appointed counsel. If the defendant has requested appointed counsel, the court may not direct or encourage the defendant to communicate with the attorney representing the state unless the court or the court's designee authorized under Article 26.04 to appoint counsel for indigent defendants in the county has denied the request and, subsequent to the denial, the defendant:*
> > *(1) has been given a reasonable opportunity to retain and has failed to retain private counsel; or*
> > *(2) waives or has waived the opportunity to retain private counsel.*

Based upon the monitor's observations, Gaines County is not following its indigent defense plan that states:

19

*The court may not direct or encourage the defendant to communicate with the attorney representing the state until the court advises the defendant of the right to counsel and the procedure for requesting appointed counsel and the defendant has been given a reasonable opportunity to request appointed counsel.*

The indigent defense plan and Article 1.051(f-2) require that procedures for requesting counsel be explained to all unrepresented defendants prior to any communications with the prosecutor.

**Recommendation 7:** The county court must follow the procedures set in its indigent defense plan and in Article 1.051(f-2) and explain the procedures for requesting counsel to defendants appearing in court without counsel.

To briefly summarize the waiver of counsel requirements in Article 1.051, the court must explain the procedures for requesting counsel to all defendants appearing in court without counsel. The court must rule on all requests for counsel, including those requests made prior to the hearing. There can be no communication between the prosecutor and the defendant until the first two conditions have been completed. After the defendant waives counsel, the prosecutor may communicate with the defendant.

**Local Practices Compared to Juvenile Statutory Provisions**

☑ If the child was not represented by an attorney at the detention hearing and a determination was made to detain the child, the child shall be immediately entitled to representation by an attorney.[33]

☑ If the child was not detained, an attorney must be appointed on or before the fifth working day after the date the petition for adjudication, motion to modify, or discretionary transfer hearing was served on the child.[34]

**Juvenile Appointments:**

**Figure 2: Statutory Attorney Appointment Timeline for Juveniles**

(relevant Texas Family Code references are listed in parentheses)

**In-custody Timeline**



**Out-of-custody Timeline**

---

[33] Tex. Fam. Code § 51.10(c).

[34] Tex. Fam. Code § 51.101(d).

21

The monitor examined the timeliness of indigence determinations in instances when the juvenile was detained and in instances when a petition was served on the juvenile. To ascertain the timeliness of local processes, the monitor examined three disposed juvenile case files from FY2012 (October 2011 – September 2012). This low number of cases reviewed is a reflection of the low number of cases filed in Gaines County.

## Juvenile Detention Hearings

Under Section 51.10 of the Family Code, a detention hearing may be conducted without the presence of an attorney. However, if there is a decision to detain the juvenile, Section 51.10(c) requires either an order to retain counsel or an immediate appointment of counsel. If no attorney was present for the hearing, the attorney who is subsequently appointed or retained may request a de novo hearing under Section 54.01(n) of the Family Code.

Of the three juvenile case files that the monitor examined, two cases contained at least one detention hearing with a decision to detain the juvenile. In both of these cases, counsel was present for all detention hearings. The county judge noted that counsel is always present at detention hearings.

**Commendation:** Gaines County's practice of ensuring that counsel is present at all juvenile detention hearings meets the requirements set in Section 51.10 of the Family Code.

## Petitions Served on the Juvenile

Under Section 51.101(c) and (d) of the Family Code, once a petition is served on the juvenile, the court has five working days to appoint counsel for the juvenile. Of the three juvenile cases examined by the monitor, all had counsel appointed by the fifth working day after the juvenile was served with a petition.

**Commendation:** Gaines County's appointment practices in instances when a juvenile is served with a petition meet the requirements of Section 51.101 of the Family Code.

# Core Requirement 5. Institute a fair, neutral, and non-discriminatory attorney selection process.

## Local Practices Compared to Adult and Juvenile Statutory Provisions

☑ Rotational method: The court must appoint an attorney from among the next five names on the appointment list in the order in which the attorneys' names appear on the list, unless the court makes a finding of good cause on the record for appointing an attorney out of order.[35]

☑ Public Defender: The system must meet the requirements set out in Article 26.044 of the Code of Criminal Procedure. The appointment process must be listed in the indigent defense plan.[36]

☑ Alternative appointment method:[37]
- The local processes must be established by vote of two-thirds of the judges.
- The plan must be approved by presiding judge of administrative judicial region.
- The courts must allocate appointments reasonably and impartially among qualified attorneys.

☑ For a contract defender program, the county must meet contract defender standards.[38]

Gaines County utilizes both a felony contract defender and a misdemeanor public defender office. The utilization of these appointment systems means that the fairness of the selection process is not measured by an examination of the distribution of appointments. For the contract defender, the fairness of the system is measured according to whether the contents of the contract meet the Commission's contract defender rules and whether the implementation of the contract meets the contract terms and relevant statutory requirements. For the public defender, the fairness of the system is measured according to whether the office meets relevant statutory requirements and its own written procedures. The analysis covering both the contract defender and the public defender delves into budgets and payment systems. This analysis is covered entirely in Core Requirement 5 rather than in Core Requirement 6 (which deals with payment systems).

## Jurisdiction's Process
**Felonies:**

Appointments of counsel in felony cases are made under a contract with a defense attorney who represents defendants in the counties of the 106th District Court. If a conflict of interest exists in representing a felony defendant, alternative counsel is appointed from the felony appointment list.

The Commission has established contract defender rules found in Title 1, Rules 174.10 – 174.25 of the Texas Administrative Code. The felony contract is listed in Appendix D. In the analysis that follows, the monitor makes two types of comparisons: (1) a comparison between the contents of the contract and the requirements set in the contract defender rules and (2) a comparison between the implementation of the contract and either the contract defender rules or the terms of the contract.

---

[35] Tex. Code Crim. Proc. art. 26.04(a). Only one of the boxes in this section needs to be checked to meet statutory requirements.

[36] Tex. Code Crim. Proc. art. 26.044.

[37] Tex. Code Crim. Proc. art. 26.04(g)-(h).

[38] 1 TAC §§174.10-174.25.

## Comparison of the Contract with Contract Defender Rules

**Solicitation Process**

The Commission's rules regarding the contract solicitation process are set in 1 TAC §§ 174.12 - 174.15. These rules require that there be a notification of the opportunity to apply, an opportunity to respond, and an application. The application is to be reviewed by the appointing authority and the following factors are to be considered: (1) experience and qualifications of the applicant; (2) applicant's past performance in representing defendants in criminal cases; (3) applicant's disciplinary history with the state bar; (4) applicant's ability to comply with the terms of the contract; and (5) cost of the services under the contract. The contracting authority can only enter into the contract if the contract complies with the Commission's contract standards and all applicable laws governing professional service contracts entered into by counties. The contract is not to be awarded solely on the basis of cost.

The notification of an opportunity to apply to be the felony contract attorney is part of the district court's indigent defense plan (see the end of Appendix A). According to an interview with the auditor's office, the current holder of the contract is the only person to ever apply for the contract. This solicitation process meets the Commission's administrative requirements.

> **Commendation:** The contract solicitation process meets the Commission's requirements as set in 1 TAC §§ 174.12 - 174.15.

**Parties**

The contract identifies the appointing authority, contracting authority, and contractor. The contract states:

> *The county of Gaines ("COUNTY") and The Law Offices of Arthur Aguilar, Jr. ("ATTORNEY") are the parties to this agreement. The District Judge of the 106th Judicial District ("DISTRICT JUDGE") is the appointing authority approving ATTORNEY to represent indigent criminal defendants in COUNTY. This agreement establishes conditions under which ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY.*

This language meets the requirement of 1 TAC § 174.15.

**Term of Contract**

The contract specifies the term of the contract, including a provision for extension and a provision for terminating early. The contract states:

> *This agreement shall commence on January 1, 2013 and shall terminate December 31, 2013, unless terminated earlier by either party. The parties shall have an option to renew the contract for additional years, and prior to October 1, 2013, the parties will revisit the contract to consider any desired modifications to the terms and conditions of this contract.*

This language meets the requirement of 1 TAC § 174.16.

**Scope of Contract**

The contract specifies the category of cases in which the contractor is to provide services. The contract states:

> *ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only. Under this contract, a felony will be considered to be any criminal offense that carries a possible punishment of confinement in excess of one year or that is classified as a*

24

*State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE. ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed. Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106th Judicial District. However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code. Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case.*

This language meets the requirement of 1 TAC § 174.17.

## Minimum Attorney Qualifications

The contract references the minimum attorney qualifications and their maintenance by noting the requirements of the Texas Fair Defense Act and the 106th Judicial District's Local Plan. The contract states:

*ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract in accordance with the Texas Fair Defense Act, the ABA's recommended caseload limitations, and pursuant to the provisions of the 106th Judicial District's Local Plan to Implement the Texas Fair Defense Act, **including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List.***

The Fair Defense Act requires that attorneys receive at least six criminal CLE hours annually to receive criminal appointments. The 106th District's Local Plan requires at least ten criminal CLE hours annually. This language meets the requirement of 1 TAC § 174.18. The monitor reviewed the criminal CLE hours of the contract attorney and found that they exceeded the contract requirements.

---

**Commendation:** The contract attorney met and exceeded the annual criminal CLE requirements set in the contract.

---

## Duration of Representation

The contract references the Fair Defense Act and asserts, "Attorney shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed." This assertion implies that the attorney will represent clients from appointment through case disposition at the trial level and then on appeal afterwards. The relevant contract provisions state:

*ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract **in accordance with the Texas Fair Defense Act**, the ABA's recommended caseload limitations, and pursuant to the provisions of the 106th Judicial District's Local Plan to Implement the Texas Fair Defense Act, including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List.*

***ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only**. Under this contract, a felony will be considered to be any criminal*

*offense that carries a possible punishment of confinement in excess of one year or that is classified as a State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE.* **ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed.** *Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106th Judicial District.* **However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code.** *Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case.*

This language meets the requirement of 1 TAC § 174.19.

In the monitor's review of case files, the monitor saw that the contract attorney represented defendants for the duration of the case unless there was a conflict of interest or the defendant retained counsel.

---

**Commendation:** Based upon the monitor's review of case files, the contract defender's duration of representation meets the requirements set in the contract and which are established under Article 26.04(j)(2) of the Code of Criminal Procedure.

---

**Substitution of Attorneys**

The contract identifies the attorney who will perform legal representation and prohibits substitution without prior approval by the appointing authority. The contract states:

*ATTORNEY may employ an associate attorney(s) to assist in representing defendants under this contract with the prior consent and approval of DISTRICT JUDGE, but only at ATTORNEY's sole expense. ATTORNEY shall not assign its entire rights under this contract or delegate the entire performance of its duties under this contract.*

This language meets the requirement of 1 TAC § 174.20.

26

**Caseload Limitations**

The contract refers to the ABA's recommended caseload limitations.[39] Under this limitation, the contract attorney cannot exceed a combination of cases that would be equivalent to 150 felony cases, 400 misdemeanor cases, 200 juvenile cases, or 25 appeals cases. The contract states the following:

> *ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract in accordance with the Texas Fair Defense Act, **the ABA's recommended caseload limitations**, and pursuant to the provisions of the 106th Judicial District's Local Plan to Implement the Texas Fair Defense Act, including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List.*

This language meets the requirement of 1 TAC § 174.21.

The monitor asked the contract attorney for the total number of cases to which he had been appointed in FY2012. The contract attorney reported that he had been appointed to 254 felony cases and two appeals cases across the four counties involved in the contract. In the monitor's visit with the contract attorney, the attorney noted that the contract represents about 60% of his total work. Based on the recommended caseload limitations set in the contract, if the contract attorney did no extra work outside of the contract, the attorney would be limited to 150 felony appointments per year. The 254 felony appointments and two appeals appointments are equivalent to 1.77 attorneys working at the maximum caseload recommendations. If the contract attorney's assessment that the contract comprises about 60% of his annual workload is accurate, 2.95 attorneys would be required to handle this annual workload. This caseload exceeds the limit set by the contract.

---

[39]The *American Bar Association Ten Principles of a Public Defense Delivery System* (2002), Principle 5 states: "National caseload standards should in no event be exceeded". This quote has a footnote referencing the standards adopted by the National Advisory Commission on Criminal Justice Standards and Goals (NAC). Principle 5 then says that the concept of workload is a more accurate measurement.

In 1973, NAC published maximum standard caseloads for public defenders, which are detailed in the following table.

**Table 6: NAC Caseload Standards**

| Type of Case | Maximum caseload |
|---|---|
| Felonies | 150 |
| Misdemeanors | 400 |
| Juvenile | 200 |
| Mental Health Act | 200 |
| Appeals | 25 |

The NAC caseload standards represent the maximum number of cases for each category that are recommended to be handled by a single attorney in a twelve month period. Caseloads given for each category represent the recommended maximum for an attorney handling only cases in that category. For example, on average, an attorney who handles only felonies should not be assigned more than 150 felony cases annually. When an attorney handles a mixed caseload, the standard should be applied proportionally. For example, an attorney who is given 120 felonies annually is working at 80 percent of the caseload maximum and could not be assigned more than 80 misdemeanors (or 20% of the misdemeanor maximum).

The NAC standards are a good starting point in assessing caseloads but should not be accepted as universal standards. They may not account for administrative work, travel time, or other professional requirements that reduce the time an attorney can spend on cases. They also are limited by the differences in work required by cases within a category. For example a case involving felony homicide may require significantly more work than a burglary case.

**Recommendation 8:** The parties to the contract for felony defense services must follow the terms of the contract according to the contract's caseload limitations. Excessive caseloads could compromise the quality of representation provided for indigent clients.

## Standards of Representation

The contract requires the attorney to devote time, attention, and energies to the performance of duties under the contract. The contract states:

> ***ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract in accordance with the Texas Fair Defense Act, the ABA's recommended caseload limitations, and pursuant to the provisions of the 106th Judicial District's Local Plan to Implement the Texas Fair Defense Ac***t, *including but not limited to the qualifications set out in the Application/Affidavit for the 106th Judicial District Court Attorney Appointment List.*

This language meets the requirement of 1 TAC § 174.22.

## Conflicts of Interest

The contract requires the attorney to notify the court and to file a motion to withdraw if the attorney has a conflict in representing the defendant. The contract states:

> *ATTORNEY will notify the office of DISTRICT JUDGE as soon as ATTORNEY is aware of ethical conflicts between indigent defendants and will file a Motion to Withdraw and be responsible to set the case for a hearing regarding the ethical conflict for consideration if deemed necessary by the Court.*

This language meets the requirement of 1 TAC § 174.23.

In the monitor's review of case files, the monitor examined several instances where the contract attorney withdrew because of a conflict of interest.

**Commendation:** The contract defender appeared to follow the requirements of the contract by filing a motion to withdraw whenever a conflict of interest arose.

## Investigation and Experts

The contract states that investigative or expert witness expenses can be incurred and reimbursed if prior approval is obtained. The expenses can be incurred and reimbursed without prior approval, but only if the expenses are necessarily and reasonably incurred. The contract states the following:

> *ATTORNEY will obtain prior approval of expenses for investigation and for experts by filing a motion in the 106th Judicial District Court, stating the need for such assistance and the estimated expense. Investigative or expert expenses incurred with prior court approval shall be reimbursed as provided in the order granting approval. Investigative or expert expenses incurred without prior approval shall be reimbursed only if necessarily and reasonably incurred. ATTORNEY will arrange for interpreters when the need exists. Expenses for interpreters shall be paid by COUNTY after approval by DISTRICT JUDGE.*

This language meets the requirement of 1 TAC § 174.24.

**Compensation and Payment Processes**

The contract sets annual amounts for the contract, itemized by county, to be paid on a monthly basis. Under the contract, the attorney is required to represent all defendants assigned during the term of the contract until the cases are disposed. The contract states the following:

*The parties agree that if this contract covered the legal representation for indigent criminal defendants in all four counties of the 106th Judicial District, the total consideration for legal representation at the trial court level would be $66,000 for the calendar year 2013.*

*The consideration for legal representation at the trial court level under this contract between COUNTY and ATTORNEY is COUNTY's pro rata portion of $66,000.00, payable in monthly installments, based on indigent defense provided under the 2011 Contract for Indigent Defense in each of the four counties of the 106th Judicial District. COUNTY agrees to pay ATTORNEY for services at the trial court level a monthly amount for COUNTY's pro rata share as follows:*

| | | |
|---|---|---|
| *Dawson County* | *$ 21,997.80 annually* | *$ 1,833.15 monthly* |
| *Gaines County* | *$ 29,554.80 annually* | *$ 2,462.90 monthly* |
| *Garza County* | *$ 10,177.20 annually* | *$ 848.10 monthly* |
| *Lynn County* | *$ 4,270.20 annually* | *$ 355.85 monthly* |

*The above amount is the total consideration to be paid by COUNTY for legal representation of indigent criminal defendants at the trial court level for all cases opened during the term of this contract, and ATTORNEY shall furnish at his own cost all equipment, travel, office space, office supplies, secretaries, salaries of any kind, and any and all other trial court expenses except as provided otherwise in this contract.*

*In consideration for ATTORNEY's appellate representation of COUNTY's indigent criminal defendants under this contract, COUNTY agrees to pay additional ATTORNEY's fees for legal services at the rate accepted in this area for such services and approved by DISTRICT JUDGE. If ATTORNEY is required to travel to the appellate court for representation under this contract, COUNTY agrees to pay ATTORNEY's actual expenses for lodging and mileage at the prevailing state rate after approval by DISTRICT JUDGE.*

*COUNTY shall not be obligated for any other additional amount or expenses unless specifically designated in this agreement or required by law, detailed in the Request to Pay Counsel, and approved by DISTRICT JUDGE.*

This language meets the requirement of 1 TAC § 174.25.

This subsection of the Texas Administrative Code (1 TAC § 174.25) requires the following:

*The contract shall state that the contractor shall be required to submit an itemized fee voucher. The voucher must be approved by a member of the appointing authority prior to being forwarded to the county financial officer for approval and payment.*

Article 26.05(c) of the Code of Criminal Procedure contains this same requirement:

*No payment shall be made under this article until the form for itemizing the services performed is submitted to the judge presiding over the proceedings or, if the county operates a managed assigned counsel program under Article 26.047, to the director of the program, and until the judge or director, as applicable, approves the payment. If the judge or director disapproves the requested amount of payment, the judge or director shall make written findings stating the*

*amount of payment that the judge or director approves and each reason for approving an amount different from the requested amount.*

According to an interview with the Gaines County Auditor, the auditor did not receive monthly itemized fee vouchers from the contract defender. It did not appear that local procedures required the itemized fee voucher to be submitted prior to issuing payment to the contractor.

---

**Recommendation 9:** The County must ensure that procedures are in place to meet the requirements of 1 TAC § 174.25 and Article 26.05(c) so that itemized fee vouchers are submitted and approved by the appointing authority prior to payment by the financial officer.

---

**Commendation:** The contract for felony defense services meets all of the Commission's requirements set in 1 TAC §§ 174.10 - 174.25.

---

**Misdemeanors:**

Appointments of counsel in misdemeanor cases are made to a regional public defender office based at Texas Tech University. If a conflict of interest exists in representing a misdemeanor defendant, alternative counsel is appointed from the misdemeanor appointment list.

The public defender office was created pursuant to Article 26.044 of the Code of Criminal Procedure. Under Article 26.044(c-1), a public defender office operated by a governmental entity must include a written plan (see Appendix E) that contains:

(1) a budget for the public defender's office, including salaries;
(2) a description of each personnel position, including the chief public defender position;
(3) the maximum allowable caseloads for each attorney employed by the public defender's office;
(4) provisions for personnel training;
(5) a description of anticipated overhead costs for the public defender's office;
(6) policies regarding the use of licensed investigators and expert witnesses by the public defender's office; and
(7) a policy to ensure that the chief public defender and other attorneys employed by the public defender's office do not provide representation to a defendant if doing so would create a conflict of interest that has not been waived by the client.

## Comparison of the Public Defender's Written Procedures with Article 26.044

**Budget**

The public defender budget for FY2013 was listed as $472,000. Of this total, the amount dedicated to salaries was $252,995.76. See below for a breakdown between the state portion of the budget and the counties' portion. For FY2013, the state pays 80% of total costs and the counties pay 20%.

| | |
|---|---|
| Direct Costs | $ 383,000 |
| Indirect Costs | $ 15,000 |
| Total Contract | $ 398,000 |
| | |
| County pays 20% | $ 79,600 |
| | |
| TIDC: | |
| FY2012 Carry-over | $ 30,000 |
| TIDC FY2013 contrib. | $ 288,400 |
| TIDC pays 80% | $ 318,400 |
| | |
| Tech's Carry-over | $ 74,000 |
| Total Budget FY2013 | $ 383,000 |
| Indirect Costs | $ 15,000 |
| Budget FY2013 | $ 472,000 |

**Description of Personnel Positions**

The public defender office manual includes positions for a chief defender, a first assistant defender, an assistant defender, a chief investigator, and an administrative assistant. Each of these positions is described in the manual. As of April 2013, the office staff only contained three persons (a chief defender, an assistant defender, and an administrative assistant).

**Maximum Allowable Caseloads for Each Attorney**

The public defender office references the same NAC caseload standards used for the contract defender (although this is referenced in different words):

> *Office Caseload standards (Developed through reference to other case management standards used by public defender and legal aid offices, including the National Legal Aid and Defender Association {NLADA}. These standards may be reevaluated later based upon actual experience by the Caprock Regional Public Defender Office.)*

The contract further disallows defenders from engaging in the private practice of criminal law. In fact, special approval must be obtained before any outside employment or self-employment can be undertaken. The caseloads for each attorney are set below.

> *Chief Public Defender Caseload*
> *Initially, with one attorney handling just misdemeanors and juveniles, considering the statewide average of 35% appointments for cases added and the region's four year average of 1261 misdemeanors and 38 juveniles added each year, should juvenile appointments rise to 200% of juvenile cases added (76 cases), this would allow the Chief Public Defender to handle a total of 248 misdemeanor cases. At the statewide 35% appointment rate (441 misdemeanors), this would result in 193 defendants that would have to receive appointment of counsel from the traditional appointment wheel until the Assistant Public Defender is hired in April, 2011. However, timing should bring the Assistant Public Defender onboard at about the right time to lessen the effect of*

*the Chief Public Defender reaching his maximum caseload. Until the Fall, 2011, the Chief Public Defender will not have duties associated with instruction or supervision of student attorneys. At that time, the Chief Public Defender's caseload should drop to a total of 56 juvenile cases and 228 misdemeanors.*

*Assistant Public Defender*
*As the Assistant Public Defender will be hired in April, 2011, this would open up an additional 400 misdemeanor appointments, assuming juvenile appointments do not exceed double the 4 year average.*

For FY2012, the regional public defender reported receiving: 258 misdemeanor cases; 3 felony cases; 23 juvenile cases; and 2 appeals cases. During the fiscal year, the chief worked all twelve months of the year and had teaching duties (limiting his capacity to 85% of national standards), and the first assistant worked nine months of the year. In other words, the office worked at 54% of its maximum caseload capacity.

---

**Commendation:** The public defender's caseload falls within the maximum thresholds set in its office manual (and in line with national standards). Keeping caseloads below this cap allows for zealous and effective representation of indigent clients.

---

**Training Provisions**

The office manual requires all attorneys to receive at least ten criminal law CLE hours annually. The manual specifically mentions that the office will pay for attorneys to attend approved seminars. The office uses third-year law students who work under the tutelage of the chief defender. Both the chief and assistant defenders exceeded the annual criminal CLE hours set in the office manual.

---

**Commendation:** Both attorneys in the public defender's office met and exceeded their annual criminal law CLE requirements.

---

**Anticipated Overhead Costs**

The budget includes expenses for anticipated overhead costs. See below for an itemization of these budgeted expenses as well as an inclusion of indirect expenses.

| | |
|---|---|
| Research | $50,000 |
| Travel | $12,000 |
| Materials/Supplies | $8,000 |
| Telecomm Services | $5,200 |
| Repairs/Maintenance | $1,500 |
| Rental | $38,615.24 |
| Printing | $2,000 |
| Other Expenses | $1,700 |
| Dues | $89 |
| Other Services | $2,400 |
| Food/entertainment | $2,000 |
| Other Expenses | $500 |
| Indirect Costs | $15,000 |

**Use of Licensed Investigators and Expert Witnesses**

The office manual references the use of a staff investigator. However, no investigator is on staff. The job description for the chief defender lists one of the duties as, "Seeks from the court any necessary funding for outside experts and investigation in the preparation of a defense."

**Conflict of Interest Policies**

The office manual includes a section covering conflict of interest checks. The manual states that a conflict check is to be conducted on each case early in the appointment process. The office utilizes software that allow for quick and easy conflict checks.

---

**Commendation:** The public defender's operational manual and proposed budget contain all of the elements required by Article 26.044(c-1) of the Code of Criminal Procedure.

---

**Juveniles:**

Appointments of counsel in juvenile cases are made to two attorneys on the juvenile appointment list. The court coordinator noted that she rotates between the two attorneys in making appointments. The monitor did not examine how juvenile cases are distributed between these two attorneys.

# Core Requirement 6.   Promulgate standard attorney fee schedule and payment process.

**Jurisdiction's Process**

The monitor's review of payment processes in Gaines County consisted of an examination of the contract defender payment processes and the budgetary items of the public defender office. These items are covered in the review of Core Requirement 5.

# Statutory Data Reporting

**Local Practices Compared to Statutory Provisions**

☑ The county auditor shall prepare and send to OCA an annual report of legal services provided in the county to indigent defendants during the fiscal year and an analysis of the amount expended:

☑     • In each district, county, statutory county, and appellate court

☑     • In cases for which a private attorney is appointed for an indigent defendant

☑     • In cases for which a public defender is appointed for an indigent defendant

☑     • In cases for which counsel is appointed for an indigent juvenile

☑     • For investigation expenses, expert witnesses expenses, or other litigation expenses.

According to Section 79.036(e) of the Texas Government Code, the county auditor (or other person designated by the commissioners' court) must annually prepare and send indigent defense data to the Commission. This data is to include the total expenses for cases in which an attorney was appointed for an indigent defendant or indigent juvenile in each district court, county court, statutory

county court, and appellate court. The data is to be submitted in the form and manner prescribed by the Commission and is to include an analysis of the amount expended by the county. The auditor's office completed the annual indigent defense expense report in a timely manner.

> **Commendation:** As mandated by Section 79.036 of the Texas Government Code, the Gaines County Auditor's Office completed the annual indigent defense expenditure report.

## County Indigent Defense Plans

The Fair Defense Act (FDA) requires the adoption and publication of written plans for appointment of counsel in criminal and juvenile cases. It also requires the local administrative judges and juvenile board chairman to submit these plans to the Commission no later than November 1 of each odd-numbered year pursuant to Section 79.036, Government Code. This is also a requirement to be eligible to receive grant funds from the new Commission.

> **Commendation:** As mandated by Section 79.036 of the Texas Government Code, Gaines County completed its indigent defense plans that describe the procedures for appointment of counsel in criminal and juvenile cases. All required elements were included in the plans.

## Conclusion

Commission staff appreciated the courtesy and cooperation of Gaines County personnel and officials in conducting this review. Commission staff is available as a resource for the County as it implements the processes described in its indigent defense plans and the recommendations in this report. As mandated by statute, the Commission will continue to monitor the County's progress in implementing the changes required by the report's findings.

## Appendix A – District Court Indigent Defense Plan

# Dawson, Gaines, Garza and Lynn District Courts Plan

## Preamble
*11/17/2009*

In accordance with the Texas Fair Defense Act, the 106th Judicial District Court in Dawson, Gaines, Garza and Lynn Counties adopts the following plan to provide for the appointment of counsel to represent indigent defendants.

This is a separate plan for the 106th Judicial District Court in Dawson, Gaines, Garza and Lynn Counties in addition to the plans filed by each of these counties pertaining to the procedures used in the county courts in those counties.

## Prompt Magistration
*8/4/2010*

Sheriff's Responsibility

The Sheriffs of each of the counties in the 106th Judicial District shall ensure that within 48 hours after arrest, every arrestee shall be brought before a magistrate for a magistrate to set bail and inform the accused person of his/her rights, including right to court appointed counsel if indigent.

Magistrate Responsibilities

The designated judge in each of the counties in the 106th Judicial District shall establish a plan to hold a magistrate's hearing each day.

At the magistrate's hearing the responsible judge shall comply with the Texas Fair Defense Act by:
>    admonishing the accused of the magistrate and Miranda warnings as provided by law;
>    notification of indigent representation rights;
>    making of record of the magistrate warnings and right to court appointed counsel for indigent accused persons;
>    notification of right to counsel and right to court appointed counsel if indigent;
>    inquiry as to whether the defendant is requesting court appointed counsel;
>    provide defendant with a "Request for Appointment of Counsel and Determination of Indigence" and reasonable assistance in completing the form; and immediate referral of applications for appointed counsel to the District Judge for appointment of counsel.

The magistrate shall, within 24 hours, transmit the felony defendant's "Request for Appointment of Counsel and Determination of Indigence" to the District Judge.

## Indigence Determination Standards
*8/4/2010*

Procedures and Financial Standards for Determining Indigence Status

At the magistrate's hearing, each defendant shall be provided an opportunity to request court appointed counsel, if indigent. Each requesting defendant shall complete and file a sworn "Request for Appointment of Counsel and Determination of Indigence", in a form approved by the District Judge. The magistrate will ensure that reasonable assistance in completing the necessary forms for requesting appointment of counsel is provided. If the defendant does not speak and/or understand the English language or is deaf, the magistrate shall inform the person in a manner consistent with Texas Code of Criminal Procedure Articles 38.30 and 38.31.

The District Judge shall review the "Request for Appointment of Counsel and Determination of Indigence" and such other information bearing on the financial status of the defendant and make a determination of indigence status and appoint counsel where required by law within three working days after receiving the request for court appointed counsel.

The District Judge shall consider the following standards for determining indigence and such other reasonable factors as the court finds to have a bearing on the financial inability of a defendant to retain counsel:

Defendant's income from any and all sources;
Sources of the defendant's income;
Assets of the defendant;
Property owned by the defendant, or in which the defendant has an interest;
Outstanding obligations of the defendant;
Necessary expenses of the defendant;
The number and age of the defendant's legal dependents;
Spousal income available to the defendant; and
Such other reasonable factors as determined by the Judge.
The Judge shall not consider whether the defendant has posted bail, except to the extent that it reflects on the defendant's financial circumstances.
Defendants receiving assistance from any of the following sources shall be considered indigent:
Food stamps;
Medicaid;
Temporary assistance for needy families;
Public housing; or
Supplemental security income.

Defendants with annual average income meeting the following maximum requirements shall be considered indigent: up to and including 200% of the Federal poverty guidelines as published in the Federal Register.

The Judge may also appoint counsel in the interest of justice.


## Minimum Attorney Qualifications
*11/17/2009*
Court appointed counsel shall make every reasonable effort to contact the defendant not later than the end of the first working day after appointment and to interview the defendant as soon as practicable.

Court appointed counsel shall comply with all laws, rules, procedures, and ethical provisions for providing reasonable assistance of counsel to the defendant.

Court appointed counsel shall maintain a high standard of ethical conduct and always be completely candid with the trial court.

Court appointed counsel shall timely inform the defendant of matters relating to the preparation, trial, and disposition of the case; appellate and writ rights, deadlines, and procedures for proper processing, and such other matters as necessary to provide reasonable assistance of counsel.

Court appointed counsel shall represent a defendant until the defendant is acquitted, appeals are exhausted, or the court, after entering a finding of good cause on the record, relieves the attorney and/or replaces the attorney with other counsel.

Court appointed counsel shall submit a request for payment for services performed, itemizing the dates services were rendered, a brief description of the services, and the number of hours expended to perform the services, and except for an attorney serving under an Indigent Defense Contract, no payment shall be made until such request is submitted.

Court appointed counsel shall meet the following standards, said attorney shall:

Be a member in good standing with the State Bar of Texas;

Professionally perform duties and responsibilities of a licensed attorney for the State of Texas; and

Complete annually such Continuing Legal Education programs as required by the Texas Judicial Council and requirements of the 106th Judicial District for attorneys representing indigent accused persons, which shall include at least ten (10) hours of Continuing Legal Education in handling criminal cases.

The District Judge may replace an attorney if the appointed attorney does not make an effort to contact the defendant by the end of the first working day or does not interview the defendant as soon as possible, or may sanction said attorney for violation of those provisions. At any time, at the judge's discretion, the District Judge may replace an appointed attorney for incompetency or in the interest of justice.

The District Judge may remove an attorney from consideration for appointments if the attorney intentionally or repeatedly does not fulfill the duties required by law, rules, local rules, or provisions for providing reasonable assistance of counsel or complying with the requirements for inclusion on the approved list for counsel for indigent accused persons.

The District Judge shall annually review and reform the list of eligible court appointed counsel and cause the list to be posted and made available to the public upon request.

## Prompt Appointment of Counsel
*11/17/2009*
Counsel shall be appointed as soon as possible to indigent defendants, but no later than the end of the third working day after the date on which the appointing authority receives the defendant's request for court appointed counsel. Working day means Monday through Friday, excluding official holidays. Counsel must be appointed whether or not a case has been filed in the trial court.

## Attorney Selection Process
*11/17/2009*
The District Judge shall prepare and distribute an "Application/Affidavit" to licensed attorneys practicing in the district who have indicated a desire to be considered for appointment as counsel to indigent accused persons.

Each attorney requesting such appointments shall complete and return the "Application/Affidavit" to the 106th Judicial District Court, P.O. Box 1268, Lamesa, Texas 79331.

The Judge shall approve and post a list of the names of attorneys approved to represent indigent accused persons in the 106th Judicial District Court.

Non-Capital Felony Appointment Procedures and Rules

The District Judge, upon any finding of indigence and request for court appointed counsel, shall sign an "Order Appointing Attorney" and file same with the District Clerk. The staff of the District Judge shall immediately deliver a copy of the "Order Appointing Attorney," by fax, mail, or in person, to the attorney, the defendant, and the District Attorney.

Capital Felony Appointment Procedures and Rules

The District Judge, upon any finding of indigence and request for court appointed counsel, shall sign an "Order Appointing Attorney" from the approved counsel for capital trials list in accordance with Art. 26.052 of the Code of Criminal Procedures, and file same with the District Clerk. The staff of the District Judge shall immediately deliver a copy of the "Order Appointing Attorney," by fax, mail, or in person, to the attorney, the defendant, and the District Attorney.

Alternative Appointment Program

Due to the rural nature of the counties in the 106th Judicial District, the limited number of attorneys available for indigent appointments, and the necessity for appointing attorneys from other counties, the Court shall use an Alternative Appointment Program, as allowed by the Texas Fair Defense Act, structured to allocate appointments among competent independent legal counsel, one or more of whom may be under a contract defender program.

The Court shall maintain a list of attorneys who have specifically requested to be placed on the appointment list, have completed the "Application/Affidavit", and have demonstrated that they meet the requirement for appointments. Attorneys on the list shall be evaluated periodically to assess the quality of legal representation provided to defendants.

The Commissioners Courts of Dawson, Gaines, Garza and Lynn Counties may enter into a contract defender program for the provision of legal services to indigent defendants. Any such indigent defense contract shall be designed to ensure quality legal representation and shall provide for counsel to have access to all the resources necessary to properly defend his client and further provide for the continuity of the defender's services beyond the contract period to ensure the continuity of representation.

Annually, the District Judge will notify each attorney on the appointment list of the requirements to be considered for contracting with the counties and setting a deadline for submission of a proposal. Once all proposals have been received, the District Judge will decide who will be recommended to the Commissioners Courts. The counties cannot contract with any attorney for appointments in the District Court if not approved by the District Judge for such contract.

If the contracting attorney has a conflict with the representation of a particular defendant, or when otherwise necessary to guarantee the integrity of the relationship between the attorney and client, the appointment shall be made reasonably and impartially from among other qualified attorneys on the appointment list. Among the factors to consider for such appointments will be the attorneys who come closest to meeting the qualifications for that particular case, the distance required to be traveled by the attorney to represent that defendant, any other defendants the attorney may represent in that county to provide efficiency in travel requirements, and whether the defendant has any language limitations to be considered to allow effective communications with the attorney.

# Fee and Expense Payment Process

*11/17/2009*

Court appointed counsel shall receive such reasonable compensation as established by a fee schedule filed with the Commissioners Courts of Dawson, Gaines, Garza and Lynn Counties. The fee schedule shall comply with the Texas Code of Criminal Procedure Article 26.05 and all applicable law.

If the presiding judge disapproves the requested amount, the Judge shall make written findings stating the amount of payment approved and the reason for approving an amount different from the requested amount. The attorney whose request for payment has been disapproved may, by written motion, file an appeal with the Presiding Judge of the Administrative Region.

Appointment of Investigators and Experts for Indigent Defense and Procedure for Expenses
Counsel appointed in a non-capital case shall be reimbursed for reasonable and necessary expenses, including expenses for investigation and for mental health and other experts. Expenses incurred with and without prior court approval shall be reimbursed, according to the procedures set forth below. When possible, prior court approval should be obtained before incurring expenses for investigation and for mental health and other experts.

Procedure *With* Prior Court Approval:
Appointed counsel may file with the trial court a pretrial *ex parte* confidential request for advance payment of investigative and expert expenses. The request for expenses must state, as applicable:
> The type of investigation to be conducted or the type of expert to be retained;
> specific facts that suggest the investigation will result in admissible evidence or that the services of an expert are reasonably necessary to assist in the preparation of a potential defense; and
> an itemized list of anticipated expenses for each investigation or each expert.
> The court shall grant the request for advance payment of expenses in whole or in part if the request is reasonable. If the court denies in whole or in part the request for expenses, the court shall:
> state the reasons for the denial in writing;
> attach the denial to the confidential request; and
> submit the request and denial as a sealed exhibit to the record.

Procedure *Without* Prior Court Approval:
Appointed counsel may incur investigative or expert expenses without prior approval of the court. On presentation of a claim for reimbursement, the court shall order reimbursement of counsel for the expenses, if the expenses are reasonably necessary and reasonably incurred. Unreasonable or unnecessary expenses will not be approved.

## Plan Documents
Dawson Gaines Garza Lynn District Court Affidavit of Indigence.wpd (11/17/2009 11:17:10 AM) view
Dawson Gaines Garza Lynn District Court Annual Attorney Update Letter.wpd (11/17/2009 11:25:47 AM) view
Dawson Gaines Garza Lynn District Court Attorney Application for Appointment.wpd (11/17/2009 12:03:17 PM) view
Dawson Gaines Garza Lynn District Court Attorney Fee Schedule.wpd (11/17/2009 11:20:10 AM) view
Dawson Gaines Garza Lynn District Court Attorney Fee Voucher.wpd (11/17/2009 11:10:52 AM) view
Dawson Gaines Garza Lynn District Court Magistrates Warning Form.wpd (11/17/2009 11:10:14 AM) view
Dawson Gaines Garza Lynn District Court Order to Pay Court Appointed Counsel.wpd (11/17/2009 11:28:37 AM) view



JANA FURLOW, COURT ADMINISTRATOR
ROSA OLVERA, COURT COORDINATOR
MILLIE COHORN, COURT SECRETARY
J'LYN SAUSEDA, COURT REPORTER

PHONE: 806/872-3740
FAX: 806/872-7810
*Physical Address:*
400 SOUTH 1ST, SUITE 301
*Mailing Address:*
P.O. BOX 1268
LAMESA, TEXAS 79331
email: djudge@windstream.net

# 106th Judicial District

CARTER T. SCHILDKNECHT
DISTRICT JUDGE

October 1, 20xx

Attorney at Law

Re:    **Annual Update of Appointment List**

Dear  :

Pursuant to the Indigent Defense Plan in the 106th Judicial District, please find enclosed an **Application/Affidavit** which we ask that you <u>complete with updated information and return to us at the above address if you want to remain on the appointment list for the year 20xx</u>.  We update attorney information annually in order to maintain current records on attorneys desiring appointments in the 106th Judicial District.

(Note:  If you have proof of your having completed required continuing education, **and no other information has changed,** you may submit your continuing education verification with a cover letter *stating no other information has changed and that you wish to remain on the appointment list in this court* in lieu of completing the application in its entirety.)

Also enclosed is a **Request to Pay Counsel** which you should utilize when submitting a request for payment for services as an appointed attorney.  The fee schedule as set out by Commissioners Courts in the 106th district follows.

**Flat Rates:**
Felony cases resulting in a plea of guilt          $300.00
Cases in which a dismissal of the charges is granted are paid at the same rate as a guilty plea, not including cases which were dismissed pursuant to a plea bargain in a separate case.  For example, a dismissal pursuant to §12.45 of the Texas Penal Code would not be eligible for payment; but a dismissal due to the appointed attorney pointing out a lack of probable cause for arrest would be eligible for payment at the same rate as a guilty plea.

40

**Hourly rates (except capital cases):**
Pleas that involve more time than covered by the flat $300 fee, contested cases, appeals and all other matters will be compensated at a minimum hourly rate of $50.00 per hour and a maximum hourly rate of $100.00 per hour. The presiding judge shall, within these limits, determine what hourly rate will be paid for any particular case. The presiding judge may approve different hourly rates during the same case depending upon the services being performed.

Generally, out of court time will be paid at $50.00 per hour and time spent in court will be compensated at a rate of $100.00 per hour for services performed.

**Payment:**
Payment for cases compensated on an hourly basis will be ordered upon approval by the presiding judge of a request for payment submitted with a Request to Pay Counsel form. The minimum billing increment shall be no greater than six (6) minutes (.1 hour).

**Expenses:**
Expenses are to be reimbursed pursuant to the procedures set forth in Texas Code of Criminal Procedure Art. 26.05. It is highly recommended that attorneys receive advance approval of the presiding judge for expenses of more than $100.00.

**Contract Defender Program:**
If you are interested in submitting a proposal for the contract to handle indigent criminal defense for district court cases in the 106th District, which include Dawson, Gaines, Garza, and Lynn counties, please notify me as soon as possible, but no later than October 15, 20xx. To those attorneys who indicate an interest, I will provide terms of a sample contract for consideration in submitting a proposal. ***The proposal must be accompanied by the updated information required for the Application/Affidavit***. Deadline for submission of a proposal is November 1, 20xx.

If you have questions, please do not hesitate to contact us.

Sincerely,

Carter T. Schildknecht
District Judge

CTS/jf

Enclosures

## Appendix B – County Court Indigent Defense Plan

# Gaines County Courts Plan
## Prompt Magistration
*8/9/2010*

A. Arresting Officer Responsibilities

    i. The arresting officer, or the person having custody of the arrestee, shall ensure that every arrestee shall be brought before a magistrate without unnecessary delay, but not later than 48 hours after the person is arrested.

    ii. Unless arrested pursuant to an arrest warrant, bench warrant, capias, or other order of a magistrate or judge, necessary forms establishing probable cause must be completed and filed at the time an arrestee is booked into jail for any felony or misdemeanor punishable by incarceration.

    iii. Release of defendants arrested without warrant

        1. A person arrested for a misdemeanor without a warrant and who is detained in jail must be released not later than the 24th hour after arrest, on a bond in an amount not to exceed $5,000, if a magistrate has not determined that probable cause exists to believe that the person committed the offense.

        2. A person arrested for a felony without a warrant and who is detained in jail must be released not later than the 48th hour after arrest, on a bond in an amount not to exceed $10,000, if a magistrate has not determined that probable cause exists to believe that the person committed the offense.

        3. If requested by the state, a magistrate may postpone the release of the defendant for not more than 72 hours after the defendant's arrest if a probable cause determination has not been made, in compliance with the procedure set forth in Article 17.033, Texas Code of Criminal Procedure.

B. Magistrate Duties

    i. At the Magistrate's hearing, the magistrate should determine if accused can speak and understand English, or if the defendant is deaf.

    ii. After making such determination, the magistrate shall, in an appropriate manner consistent with Texas Code of Criminal Procedure Articles 38.30 and 38.31, do the following:

        1. Advise the accused of the accusation against him/her and any affidavit filed therewith;

        2. Admonish the accused of:

            a. The right to retain counsel;

            b. The right to remain silent;

    c. The right to have an attorney present during any interview with peace officers or attorneys representing the state;

    d. The right to terminate an interview at any time;

    e. The right not to make a statement and that any statement made by the accused may be used against him/her; and

    f. The right to an examining trial.

3. Inform the accused of the right to appointed counsel if the person cannot afford counsel and the procedures for requesting appointment of counsel.

4. Inquire as to whether accused is requesting that counsel be appointed.

5. Provide accused persons requesting appointed counsel with necessary forms for requesting appointment of counsel and ensure that reasonable assistance in completing required forms is provided to the accused at the time of the magistrate's hearing.

6. If the magistrate has reason to believe the accused is not mentally competent, the magistrate shall enter a request for counsel on behalf of the accused. Such a request will alert the appointing authority that counsel competent to represent mentally ill persons should be appointed.

iii. In cases where the individual was arrested without an arrest warrant, bench warrant, capias, or other order of magistrate or judge, the magistrate shall determine if there is probable cause to believe the person committed the offense.

1. If probable cause has not been determined by a magistrate:

    a. A person arrested for a misdemeanor must be released on bond, in an amount not to exceed $5,000, not later than 24 hours after the person's arrest.

    b. A person arrested for a felony must be released on bond, in an amount not to exceed $10,000, not later than 48 hours after the person's arrest.

    c. If requested by the state, the magistrate may postpone the release of the defendant for not more than 72 hours after the defendant's arrest, in compliance with the procedure set forth in Article 17.033, Texas Code of Criminal Procedure.

iv. The magistrate shall set the amount of bail and any conditions of bond for the accused, if bail is allowed by law and has not been set by the court or magistrate issuing a warrant.

v. The magistrate shall record the following:

1. The date and time the accused was arrested and the date and time when he/she was brought before the magistrate.

2. Whether the magistrate informed the accused of the right to request appointment of counsel and asked the accused whether he/she wants to request counsel.

3. Whether the accused requested appointment of counsel

vi. If the magistrate is not authorized to appoint counsel and if the accused requests appointment of counsel, the magistrate shall transmit or cause to be transmitted the magistrate form and any other forms requesting appointment of counsel to the appointing authority. The forms requesting appointment of counsel shall be transmitted without unnecessary delay, but not later than 24 hours after the person arrested requests appointment of counsel.

vii. If the magistrate is authorized to appoint counsel, the magistrate shall make a determination of indigence and appoint counsel if the defendant is indigent within three working days unless the County has a U.S. Census population over 250,000, in which case counsel shall be appointed within one working day.

viii. If a request for counsel was made at magistration, the appointing authority shall forward the magistrate form and any other forms requesting appointment of counsel to the appropriate clerk to be put into the case file.

ix. If a request for counsel was not made at magistration, the magistrate will forward the magistrate form to the clerk to be put into the case file.

## Indigence Determination Standards

*8/9/2010*

A. Definitions, as used in this rule:

i. "Indigent" means a person who is not financially able to employ counsel.

ii. "Net household income" means all income of the accused and spousal income actually available to the accused. Such income shall include: take-home wages and salary (gross income earned minus those deductions required by law or as a condition of employment); net self-employment income (gross income minus business expenses, and those deductions required by law or as a condition of operating the business); regular payments from a governmental income maintenance program, alimony, child support, public or private pensions, or annuities; and income from dividends, interest, rents, royalties, or periodic receipts from estates or trusts. Seasonal or temporary income shall be considered on an annualized basis, averaged together with periods in which the accused has no income or lesser income.

iii. "Non-exempt assets and property" means cash on hand, stocks and bonds, and accounts at financial institutions.

iv. "Household" means all individuals who are actually dependent on the accused for financial support.

v. "The cost of obtaining competent private legal representation" includes the reasonable cost of support services such as investigators and expert witnesses as necessary and appropriate given the nature of the case.

B. Eligibility for Appointment

i. An accused is presumed indigent if at the time of requesting appointed counsel, the accused or accused's dependents are eligible to receive food stamps, Medicaid, Temporary Assistance for Needy Families, Supplemental Security Income, or public housing.

ii. Defendants with average annual income meeting the following maxium requirements shall be considered indigent:

1. 1 person $11,225
2. 2 persons $15,150
3. 3 persons $19,075
4. 4 persons $23,000
5. Each additional person, add $3,925

iii. An accused who does not meet any of the standards above shall nevertheless be considered indigent if the accused is unable to retain private counsel without substantial hardship to the accused or the accused's dependents.

v. Factors NOT to be considered in determining indigence:

1. The accused's posting of bail or ability to post bail may not be considered in determining whether the accused is indigent.

C. Indigence Proceedings:

i. The appointing authority can require the accused to respond to questions about the accused's financial status, produce documentation supporting financial information provided, and/or order a court official to verify financial information provided.

ii. Information gathered for determining indigence, both in the affidavit of indigence and through oral examination, may not be for any purpose other than:

1. Determining if accused is (or is not) indigent; or
2. Impeaching direct testimony of accused regarding the accused's indigence.

iii. A request by the appointing authority for additional information, documentation, and/or verification cannot delay appointment of counsel beyond the timelines specified in Parts I and IV of these rules and contained in Code of Criminal Procedure article 1.051.

iv. An accused determined to be indigent is presumed to remain indigent for the remainder of the case unless a material change in the accused's financial circumstances occurs.

1. An accused's status as indigent or not indigent may be reviewed in a formal hearing at any stage of court proceedings, on a motion for reconsideration by the accused,

45

the accused's attorney, or the attorney representing the state. The accused's indigent status will be presumed not to have changed. The presumption can be rebutted in the review proceedings based on the following:

    a. Evidence of a material change in the accused's financial circumstances, as a result of which the accused does not meet any of the standards for indigence contained in these rules; or

    b. Additional information regarding the accused's financial circumstances that shows that the accused does not meet any of the standards for indigence contained in these rules.

2. If an accused previously determined to be indigent is subsequently determined not to be indigent, the attorney shall be compensated by the county according to the fee schedule for hours reasonably expended on the case.

v. If the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the defendant to pay during the pendency of the charges or, if convicted, as court costs the amount that it finds the defendant is able to pay.

## Minimum Attorney Qualifications
*6/18/2010*

A. The Judge hearing criminal cases shall establish attorney appointment lists for the following categories of offenses. Attorneys may apply for and be placed on multiple lists. To be eligible for an appointment list, an attorney must meet the following minimum requirements:

    i. Misdemeanor Qualification Requirements:

1. All attorneys on the appointment list must ensure all information on their application is correct;

2. An attorney must be a licensed practicing attorney and a member in good standing of the State Bar of Texas;

3. An attorney shall complete a minimum of _6_ hours of CLE in the area of criminal law and procedure each year. All attorneys on the appointment list must file a certificate with the court administration office each year attesting to completion of the required CLE or submit documentation showing that the attorney is certified as a specialist in criminal law. Continuing legal education activity completed with-in a one year period immediately preceding an attorney's initial reporting period may be used to meet the educational requirements for the initial year. Continuing legal education activity completed during any reporting period in excess of the minimum of _6_ hours for such period may be applied to the following period's requirement. The carryover provision applies to one year only;

4. An attorney must have a minimum __2__ year(s) experience in criminal law;

5. An attorney may not have been the recipient of any public disciplinary action by the State Bar of Texas or any other attorney licensing authority of any state or the United States within the last __5__ year(s);

6. An attorney must maintain an office capable of receiving email, fax, and telephone calls;

7. An attorney must have the ability to produce typed motions and orders;

8. An attorney shall notify the court administration office promptly, in writing, of any matter that would disqualify the attorney by law, regulation, rule or under these guidelines from receiving appointments to represent indigent defendants.

v. Appeal Qualification Requirements - An attorney must meet at least one of the following criteria:

1. Be currently board certified in criminal law by the Texas Board of Legal Specialization; or

2. Have personally authored and filed at least three criminal appellate briefs or post-conviction writs of habeas corpus; or

3. Have submitted an appellate writing sample approved by a majority of the judges; or

4. Have worked as a briefing clerk of an appellate court for a period of at least one year.

B. Approval for Appointment Lists

i. Misdemeanor List – An attorney must be approved by the County Court Judge hearing misdemeanor cases.

C. Removal from Appointment List - The judge will monitor attorney performance on a continuing basis to assure the competency of attorneys on the list. An attorney may be removed or suspended, as appropriate, from the appointment lists by the County Judge.

D. Reinstatement to Appointment Lists

i. An attorney who was removed from the appointment list for non-completion of the required CLE hours may be immediately reinstated upon providing proof that the attorney has completed the required hours so long as the attorney otherwise meets the other qualifications under this Plan.

ii. An attorney who has been removed from the appointment list for any other reason and who wishes to be reinstated must apply through the original application process.

E. Duties of Appointed Counsel - Appointed Counsel shall:

i. Notify the court within 72 hours of the receipt of appointment;

ii. Make every reasonable effort to:

1. Contact the defendant by the end of the first working day after the date on which the attorney is appointed; and
2. Interview the defendant as soon as practicable after the attorney is appointed;

iii. Represent the defendant until:

1. Charges are dismissed;
2. The defendant is acquitted;
3. Appeals are exhausted; or
4. The attorney is relieved of his duties by the court or replaced by other counsel after a finding of good cause entered on the record.

iv. Investigate, either by self or through an investigator, the facts of the case and be prepared to present any factual defense(s) that may be reasonably and arguably available to the defendant;

v. Brief the law of the case and be prepared to present any legal defense(s) that may be reasonably and arguably available to the defendant;

vi. Be prepared to negotiate with the prosecutor for the most favorable resolution of the case as can be achieved through a plea agreement;

vii. Be prepared to try the case to conclusion either with or without a jury;

viii. Be prepared to file post-trial motions, give notice of appeal and appeal the case pursuant to the standards and requirements of the Texas Rules of Appellate Procedure;

ix. Maintain reasonable communication and contact with the client at all times and keep the client informed of the status of the case; and

x. Advise the client on all matters involving the case and such collateral matters as may reasonably be required to aid the client is making appropriate decisions about the case; and

xi. Perform the attorney's duty owed to the defendant in accordance with these procedures, the requirements of the Code of Criminal Procedure, and applicable rules of ethics.

xii. Manage attorney's workload to allow for the provision of quality representation and the execution of the responsibilities listed in these rules in every case.

## Prompt Appointment of Counsel

*6/18/2010*

A. Prompt Appointment of Counsel

i. Counsel shall be appointed as soon as possible to indigent defendants, but no later than the end of the third working day after the date on which the appointing authority receives the defendant's request for court appointed counsel. Working day means Monday through Friday, excluding official state holidays. Counsel must be appointed whether or not a case has been filed in the trial court.

ii. If the defendant is released from custody prior to the appointment of counsel, appointment of counsel is not required until the defendant's first court appearance or when adversarial judicial proceedings are initiated, whichever comes first.

iii. Appointment Authority

1. If no case has been filed in the trial court, the appointing authority for misdemeanors is: __County Judge__

2. If the case has been filed in the trial court, the appointing authority is: __County Judge___.

B. Defendants Appearing Without Counsel - If a defendant appears without counsel in any adversary judicial proceeding that may result in punishment by confinement:

i. The court may not direct or encourage the defendant to communicate with the attorney representing the state until the court advises the defendant of the right to counsel and the procedure for requesting appointed counsel and the defendant has been given a reasonable opportunity to request appointed counsel.

ii. If the defendant has requested appointed counsel, the court may not direct or encourage the defendant to communicate with the attorney representing the state unless the appointing authority has denied the request and, subsequent to the denial, the defendant:

1. Has been given a reasonable opportunity to retain and has failed to retain appointed counsel; or

2. Waived or has waived the opportunity to retain private counsel.

iii. The attorney representing the state may not:

1. Initiate or encourage an attempt to obtain from the defendant a waiver of the right to counsel; or

2. Communicate with a defendant who has requested the appointment of counsel, unless the appointing authority has denied the request and subsequent to the denial, the defendant:

a. Has been given a reasonable opportunity to retain counsel; or

b. Waives or has waived the opportunity to retain private counsel.

C. Waiver of the Right to Counsel

i. A defendant may voluntarily and intelligently waive the right to counsel.

ii. A waiver obtained in violation of section IV.B above is presumed invalid.

iii. If a defendant wishes to waive the right to counsel for purposes of entering a guilty plea or proceeding to trial, the court shall advise the defendant of the nature of the charges against the defendant and, if the defendant is proceeding to trial, the dangers and disadvantages of self-representation. If the court determines that the waiver is voluntarily and intelligently waived, the court shall provide the defendant with a

statement substantially in the following form, which, if signed by the defendant, shall be filed with and become part of the record of the proceedings.

"I have been advised this ___ day of ____, 2___, by the (name of court) Court of my right to representation by counsel in the case pending against me. I have been further advised that if I am unable to afford counsel, one will be appointed for me free of charge. Understanding my right to have counsel appointed for me free of charge if I am not financially able to employ counsel, I wish to waive that right and request the court to proceed with my case without an attorney being appointed for me. I hereby waive my right to counsel. (signature of defendant)"

iv. A defendant may withdraw a waiver of the right to counsel at any time but is not entitled to repeat a proceeding previously held or waived solely on the grounds of the subsequent appointment or retention of counsel. If the defendant withdraws a waiver, the trial court, in its discretion, may provide the appointed counsel 10 days to prepare.

## Attorney Selection Process
*6/18/2010*

A. The appointing authority will identify which of the appointment list, discussed in the Section III (attorney qualifications), is most appropriate based on the accusations against the defendant and will appoint the attorney whose name is first on the list, unless the court makes a finding of good cause on the record for appointing an attorney out of order. Good cause may include:

i. The defendant requesting counsel does not understand English, in which case the judge will appoint the lawyer whose name appears next in order and speaks the clients' language, if one is available;

ii. The defendant has an attorney already appointed on a prior pending or concluded matter. The same attorney will be appointed to the new matter, unless the attorney is not on the list for the type of offense involved in the current case; or

iii. Other good cause exists for varying from the list.

B. Once appointed, an attorney's name will be moved to the bottom of the appointment list. An attorney who is not appointed in the order in which the attorney's name appears on the list shall remain next in order on the list.

C. Judicial Removal from Case:

i. The judge presiding over a criminal case may remove appointed counsel upon entering a written order showing good cause for such removal, including without limitation, the following:

1. Counsel's failure to appear at a court hearing;

2. Counsel's failure to comply with the requirements imposed upon counsel by this plan;

3. Current information about the defendant and the charges against the defendant indicate that another qualified attorney is more appropriate for the defendant under these rules;

4. Replacement of appointed counsel in a death penalty case is required under Article 26.052(e), Texas Code of Criminal Procedure;

5. The appointed counsel shows good cause for being removed, such as illness, workload or scheduling difficulties;

6. The defendant requests an attorney, other than trial counsel, for appeal; or

7. The defendant shows good cause for removal of counsel, including counsel's persistent or prolonged failure to communicate with the defendant.

ii. Appointment of Replacement Counsel - Whenever appointed counsel is removed under this section, replacement counsel shall immediately be selected and appointed in accordance with the procedures described in this plan.

## Fee and Expense Payment Process
*6/18/2010*

A. Court appointed counsel shall be compensated for all reasonable and appropriate services rendered in representing the accused. Compensation shall be reasonable for time and effort expended and will be in accordance with a fee schedule adopted and approved by the County Judge hearing misdemeanor criminal cases in the county.

B. Payment Process: No payment of attorney's fees will be made other than in accordance with the rules set forth below.

i. An appointed attorney shall fill out and submit a fee voucher to the court for services rendered.

ii. The trial judge presiding over the proceedings shall review the request for compensation and either approve or disapprove of the amount requested.

1. If a judge disapproves a request for compensation, the judge shall make written findings, stating the amount of payment that the judge approves and each reason for approving an amount different from the requested amount.

2. An attorney whose request for payment is disapproved or is not otherwise acted on by the 60th day after the date the request for payment is submitted may appeal the disapproval or failure to act by filing a motion with the presiding judge of this administrative judicial region.

C. Payment of Expenses:

i. Court appointed counsel will be reimbursed for reasonable and necessary expenses incurred, including expenses for investigation and for mental health and other experts. Expenses incurred with and without prior approval shall be paid according to the procedures set forth below. Whenever possible prior court approval should be obtained before expenses are incurred.

ii. Procedure With Prior Court Approval:

1. Appointed Counsel may file with the trial court a pretrial ex parte confidential request for advance payment of investigative and expert expenses. The request for expenses must state the below, as applicable:

   a. The type of investigation to be conducted or the type of expert to be retained;

   b. Specific facts that suggest the investigation will result in admissible evidence or that the services of an expert are reasonably necessary to assist in the preparation of a potential defense; and

   c. An itemized list of anticipated expenses for each investigation and/or each expert.

2. The court shall grant the request for advance payment of expenses in whole or in part if the request is reasonable. If the court denies in whole or in part the request for expenses, the court shall:

   a. State the reasons for the denial in writing;

   b. Attach the denial to the confidential request; and

   c. Submit the request and denial as a sealed exhibit to the record.

iii. Procedure Without Prior Court Approval: Appointed counsel may incur investigative or expert expenses without prior approval of the court. On presentation of a claim for reimbursement, the court shall order reimbursement of counsel for the expenses, if the expenses are reasonably necessary and reasonably incurred. Unreasonable or unnecessary expenses will not be approved.

## Plan Documents

Gaines County Court Affidavit of Indigence.pdf (6/18/2010 4:35:19 PM) view
Gaines County Court Attorney Fee Schedule.pdf (6/18/2010 5:18:44 PM) view
Gaines County Court Attorney Fee Voucher.pdf (6/18/2010 4:39:53 PM) view

## Appendix C – Juvenile Indigent Defense Plan

# Gaines Juvenile Board Plan
## Prompt Detention Hearings
*6/18/2010*

A. A child taken into custody must either be brought to a juvenile processing office without unnecessary delay where they may not be detained for longer than six hours pursuant to §52.025, Family Code, or another disposition authorized by §52.02, Family Code, including referral to the office designated by the juvenile board as intake for the juvenile court. The intake officer shall process the child according the requirement of §53.01, Family Code, and shall also inform the child and the child's parents of the right to appointed counsel if they are indigent and provide a form for the purpose of determining eligibility for appointment of counsel. If the child is not released by intake, then a Detention Hearing shall be held not later than the second working day after the child is taken into custody unless the child is detained on a Friday, Saturday or listed holiday in which case the detention hearing shall be held on the first working day after the child is taken into custody.

B. Prior to the detention hearing the court shall inform the parties of the child's right to counsel and to appointed counsel if they are indigent, and of the child's right to remain silent as to the alleged conduct.

C. The detention hearing may be conducted without the presence of the child's parent(s) or other responsible adult(s), however, in these cases the court must immediately appoint counsel or a guardian ad litem to represent the child.

D. The court shall provide the attorney for the child access to all written matter to be considered by the Court in making the detention decision.

## Indigence Determination Standards
*8/9/2010*

A. Definitions, as used in this rule:

   i. "Indigent" means a person who is not financially able to employ counsel.

   ii. "Net household income" in the case of a child is the income of the child's parents or other person determined responsible for the support of the child. Such income shall include: take-home wages and salary (gross income earned minus those deductions required by law or as a condition of employment); net self-employment income (gross income minus business expenses, and those deductions required by law or as a condition of operating the business); regular payments from a governmental income maintenance program, alimony, child support, public or private pensions, or annuities; and income from dividends, interest, rents, royalties, or periodic receipts from estates or trusts. Seasonal or temporary income shall be considered on an annualized basis,

53

averaged together with periods in which the person determined responsible for the support of the child has no income or lesser income.

   iii. "Household" means all individuals who are actually dependent on the child's parent(s) or person(s) deemed responsible for the support of the child, for financial support.

   iv. "The cost of obtaining competent private legal representation" includes the reasonable cost of support services such as investigators and expert witnesses as necessary and appropriate given the nature of the case.

B. Eligibility for Appointment

   i. All juveniles charged by petition of Delinquent Conduct or Conduct Indicating a Need for Supervision shall be presumed to be indigent unless the State should plead and prove otherwise, or if any of the following conditions or factors are present:

      1. At the time of requesting appointed counsel, a child is presumed indigent if the child's parent(s) or other person(s) determined responsible for the support of the child is eligible to receive food stamps, Medicaid, Temporary Assistance for Needy Families, Supplemental Security Income, or public housing.

      2. Defendants with average annual income meeting the following maxium requirements shall be considered indigent:

         1. 1 person $ 11,225

         2. 2 persons $ 15,150

         3. 3 persons $ 19,075

         4. 4 persons $ 23,000

         5. Each additional person, add $ 3,925

   ii. The child who does not meet any of the standards above shall nevertheless be considered indigent if the child's parent(s) or other person(s) responsible for the child is unable to retain private counsel without substantial hardship.

   iii. Factors NOT to be considered in determining indigence:

      1. The resources available to friends or relatives of the child, other than the child's parent(s) or other person(s) deemed responsible for the child, may not be considered in determining whether the child is indigent.

      2. Only the child's parent(s) or other person(s) responsible for the child and the child's financial circumstances as measured by the financial standards stated in this rule shall be used as the basis for determining indigence.

C. Indigence Proceedings:

   i. The appointing authority can require the child and the child's parent(s) or other person(s) responsible for the child to respond to questions about the child's household financial

status, produce documentation supporting financial information provided, and/or order a court official to verify financial information provided.

ii. Information gathered for determining indigence, both in the affidavit of indigence and through oral examination, may not be for any purpose other than:

    1. Determining if child is (or is not) indigent; or

    2. Impeaching direct testimony of the child or the child's parent(s)/person(s) responsible regarding the child's indigence.

iii. A request by the appointing authority for additional information, documentation, and/or verification cannot delay appointment of counsel beyond the timelines specified in Parts I and IV of these rules.

iv. A child determined to be indigent is presumed to remain indigent for the remainder of the case unless a material change in the child's financial circumstances occurs.

    1. A child's status as indigent or not indigent may be reviewed in a formal hearing at any stage of a court. The child's indigent status will be presumed not to have changed. The presumption can be rebutted in the review proceedings based on the following:

        a. Evidence of a material change in the child's parent(s)/person(s) responsible and the child's financial circumstances; or

        b. Additional information regarding the child's parent(s)/person(s) responsible and the child's financial circumstances that shows that they do not meet any of the standards for indigence contained in these rules.

    2. If a child previously determined to be indigent is subsequently determined not to be indigent, the attorney shall be compensated by the county according to the fee schedule for hours reasonably expended on the case.

v. If the court determines that a child's parent(s) or other person(s) responsible for the child has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the child's parent(s) or other person(s) responsible for the child to pay during the pendency of the charges or, if found to have engaged in delinquent conduct or CINS, as court costs the amount that it finds the child's parent(s) or other person(s) responsible for the child is able to pay.

## Minimum Attorney Qualifications

*6/30/2010*

A. The Juvenile Board shall establish attorney appointment lists for the following categories of offenses. Attorneys may apply for and be placed on multiple lists. To be eligible for an appointment list, an attorney must meet the following minimum requirements:

i. General Requirements:

1. All attorneys on the appointment list must ensure all information on their application is correct;
2. An attorney must be a licensed practicing attorney and a member in good standing of the State Bar of Texas;
3. An attorney shall complete a minimum of __6__ hours of CLE in the area of juvenile law and procedure each year. All attorneys on the appointment list must file a certificate with the court administration office each year attesting to completion of the required CLE or submit documentation showing that the attorney is certified as a specialist in juvenile law. Continuing legal education activity completed within in a one year period immediately preceding an attorney's initial reporting period may be used to meet the educational requirements for the initial year. Continuing legal education activity completed during any reporting period in excess of the minimum of __6__ hours for such period may be applied to the following period's requirement. The carryover provision applies to one year only;
4. Must be knowledgeable in juvenile law and be aware of collateral consequences of a juvenile adjudication and disposition;
5. May not have been the recipient of any public disciplinary action by the State Bar of Texas or any other attorney licensing authority of any state or the United States within the last __3__ years;
6. An attorney must maintain an office capable of receiving email, fax, and telephone calls;
7. An attorney must have the ability to produce typed motions and orders;
8. An attorney shall notify the Juvenile Board promptly, in writing, of any matter that would disqualify the attorney by law, regulation, rule, or under these guidelines from receiving appointments to represent indigent defendants.

ii. CINS Charges or Delinquent Conduct, and Commitment to TYC Is Not an Authorized Disposition:

1. Meet the General Requirements;
2. Must have a minimum __1__ year of work experience in juvenile law;
3. Must have observed or participated in at least:
    a. __2__ stipulated juvenile adjudications;
    b. __2__ contested juvenile adjudications;
    c. __2__ juvenile dispositions; and
    d. __2__ detention hearings; and
4. Participated in at least __2__ criminal or juvenile trial.

56

iii. Delinquent Conduct, and Commitment to TYC Without a Determinate Sentence Is an Authorized Disposition:
   1. Meet General Requirements;
   2. Have a minimum __2__ years of work experience in juvenile law;
   3. Participated in __5__ criminal or juvenile cases, of which at least __2__ was tried to a jury verdict; and
iv. Determinate Sentence Proceedings have been Initiated; or Proceedings for Discretionary Transfer to Criminal Court Have Been Initiated:
   1. Meet General Requirements;
   2. Have a minimum __3__ years of work experience in juvenile law;
   3. Participated in __5__ criminal or juvenile cases, of which at least __2__ were tried to a jury verdict;
   4. Tried at least __2__ criminal or juvenile case as lead counsel.

B. Approval for Appointment Lists - An attorney must be approved by a majority of the Juvenile Board for each appointment list for which the attorney applies.

C. Removal from Appointment List - The Juvenile Board will monitor attorney performance on a continuing basis to assure the competency of attorneys on the list. An attorney may be removed or suspended, as appropriate, from one or more appointment lists by a majority vote of the judges.

D. Reinstatement to Appointment Lists
   i. An attorney who was removed from the appointment list for non-completion of the required CLE hours may be immediately reinstated upon providing proof that the attorney has completed the required hours so long as the attorney otherwise meets the other qualifications under this Plan.
   ii. An attorney who has been removed from the appointment list for any other reason and who wishes to be reinstated must apply through the original application process.

E. Duties of Appointed Counsel - Appointed Counsel shall:
   i. Notify the court within 72 hours of the receipt of appointment;
   ii. Make every reasonable effort to:
      1. Contact the child by the end of the first day after the date on which the attorney is appointed; and
      2. Interview the child as soon as practicable after the attorney is appointed;
   iii. Represent the child until:
      1. The case is terminated;
      2. The family retains an attorney;
      3. The attorney is relieved of his duties by the court or replaced by other counsel.

iv. Investigate, either by self or through an investigator, the facts of the case and be prepared to present any factual defense that may be reasonably and arguably available to the child;

v. Brief the law of the case and be prepared to present any legal defense that may be reasonably and arguably available to the child;

vi. Be prepared to negotiate with the prosecutor for the most favorable solution of the case as can be achieved through a plea agreement;

vii. Be prepared to try the case to conclusion either with or without a jury;

viii. Be prepared to file post-trial motions, give notice of appeal and appeal the case pursuant to the standards and requirements of the Texas Rules of Appellate Procedure;

ix. Maintain reasonable communication and keep the child informed of the status of the case; and

x. Advise the child on all matters involving the case and such collateral matters as may reasonably be required to aid the client is making appropriate decisions about the case.

xi. Perform the attorney's duty owed to the child in accordance with these procedures, the requirements of the Code of Criminal Procedure and the Family Code, and applicable rules of ethics.

xii. Manage attorney's workload to allow for the provision of quality representation and the execution of the responsibilities listed in these rules in every case.

## Prompt Appointment of Counsel
*6/18/2010*

A. Appointment of Counsel for Children in Detention

i. Prior to the detention hearing the court shall inform the parties of the child's right to counsel and to appointed counsel if they are indigent, and of the child's right to remain silent as to the alleged conduct.

ii. Prior to the initial detention hearing, the court shall provide the attorney for the child with access to all written matter to be considered by the court in making the detention decision.

iii. If there is no parent or other responsible adult present, the court must appoint counsel or a guardian ad litem for the child.

iv. If the juvenile is detained, the child has an immediate right to counsel. If counsel has not already been appointed, the court must either appoint counsel or direct the juvenile's parent or other responsible adult to retain an attorney promptly. The court may enforce an order to retain counsel by appointing an attorney to represent the child and requiring that the child's parent or other responsible adult reimburse the court for attorneys' fees.

v. Upon appointment, the court administrator shall notify the appointed attorney by fax, e-mail, or personal contact of the appointment and the scheduled hearing time and date.

vi. The appointed attorney shall make every reasonable effort to contact a child in detention by the end of the first working day after receiving the notice of appointment or to inform the court that the appointment cannot be accepted. Contacting the child in detention may be by personal visit (including contact during a detention hearing), by phone, or by video teleconference. Contacting the court may be by fax, email, phone or personal visit. A court-appointed attorney shall contact the child, in one of the ways mentioned above, no less than once every ten working days while the child remains in detention.

vii. An attorney appointed for a detention hearing shall continue to represent the child until the case is terminated, the family retains an attorney, or a new attorney is appointed by the juvenile court. Release of the child from detention does not terminate the attorney's representation.

viii. Court-appointed attorneys shall make every effort to comply with the Texas State Bar Code of Ethics for communication with a client.

B. Appointment of Counsel for Children not Detained at Intake

i. If the child is released from detention and if a petition to adjudicate or a motion to modify is filed, the juvenile court will use the financial forms gathered at intake to make a determination of indigence. If no financial information is available, the juvenile court shall promptly summon the child's parent/guardian/custodian to the court so that financial information may be gathered for a determination of indigence.

ii. If the court makes a finding of indigence, the court shall appoint an attorney on or before the fifth working day after:

   a. The date a petition for adjudication or discretionary transfer hearing has been served on the child; or

   b. A motion to modify disposition seeking commitment to TYC or placing in secure correctional facility has been filed.

iii. If the family does not qualify for appointed counsel or if the parent or guardian is not available, and the family fails to provide an attorney, the juvenile court may appoint an attorney in any case in which it deems representation necessary to protect the interests of the child.

iv. The prosecuting attorney/court clerk shall notify the juvenile court upon the filing of and return of service of a motion to modify or the return of service of a petition for adjudication or discretionary transfer.

# Attorney Selection Process

*6/18/2010*

A. The appointing authority will identify which of the appointment lists, discussed in the attorney qualifications section, is most appropriate based on the accusations against the child and will appoint the attorney whose name is first on the list, unless the court makes a finding of good cause on the record for appointing an attorney out of order. Good cause may include:

    i. The child requesting counsel does not understand English, in which case the judge will appoint the lawyer whose name appears next in order and speaks the clients' language, if one is available;

    ii. The child has an attorney already appointed on a prior pending or concluded matter. The same attorney will be appointed to the new matter, unless the attorney is not on the list for the type of offense involved in the current case;

    iii. An initial detention hearing is scheduled and the first attorney on the list is unavailable; or

    iv. Other good cause exists for varying from the list.

B. Once appointed, an attorney's name will be moved to the bottom of the appointment list. An attorney who is not appointed in the order in which the attorney's name appears on the list shall remain next in order on the list.

C. Judicial Removal from Case:

    i. The judge presiding over a case involving a child may remove appointed counsel upon entering a written order showing good cause for such removal, including without limitation, the following:

        1. Counsel's failure to appear at a court hearing;

        2. Counsel's failure to comply with the requirements imposed upon counsel by this plan;

        3. Current information about the child and the charges against the child indicate that another qualified attorney is more appropriate for the child under these rules;

        4. The appointed counsel shows good cause for being removed, such as illness, workload or scheduling difficulties;

        5. The child requests an attorney, other than trial counsel, for appeal; or

        6. The child shows good cause for removal of counsel, including counsel's persistent or prolonged failure to communicate with the child.

    ii. Appointment of Replacement Counsel - Whenever appointed counsel is removed under this section, replacement counsel shall immediately be selected and appointed in accordance with the procedures described in this plan.

# Fee and Expense Payment Process

A. Court appointed counsel shall be compensated for all reasonable and appropriate services rendered in representing the accused. Compensation shall be reasonable for time and effort expended and will be in accordance with a fee schedule adopted and approved by the Juvenile Board.

B. Payment Process - No payment of attorney's fees will be made other than in accordance with the rules set forth below.

    i. An appointed attorney shall fill out and submit a fee voucher to the court for services rendered.

    ii. The trial judge presiding over the proceedings shall review the request for compensation and either approve or disapprove of the amount requested.

        1. If a judge disapproves a request for compensation, the judge shall make written findings, stating the amount of payment that the judge approves and each reason for approving an amount different from the requested amount.

        2. An attorney whose request for payment is disapproved or is not otherwise acted on by the 60th day after the date the request for payment is submitted may appeal the disapproval or failure to act by filing a motion with the presiding judge of this administrative judicial region.

C. Payment of Expenses:

    i. Court appointed counsel will be reimbursed for reasonable and necessary expenses incurred, including expenses for investigation and for mental health and other experts. Expenses incurred with and without prior approval shall be paid according to the procedures set forth below. Whenever possible prior court approval should be obtained before expenses are incurred.

    ii. Procedure With Prior Court Approval:

        1. Appointed Counsel may file with the trial court a pretrial ex parte confidential request for advance payment of investigative and expert expenses. The request for expenses must state the below, as applicable:

            a. The type of investigation to be conducted or the type of expert to be retained;

            b. Specific facts that suggest the investigation will result in admissible evidence or that the services of an expert are reasonably necessary to assist in the preparation of a potential defense; and

            c. An itemized list of anticipated expenses for each investigation and/or each expert.

2. The court shall grant the request for advance payment of expenses in whole or in part if the request is reasonable. If the court denies in whole or in part the request for expenses, the court shall:

    a. State the reasons for the denial in writing;

    b. Attach the denial to the confidential request; and

    c. Submit the request and denial as a sealed exhibit to the record.

iii. Procedure Without Prior Court Approval:

1. Appointed counsel may incur investigative or expert expenses without prior approval of the court. On presentation of a claim for reimbursement, the court shall order reimbursement of counsel for the expenses, if the expenses are reasonably necessary and reasonably incurred. Unreasonable or unnecessary expenses will not be approved.

## Plan Documents

Gaines Juvenile Board Affidavit of Indigence.pdf (6/18/2010 5:55:57 PM) view
Gaines Juvenile Board Attorney Fee Schedule.pdf (6/18/2010 5:55:26 PM) view
Gaines Juvenile Board Attorney Fee Voucher.pdf (6/18/2010 5:55:03 PM) view

**Appendix D – Defender Contract**

CONTRACT FOR INDIGENT DEFENSE
IN
THE 106ᵀᴴ JUDICIAL DISTRICT COURT OF TEXAS
DAWSON, GAINES, GARZA AND LYNN COUNTIES

RECEIVED

DEC 12 2012

DAWSON COUNTY AUDITOR

1.  INTRODUCTION
    The county of Dawson ("COUNTY") and The Law Offices of Arthur Aguilar, Jr. ("ATTORNEY") are the parties to this agreement. The District Judge of the 106ᵗʰ Judicial District ("DISTRICT JUDGE") is the appointing authority approving ATTORNEY to represent indigent criminal defendants in COUNTY. This agreement establishes conditions under which ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY.

2.  SCOPE OF WORK
    ATTORNEY will provide legal representation for indigent criminal defendants in COUNTY for felony cases only. Under this contract, a felony will be considered to be any criminal offense that carries a possible punishment of confinement in excess of one year or that is classified as a State Jail Felony, Third Degree Felony, Second Degree Felony or First Degree Felony by the Penal Code of Texas. Under this contract, ATTORNEY will represent only those defendants designated by DISTRICT JUDGE, and no file shall be opened or appearance made under this contract except by order of DISTRICT JUDGE. ATTORNEY shall represent such defendants in the trial court and on direct appeal in any of the appellate courts to which such case is appealed. Post conviction writs are extraordinary and are NOT covered in this contract. Capital Murder Trials where the State elects to pursue the Death Penalty are NOT covered in this contract. This contract does not cover any juvenile or misdemeanor work in the 106ᵗʰ Judicial District. However, if an indigent defendant has a misdemeanor charge as well as a felony charge, ATTORNEY will handle the misdemeanor charge at no extra cost to COUNTY as long as the misdemeanor charge is taken into account in determining sentence for the felony offense as provided in Section 12.45 of the Texas Penal Code. Otherwise, ATTORNEY will consider the indigent defendant to be under this contract for only the felony case. ATTORNEY shall meet qualifications and shall devote time, attention and energies to the performance of duties under this contract in accordance with the Texas Fair Defense Act, the ABA's recommended caseload limitations, and pursuant to the provisions of the 106ᵗʰ Judicial District's Local Plan to Implement the Texas Fair Defense Act, including but not limited to the qualifications set out in the Application/Affidavit for the 106ᵗʰ Judicial District Court Attorney Appointment List.

3.  CONTRACT PERIOD
    This agreement shall commence on January 1, 2013 and shall terminate December 31, 2013, unless terminated earlier by either party. The parties shall have an option to renew the contract for additional years, and prior to October 1, 2013, the parties will revisit the contract to consider any desired modifications to the terms and conditions of this contract.



4.  **CONSIDERATION**
The parties agree that if this contract covered the legal representation for indigent criminal defendants in all four counties of the 106th Judicial District, the total consideration for legal representation at the trial court level would be $66,000 for the calendar year 2013.

The consideration for legal representation at the trial court level under this contract between COUNTY and ATTORNEY is COUNTY's pro rata portion of $66,000.00, payable in monthly installments, based on indigent defense provided under the 2012 Contract for Indigent Defense in each of the four counties of the 106th Judicial District. COUNTY agrees to pay ATTORNEY for services at the trial court level a monthly amount for COUNTY's pro rata share as follows:

| | | |
|---|---|---|
| Dawson County | $ 21,997.80 annually | $ 1,883.15 monthly |
| Gaines County | $ 29,554.80 annually | $ 2,462.90 monthly |
| Garza County | $ 10,177.20 annually | $ 848.10 monthly |
| Lynn County | $ 4,270.20 annually | $ 355.85 monthly |

*[handwritten: Should be $1833.15  CTS 12-14-12]*

The above amount is the total consideration to be paid by COUNTY for legal representation of indigent criminal defendants at the trial court level for all cases opened during the term of this contract, and ATTORNEY shall furnish at his own cost all equipment, travel, office space, office supplies, secretaries, salaries of any kind, and any and all other trial court expenses except as provided otherwise in this contract.

In consideration for ATTORNEY's appellate representation of COUNTY's indigent criminal defendants under this contract, COUNTY agrees to pay additional ATTORNEY's fees for legal services at the rate accepted in this area for such services and approved by DISTRICT JUDGE. If ATTORNEY is required to travel to the appellate court for representation under this contract, COUNTY agrees to pay ATTORNEY's actual expenses for lodging and mileage at the prevailing state rate after approval by DISTRICT JUDGE.

COUNTY shall not be obligated for any other additional amount or expenses unless specifically designated in this agreement or required by law, detailed in the Request to Pay Counsel, and approved by DISTRICT JUDGE.

If the renewal option is exercised, COUNTY's designated monthly percentage will be adjusted to reflect the number of COUNTY's cases disposed under the contract in trial court compared to the number of trial court level cases disposed under the contract in the entire 106th Judicial District during the previous year.

5.  **EXPERTS, INVESTIGATORS, AND INTERPRETERS**
ATTORNEY will obtain prior approval of expenses for investigation and for experts by filing a motion in the 106th Judicial District Court, stating the need for such assistance and

the estimated expense. Investigative or expert expenses incurred with prior court approval shall be reimbursed as provided in the order granting approval. Investigative or expert expenses incurred without prior approval shall be reimbursed only if necessarily and reasonably incurred. ATTORNEY will arrange for interpreters when the need exists. Expenses for interpreters shall be paid by COUNTY after approval by DISTRICT JUDGE.

6.   CHANGE OF VENUE
If there is a change of venue which moves a case from the boundaries of the 106th Judicial District, then ATTORNEY will be allowed his actual expenses in regard to lodging, meals, court fees or costs, copy machine fees, or any other fees approved by DISTRICT JUDGE in the original jurisdiction. Any such expenses should be discussed, if at all possible, with DISTRICT JUDGE prior to incurring the same. In such cases, any travel (mileage fees) outside the 106th Judicial District will be paid at the prevailing state rate. All other fees designated herein will be the responsibility of and paid by the County of original jurisdiction.

7.   ASSIGNMENT
ATTORNEY may employ an associate attorney(s) to assist in representing defendants under this contract with the prior consent and approval of DISTRICT JUDGE, but only at ATTORNEY's sole expense. ATTORNEY shall not assign its entire rights under this contract or delegate the entire performance of its duties under this contract.

8.   CONFLICTS
ATTORNEY will notify the office of DISTRICT JUDGE as soon as ATTORNEY is aware of ethical conflicts between indigent defendants and will file a Motion to Withdraw and be responsible to set the case for a hearing regarding the ethical conflict for consideration if deemed necessary by the Court.

9.   REPORTS
ATTORNEY shall compile a year-end report giving the number of indigent defendants served, the number of individual cases handled, the types of cases, the disposition of the cases handled, and any other information required to be in compliance with the Texas Fair Defense Act. Such report shall identify the cases by county and shall include cases for the other contracting counties in the 106th Judicial District as well as COUNTY's cases. For approval and payment, ATTORNEY shall provide itemized interim progress reports to COUNTY and DISTRICT JUDGE as requested for indigent defense expenditure reports.

10.  ATTORNEY'S PRIVATE PRACTICE
It is agreed that ATTORNEY will maintain a private practice as long as there is no conflict of interest under the laws of the State and no violation of the State Bar Rules as promulgated by the Supreme Court of Texas. It is further agreed and understood that ATTORNEY's private practice will not interfere in any material manner with the indigent criminal defense cases provided for in this contract.

692

11. **TERMINATION**

If COUNTY wishes to terminate this contract, COUNTY may determine that desire by a majority vote of the Commissioners Court of COUNTY. Either party may terminate with 90 days notice by Certified Mail to the other party. ATTORNEY shall complete all cases that are open as of the date of the termination notice unless relieved or replaced by DISTRICT JUDGE.

12. **AMENDMENTS**

Any alterations, additions or deletions in the terms and conditions of this contract shall be by written amendment approved by DISTRICT JUDGE and executed by ATTORNEY and the Commissioners Court of COUNTY.

13. **SEVERABILITY**

If any provision of this contract is construed to be illegal or invalid, such construction will not affect the legality or validity of any of its other provisions. The illegal or invalid provision will be deemed severable and stricken from the contract as if it had never been incorporated herein, but all other provisions will continue.

14. **SURVIVAL OF TERMS**

Termination of this contract for any reason shall not release either party from any liabilities or obligations set forth in this contract that the parties have expressly agreed in writing shall survive any such termination or which by their nature would be intended to be applicable following such termination.

15. **INDEPENDENT CONTRACTOR**

It is agreed that ATTORNEY is an independent contractor and that this contract does not create an employment relationship between COUNTY and ATTORNEY. ATTORNEY, not COUNTY, will be responsible for appropriate payment of social security taxes and federal income taxes applicable to the consideration received by ATTORNEY under this contract.

COUNTY shall not be liable or responsible and shall be saved and held harmless by ATTORNEY from and against any and all suits, actions, claims or liability of any character arising out of the performance of ATTORNEY under this contract, including claims and damages arising from acts of negligence or acts of malpractice of ATTORNEY.

16. **NO WAIVER OF SOVEREIGN IMMUNITY**

THE PARTIES EXPRESSLY AGREE THAT NO PROVISION OF THIS CONTRACT IS IN ANY WAY INTENDED TO CONSTITUTE A WAIVER BY COUNTY OR THE STATE OF TEXAS OF ANY IMMUNITIES FROM SUIT OR FROM LIABILITY THAT COUNTY OR THE STATE OF TEXAS MAY HAVE BY OPERATION OF LAW.

17. **GOVERNING LAW AND JURISDICTION**

This contract shall be construed in accordance with and governed by the laws of the State of Texas, except for its provisions regarding conflicts of laws. The venue of any suit brought for any breach of this contract is fixed in any court of competent jurisdiction in Dawson County, Texas. All payments under the contract shall be due and payable at ATTORNEY's office in Lubbock, Texas. This contract represents the entire agreement between the parties. No prior agreement of understanding, oral or otherwise, of the parties or their agents will be valid or enforceable unless embodied in this contract. The County Judge of COUNTY has signed this agreement pursuant to the authority placed in him by the Commissioners Court. Any signatory executing this contract on behalf of either ATTORNEY or COUNTY warrants and guarantees that he has authority to execute this contract on behalf of ATTORNEY or COUNTY and to validly and legally bind ATTORNEY and COUNTY to the provisions of this contract.

EXECUTED IN MULTIPLE ORIGINALS ON THE DATES SHOWN.

COUNTY:

_____
Allen Wells, County Judge

ATTEST:

_____
Gloria Vera, County Clerk, Dawson County

Date: _12-11-12_

ATTORNEY:

THE LAW OFFICES OF ARTHUR AGUILAR, JR.

By: _____

Date: _11-30-12_

APPOINTING AUTHORITY:

_____
Carter T. Schildknecht, District Judge

Date: _November 30, 2012_

**Appendix E – Regional Public Defender's Written Procedures and Budget**

# MODIFICATION OF
## REGIONAL PUBLIC DEFENDER CONTRACT DATED OCTOBER 25, 2010

Between

## DICKENS COUNTY, TEXAS

And

## TEXAS TECH UNIVERSITY

July __, 2012

FILED FOR RECORD
THIS 23rd DAY OF Oct, 2012
AT 9:30 O'CLOCK A M.
WINONA HUMPHREYS
CLERK OF COUNTY COURT, DICKENS CO. TEXAS
BY _____ DEPUTY

DICKENS COUNTY, TEXAS ("COUNTY") and TEXAS TECH UNIVERSITY ("ENTITY") entered into a agreement dated October 25, 2010, under which ENTITY agreed to perform legal services for persons accused of crimes in DICKENS COUNTY and other counties that agree to participate in the Caprock Regional Public Defender Office ("CRPDO") program.

In the initial agreement, the following counties were authorized to participate in the CRPDO program with the agreement of DICKENS COUNTY and ENTITY: Armstrong County, Briscoe County, Collingsworth County, Cottle County, Crosby County, Dickens County, Floyd County, Foard County, Hall County, Hardeman County, Haskell County, Kent County, King County, Knox County, Motley County and Stonewall County.

With the agreement of ENTITY and COUNTY, since October 25, 2010, the following additional counties have begun participation in the CRPDO program as per the original contract: Gaines, Swisher, Garza and Dawson and the following counties have failed to enter the program: Hall, Foard, Crosby and Haskell.

All previous terms and conditions of the agreement between the parties dated October 25, 2010, are hereby radified and continued in full force and effect if not expressly modified by this agreement. The grant provider to the COUNTY suggested the third year budget be approved by the COUNTY for all participating counties in the CRPDO program as the amounts are different than those originally anticipated. Attached hereto marked Exhibit A is the proposed budget for the CRPDO program for the third year of operation, October 1, 2012 through September 30, 2013. The COUNTY and the ENTITY hereby agree to this third year budget evidenced by their signatures below, acknowledging that all other terms of the orginal contract will remain the same unless herein modified. Further, the COUNTY and the ENTITY acknowledge and agree:

That the participating counties have not fully utilized the CRPDO as was anticipated on the CRPDO's inception;

That additional time is necessary for the CRPDO to build its client base and gain the confidence of the participating counties;

That as a show of good faith the ENTITY agrees to reduce the contract amount for year three;

That the COUNTY and the ENTITY agree for the third year of the CRPDO's operation only, the COUNTY is not responsible for the original contract amount of FOUR HUNDRED FORTY THOUSAND ($440,000.00) Dollars, but the total of THREE HUNDRED NINETY-EIGHT THOUSAND AND NO/100 ($398,000.00) Dollars;

That this $398,000.00 represents direct costs for contract services to be paid to ENTITY of THREE HUNDRED EIGHTY-THREE THOUSAND AND NO/100 ($383,000.00) Dollars,

and indirect costs of FIFTEEN THOUSAND AND NO/100 ($15,000.00) Dollars to be retained by Dickens County for administrative costs;

That ENTITY will establish it's budget for the third year of the CRPDO for the direct costs of contract services of $383,000.00 to be paid to ENTITY by COUNTY plus approximately SEVENTY-FOUR THOUSAND AND NO/100 ($74,000.00) Dollars being the estimated carry-over belonging to ENTITY by virtue of the second year of operation – the exact amount of the carry-over cannot be calculated until the end of September, 2012;

That the amount of the contract and other terms of the original contract for year four and beyond will remain at the original FOUR HUNDRED FORTY THOUSAND ($440,000.00) unless by agreement the amount is raised or lowed or other modifications are made in writing;

That beginning in year three the COUNTY has previously agreed to pay 20% of the contract amount, which for year three will be SEVENTY-NINE THOUSAND SIX HUNDRED AND NO/100 ($79,600.00) Dollars (20% of $398,000.00), with the 80% balance of the contract ($318,400.00) to be provided by the grant provider using the anticipated carry-over from year two of approximately THIRTY THOUSAND AND NO/100 ($30,000.00) Dollars and a new grant of TWO HUNDRED EIGHTY-EIGHT THOUSAND FOUR HUNDRED ($288,400.00) Dollars;

That any amounts of the third year contract of $398,000.000 remaining on hand at the end of September, 2013, shall be divided pursuant to the **Carry-Over** provisions of the original contract (i.e., the first $39,800.00 to be retained by ENTITY, and the remaining balance over $39,800.00 to be divided equally between COUNTY and ENTITY;

That the budget for year three, attached hereto as Exhibit A, is hereby approved for ENTITY'S accounting purposes and COUNTY'S informational purposes;

That unless further modification is made, the terms of the original contract will remain in effect unmodified for year four and all subsequent years of the CRPDO program;

That two clarifications as to the intended scope of the CRPDO must be enumerated, to-wit:

(1) That on February 2, 2012, the CRPDO's Oversight Board approved a clarification of the scope of the CRPDO program to insure the CRPDO can accept appointments on misdemeanors, felonies and juvenile cases, including appeals on misdemeanors, felonies and juvenile cases, from the County and District Courts of the 7th and 9th Administrative Judicial Region, and

(2) That the current caseload maximum of the CRPDO is 600 misdemeanor cases, or their weighted equivalent;

That the CRPDO may also receive the appointment of appeals from any courts within the 7th and 9th Administrative Judicial Region -- whether or not from counties in the CRPDO

program -- until such time as CRPDO has reached its full caseload maximums, as set by the CRPDO's Oversight Board, giving preference to the needs of the counties within the CRPDO program;

That any appeals accepted by the CRPDO from counties not participating in the CRPDO program shall be compensated by the appointing county at its normal customary court appointed rate with any sums received to be credited against COUNTY's obligations to the ENTITY hereunder;

That upon the hiring of a second Assistant Public Defender, should that occur, the caseload maximum of CRPDO, with approval of the CRPDO Oversight Board, will increase to 1000 misdemeanor cases, or their weighted equivalent; and

That the ENTITY and COUNTY hereby agree to these clarifications of scope to take effect August 1, 2012, and to continue for the life of the CRPDO.

**COUNTY:**

Judge Lesa Arnold (or her successor)
Dickens County Judge
Post Office Box 179
Dickens, Texas 79229

**ENTITY:**

FOR TECHINICAL ISSUES:

> Patrick S Metze (or his successor)
> Director, CRPDO
> Texas Tech University School of Law
> 1802 Hartford Avenue
> Lubbock, Texas 79408

FOR CONTRACTUAL ISSUES:

> Dr. Jay B. McMillen
> Assistant Managing Director
> Office of Research Services
> Texas Tech University
> P.O. Box 41035
> 203 Holden Hall
> Lubbock, Texas 79409-1035

With copy to:

Dr. Kathleen Harris
Senior Associate Vice President for Research
Office of Research Services
Texas Tech University
P.O. Box 41035
203 Holden Hall
Lubbock, Texas 79409-1035

SIGNED AND EXECUTED by the parties on the date(s) indicated by the signatures of the authorized representatives.

DICKENS COUNTY

By: _____ Date: 10/22/12

Judge Lesa Arnold (or her successor)
Dickens County Judge
Post Office Box 179
Dickens, Texas 79229

TEXAS TECH UNIVERSITY

By: _____ Date: 10/8/12

Dr. Kathleen Harris
Senior Associate Vice President for Research
Office of Research Services
Texas Tech University
Post Office Box 41035
203 Holden Hall
Lubbock, Texas 79409-1035

**EXHIBIT A**
**THIRD YEAR BUDGET FOR CAPROCK REGIONAL PUBLIC DEFENDER OFFICE**

| FY 2013 | Budget Expenses | Projected FY 2013 |
|---|---|---|
| ? | Indirect Costs to Dickens | $ 15,000.00 |
| 6A1 | Faculty salaries | |
| | Metze | $ 15,000.00 |
| | Yandell | $ 105,995.76 |
| 6A2 | Staff salaries | |
| | Washington | $ 50,000.00 |
| | Pelowski | $ 72,000.00 |
| | Clerk | $ 10,000.00 |
| 6B4 | Fringe | $ 80,000.00 |
| | Research | $ 50,000.00 |
| 7B | Travel | $ 12,000.00 |
| 7C | Materials/supplies | $ 8,000.00 |
| 7D0030 | Telecomm services | $ 5,200.00 |
| 7F1010 | Repairs/maintenance | $ 1,500.00 |
| 7G | Rental | $ 38,615.24 |
| 7H0026 | Printing | $ 2,000.00 |
| 7N | Other expenses | $ 1,700.00 |
| 7N1000 | Dues | $ 89.00 |
| 7N3 | Other services | $ 2,400.00 |
| 7N4 | Food/entertainment | $ 2,000.00 |
| 7N6009 | Other exp | $ 500.00 |
| | Total: | $ 472,000.00 |
| | Direct Costs | $ 383,000.00 |
| | Indirect Cost | $ 15,000.00 |
| | Total Contract: | $ 398,000.00 |
| | County pays 20% | $ 79,600.00 |
| | TIDC: | |
| | FY 2012 Carry-over | $ 30,000.00 |
| | TIDC FY 2013 contrib. | $ 288,400.00 |
| | TIDC pays 80% | $ 318,400.00 |
| | Tech's Carry-over | $ 74,000.00 |
| | Total budget FY 2013 | $ 383,000.00 |
| | Indirect Costs | $ 15,000.00 |
| | Budget FY 2013 | $ 472,000.00 |

# FY 2013 County Costs

| County | 2010 Pop. Est. | Portion of Population | FY 2012 Projected Use | FY 2013 Min. Case Allocation | FY 2013 Max. Case Allocation | Year 3 | Cost Per Case 2011 & 2012 | Cost Per Case @ FY 2012 Usage | Cost Per Case FY 2013 at Min | Cost Per Case FY 2013 at Max |
|---|---|---|---|---|---|---|---|---|---|---|
| Armstrong | 2,188 | 3.00% | 15 | 18 | 30 | $2,388.00 | $0.00 | $ 159.20 | $ 132.67 | $ 79.60 |
| Briscoe | 1,577 | 2.17% | 15 | 13 | 22 | $1,727.32 | $0.00 | $ 115.15 | $ 132.87 | $ 78.51 |
| Collingsworth | 3,059 | 4.20% | 0 | 25 | 42 | $3,343.20 | $0.00 | | $ 133.73 | $ 79.60 |
| Cottle | 1,647 | 2.26% | 0 | 14 | 23 | $1,798.96 | $0.00 | | $ 128.50 | $ 78.22 |
| Dawson | 13,929 | 19.13% | 95 | 115 | 192 | $15,227.48 | $0.00 | $ 160.29 | $ 132.41 | $ 79.31 |
| Dickens | 2,656 | 3.65% | 35 | 22 | 37 | $2,905.40 | $0.00 | $ 83.01 | $ 132.06 | $ 78.52 |
| Floyd | 7,248 | 9.95% | 42 | 60 | 100 | $7,920.20 | $0.00 | $ 188.58 | $ 132.00 | $ 79.20 |
| Gaines | 15,201 | 20.88% | 40 | 125 | 208 | $16,620.48 | $0.00 | $ 415.51 | $ 132.96 | $ 79.91 |
| Garza | 5,057 | 6.95% | 54 | 42 | 70 | $5,532.20 | $0.00 | $ 102.45 | $ 131.72 | $ 79.03 |
| Hardeman | 4,352 | 5.98% | 23 | 36 | 60 | $4,760.08 | $0.00 | $ 206.96 | $ 132.22 | $ 79.33 |
| Kent | 816 | 1.12% | 1 | 6 | 10 | $891.52 | $0.00 | $ 891.52 | $ 148.59 | $ 89.15 |
| King | 355 | 0.48% | 0 | 3 | 5 | $382.08 | $0.00 | | $ 127.36 | $ 76.42 |
| Knox | 3,797 | 5.21% | 11 | 31 | 51 | $4,147.16 | $0.00 | $ 377.01 | $ 133.78 | $ 81.32 |
| Motley | 1,465 | 2.01% | 12 | 12 | 20 | $1,599.96 | $0.00 | $ 133.33 | $ 133.33 | $ 80.00 |
| Stonewall | 1,460 | 2.01% | 12 | 12 | 20 | $1,599.96 | $0.00 | $ 133.33 | $ 133.33 | $ 80.00 |
| Swisher | 8,007 | 11.00% | 11 | 66 | 110 | $8,756.00 | $0.00 | $ 796.00 | $ 132.67 | $ 79.60 |
| Totals: | 72,814 | 100.00% | 366 | 600 | 1000 | $79,600.00 | | | | |

| | | Indirect Costs to Dickens | CRPDO Contract | Equipment Budget | Total Contract | Total Revenue | Total Expenses | Funds Returned | Funds Carried over | Maximum Caseload |
|---|---|---|---|---|---|---|---|---|---|---|
| FY2010 | Year 1 | $ - | $ 440,000.00 | $ 123,064.00 | $ 563,064.00 | $ 489,730.60 | $ 346,025.65 | $ 44,500.56 | $ 99,204.39 | 400 |
| | Equipment cost | | | $ 53,492.43 | | | | | | |
| | Funds unused | | | $ 69,571.57 | | | | | | |
| FY2011 | Year 2 | $ - | $ 440,000.00 | | $ 440,000.00 | $ 440,000.00 | $ 336,000.00 | $ 30,000.00 | $ 74,000.00 | 600 |
| FY2012 | Year 3 | $ 15,000.00 | $ 383,000.00 | | $ 398,000.00 | | | | | 600 |
| | TIDC's 80% | | | | $ 318,400.00 | | | | | |
| | Less Funds Returned to TIDC | | | | $ (30,000.00) | | | | | |
| | Total TIDC Contrib | | | | $ 288,400.00 | | | | | |
| | Counties' 20% | | | | $ 79,600.00 | | | | | |

# Caprock Regional Public Defender Office

## Mission Statement:

The Caprock Regional Public Defender Office provides zealous advocacy for indigent people in West Texas who are accused of committing crimes; educates third-year Texas Tech law students about criminal defense representation; assists criminal defense attorneys in West Texas; and furthers and promotes the causes of justice and equality in Texas and throughout the United States.

## Vision Statement:

The Caprock Regional Public Defender Office will endeavor to grow and expand the educational opportunities it provides to students and the service it provides to members of the community. The clinic will work with the Law School administration and its faculty to increase the number of law students who can take the clinic. The clinic will work with members of the bench and bar to expand the number and types of cases that it handles. The clinic will collaborate with more organizations to further its goals and mission.

## Goals:

The Caprock Regional Public Defender Office has four primary goals. They are as follows:

1. The timely and efficient representation of indigent clients appointed to the office within the region for which the office operates while maintaining the quality of the representation at an exemplary level.

2. The training and education of third year students attending the Texas Tech School of Law who have shown an interest in practicing in a criminal law environment.

3. Assist the counties in the region for which the office operates in their budgetary and criminal justice concerns by striving to assist the counties to minimize the counties' expenses.

4. Provide raw data to and assist other schools within the Texas Tech University System with research interests that could benefit from the data obtained as a result of the office while maintaining client confidentiality.

# Table of Contents

## Contents

Mission Statement:................................................................................................................. 1

Vision Statement:.................................................................................................................. 1

Goals: .................................................................................................................................... 1

A.      Purpose................................................................................................................. 3

B.      Objective .............................................................................................................. 3

C.      Personnel ............................................................................................................. 3

D.      Continuing Legal Education ............................................................................... 4

E.      Investigator Training .......................................................................................... 4

F.      Conflict Checks ................................................................................................... 5

G.      Caseload Allocation ........................................................................................... 5

H.      Case Management/Performance Guidelines ...................................................... 8

I.      Ethics of Public Service ..................................................................................... 9

J.      Discrimination/Sexual Harassment: ................................................................. 10

K.      Equal Employment: ........................................................................................... 13

L.      Drug Free Workplace: ....................................................................................... 13

M.      Confidentiality: .................................................................................................. 14

N.      Outside Speaking Engagements:........................................................................ 14

O.      Outside and Self Employment: ......................................................................... 14

P.      Acceptance of Gifts:.......................................................................................... 15

Q.      Use of Public Defender Property for Personal Business: .................................. 15

R.      Media Relations:................................................................................................ 16

S.      Conduct: ............................................................................................................ 17

T.      Personal Appearance:........................................................................................ 17

U.      Computer Policies and Procedures: .................................................................. 18

V.      Ethics: ................................................................................................................ 18

W.      Construction:...................................................................................................... 19

This manual is designed to function as the working guide to the operation and utilization of the Caprock Regional Public Defender Office. The policies and procedures outlined in this manual have been developed by the Public Defender. These guidelines are subject to the organizational agreement between the Public Defender and the oversight board created by counties serviced by the office. Policies and procedures described in this manual are subject to change on an "as needed" basis as the needs and capabilities of the office and the county change.

## A.     Purpose

1.      The purpose of these guidelines is to provide principles for establishing and maintaining productive relationships between the Office and its employees.

2.      The Chief Public Defender reserves the right to change any provision of these guidelines unilaterally at any time, without individual notice of the potential change to the individual employees.

3.      No employee, supervisor, official, or representative of the Caprock Regional Public Defender Office has any authority to change any portion of these guidelines, except at the specific direction of the Chief Public Defender.

## B.     Objective

The objectives of these guidelines, as supported by sound personnel administration, include:

1.      To treat applicants and employees in accordance with the law.

2.      To motivate employees to work toward the goals established by the Office and to ~~provide~~ create a working environment~~,~~ which ~~provide for~~encourages employee achievement, recognition and growth.

## C. Personnel

Detailed job descriptions for each position in the Public Defender's office are attached as Appendix "A" to this document. The positions that are envisioned for the Public Defender's Office are:

1. Attorneys
   a. Chief Public Defender;
   b. First Assistant Public Defender; and
   c. Assistant Public Defender.

3

2. Investigation
    a. Chief Investigator

3. Support Staff
    a. Administrative Assistant

4. Conduct/ Ethical Guidelines

As employees of attorneys, staff members are bound by the same ethical standards as attorneys. **First and foremost, this includes the attorney-client privilege. Anything we learn from a client is confidential and will not be shared with anyone outside this office without the clients' permission. This includes friends and family of the client.**

Secondly, all members of the PDO should be respectful of the witnesses and other parties that we come across during the course of our representation of a client. While there will be individuals who will make it difficult or impossible to do that, always go into the situation as respectfully as possible. You should also show respect to the victims who agree to speak with us. Finally, you should seek a parent or guardian's permission before speaking to a juvenile witness or victim.

5. Sick/ Vacation Leave

Sick and vacation leave are to be governed under the guidelines and policies of Texas Tech University.

## D.     Continuing Legal Education

Under the Texas Fair Defense Act, any attorney requesting appointments to represent indigent defendants must have at least ten (10) hours of continuing legal education in the field of criminal law each calendar year and be an active member of the State Bar of Texas to maintain eligibility to receive appointments.

The PDO will cover all expenses in sending its attorneys to CLE seminars approved in advance by the Chief Public Defender in order to meet with appointment requirements. The PDO will also cover the expense for membership dues to the State Bar of Texas and the Texas Criminal Defense Lawyer's Association.

## E.     Investigator Training

The investigator will receive training and certification under the guidelines of the National Association of Investigative Specialists (NAIS). The investigator will need to become

proficient in interviewing skills, with the use of a digital camera and voice recorder, and with scene or location sketches or diagrams. The investigator will also need to review and become familiar with common investigative manuals and procedures utilized by local law enforcement agencies to assist the attorneys in strategy planning before trial.

## F.    Conflict Checks

It is axiomatic in law that a lawyer cannot effectively represent a client when there exists a conflict of interest.  In criminal defense work, that conflict most often arises when you have been appointed to represent someone and you already represent the victim, a co-defendant, or adverse witness in the case.  In order to avoid that situation, a conflicts check is to be conducted on each case early in the appointment process.

The administrative assistant, or the attorney assigned to the case, should enter in the names of the client, victim(s), co-defendant(s), if any, and any known witnesses into the conflict checking software.  If additional victims, witnesses, etc. are later uncovered, they should also be entered into the software program to see if a conflict arises.

In the event a potential conflict is uncovered, the attorney needs to view the nature of the conflict and then make a professional judgment as to whether withdrawal is required.  If in doubt, the attorney should discuss it with the Chief Public Defender or the First Assistant for guidance.

If withdrawal is required, the attorney shall report the conflict to the Chief Public Defender who shall approve the withdrawal after consideration and report the need for withdrawal to the appointing court.

## G.    Caseload Allocation

The ability to provide zealous and effective representation of indigent citizens accused of crimes depends on the skill of the attorney, the quality of the support staff, adequate funding for investigators and experts, and sufficient time to adequately investigate, research and prepare the case.  In order to allow sufficient time to be allocated to any individual case, the attorneys and support staff must not be responsible for representing too many clients at any one time, lest the representation of all should suffer.  Counterbalancing the needs of the client is the need to be mindful of the limited resources available to the defense of indigent citizens.  The caseload standards and allocation plan for fairly distributing cases amongst the attorneys of the public defender's office seeks to maximize the number of cases that can be handled by the office while still maintaining a quality defense in line with ethical and professional standards.

1.   Caseload Standards

Office Caseload standards (Developed through reference to other case management standards used by public defender and legal aid offices, including the National Legal Aid and Defender Association {NLADA}. These standards may be reevaluated later based upon actual experience by the Caprock Regional Public Defender Office.)

    a. Types of Cases
        i. Felonies – All degrees (No capital cases)
        ii. Misdemeanors – Class A & B

    b. Caseload Limits
        i. 400 Cases/Year Per Attorney
        ii. These standards may be modified by agreement of the Commissioner's Overnight Committee, Board of Judges, and the Public Defender's office based upon:
            1. Number and type of support personnel;
            2. Actual mix of cases;
            3. Experience and position level of attorney; and
            4. Actual experience.

    c. Case tracking
        i. Computer software program to track and monitor caseloads to determine most viable numbers will be implemented.
        ii. Records to be kept regarding number of each grade felony and misdemeanor assigned to office will be implemented.

2. <u>Chief Public Defender Caseload</u>

Initially, with one attorney handling just misdemeanors and juveniles, considering the statewide average of 35% appointments for cases added and the region's four year average of 1261 misdemeanors and 38 juveniles added each year, should juvenile appointments rise to 200% of juvenile cases added (76 cases), this would allow the Chief Public Defender to handle a total of 248 misdemeanor cases. At the statewide 35% appointment rate (441 misdemeanors), this would result in 193 defendants that would have to receive appointment of counsel from the traditional appointment wheel until the Assistant Public Defender is hired in April, 2011. However, timing should bring the Assistant Public Defender onboard at about the right time to lessen the effect of the Chief Public Defender reaching his maximum caseload. Until the Fall, 2011, the Chief Public Defender will not have duties associated with instruction or supervision of student attorneys. At that time, the Chief Public Defender's caseload should drop to a total of 56 juvenile cases and 228 misdemeanors.

3. <u>Assistant Public Defender</u>

As the Assistant Public Defender will be hired in April, 2011, this would open up an additional 400 misdemeanor appointments, assuming juvenile appointments do not exceed double the 4 year average.

4. Anticipated Increase in Appointments

From experience, once public defenders are available for juvenile cases, the juvenile caseload is expected to double to 76 juvenile cases and the number of adults that qualify as indigent for appointment will increase to 50% of cases added. At that time, juvenile caseload should reach 76 and misdemeanors 630. With the Chief Public Defender handling all the juveniles and 248 of the misdemeanors the remaining 382 misdemeanors will virtually create a full caseload for both attorneys. This is expected within the first year.

5. Student Attorneys

Once the initial 12 student attorneys are assigned in the Fall, 2011, over the next 9 months, the students should handle 180 of these cases, both misdemeanors and juveniles (average 9 month caseload would be 15 cases per student). These cases should be assigned 120 to the Assistant Public Defender giving him a balance of 262 cases on his exclusive docket. The Chief Public Defender will see his exclusive docket reduce from 248 misdemeanors and 76 juveniles to 228 misdemeanors and 56 juveniles (juvenile cases taking twice as much time as a typical misdemeanor case).

Due to the fact that unforeseen circumstances may present themselves, the Chief Public Defender will be responsible for monitoring and adjusting the caseload as he/she sees fit.

| Chief Public Defender's Caseload: | | | | Until Fall 2011 |
| --- | --- | --- | --- | --- |
| | Maximum Caseload PD | Maximum Caseload PD | Maximum Caseload PD | Expected Caseload PD |
| Misdemeanors | 400 | | | 248 |
| Juveniles | | 200 | | 76* |
| Felonies | | | 150 | 0 |

| First Assistant Public Defender's Caseload: | | | | Until Fall 2011 |
| --- | --- | --- | --- | --- |
| | Maximum Caseload PD | Maximum Caseload PD | Maximum Caseload PD | Expected Caseload PD |
| Misdemeanors | 400 | | | 400 |
| Juveniles | | 200 | | 0 |
| Felonies | | | 150 | 0 |

12 Student Attorneys Caseload:

|  |  |  |  | Fall 2011 Expected Caseload Student Attorneys |
| --- | --- | --- | --- | --- |
| Total cases for the period of August, 2011 – May, 2012 |  |  |  | 180 cases |
| Misdemeanors |  |  |  | 140 |
| Juveniles |  |  |  | 20 (Juv x2)* |
| Felonies |  |  |  | 0 |

| Fall: 2011: | Misdemeanors | Juveniles |  | % of time to cases |
| --- | --- | --- | --- | --- |
| Student Attorneys | 140 | 20 | (Juv x2)* | 100% |
| PD | 228 | 56 |  | 85% |
| 1st Asst. PD | 280 |  |  | 70% |
| Totals: | 648 | 76 | (Juv x2)* |  |
| Total cases: | 800 |  |  |  |

*Juvenile cases count as two misdemeanor cases as they take twice as much time.

## H.    Case Management/Performance Guidelines

The provision of criminal defense services is not one that easily lends itself to pure numerical analysis.  While the process of determining the dollars and cents it costs to provide defense services for "x" number of cases is ascertainable, determining the actual quality of those services is more difficult.  The Constitution guarantees all citizens accused of jailable offenses the effective representation of counsel. Mindful of that guarantee, the goal should be to provide a high quality of representation at a reasonable cost and not the bare minimum at lowest possible cost.  While there is no one standard to determine effective representation, the Public Defender should seek to measure, to the extent possible, those items that the office and the Commissioner's Court agree provide some measure of the success in providing criminal defense services.  These measurements and reports are subject to ongoing revision based upon the capabilities of the equipment available to capture the information and the determination of the parties as to what constitutes valid measurement criteria.

For more objective measurements of the PDO's performance, reports relaying the following information are under development. In the event that the computer software used by the office is unable to prepare this information, alternative reports shall be developed.

1.      Effectiveness of Representation

    a.      Monthly case flow
        i.  Number of cases received;
        ii.  Number of cases closed; and
        iii.  Pending case load

    b.      Length of time from:
        i.  Arrest to appointment;
        ii. Arrest to release from custody with judgment or dismissal;
        iii.  Appointment of case to release from custody with judgment or dismissal; and
        iv.  Appointment to disposition of case

# I.      Ethics of Public Service

Public Service is a public trust. The highest obligation of every individual in our organization is to fulfill that trust. Each person who undertakes this public trust assumes two paramount obligations:
      - to serve the public interest by zealously representing our clients;
      - to perform public services with integrity.

These are the commitments implicit in all public service. In addition to faithful adherence to these principles, public employees have an additional duty to discern, understand and meet the needs of their fellow citizens so far as this does not conflict with the zealous and ethical representation of our clients. That is the definition of a public servant. As public lawyers, each Assistant Public Defender (APD) is charged with the ethical obligations owed by every member of the bar. Each Assistant Public Defender is additionally charged with the ethical duties and responsibilities of the government lawyer.

The core values above should be the foundation of all action by members of our staff. These principles are too general to govern the resolution of concrete ethical problems. In an attempt to spell out the practical implications of these core values, we have articulated the principles set forth below. We address them to you in the hope that they will guide your day-to-day work and help you deal with ethical dilemmas you may face:

Integrity requires of you a consistent approach to all issues, decisions or actions. Your willingness to speak up is essential.

The true public servant:

9

- will not act out of spite, bias, or favoritism;

- will not tell the boss only what he/she wants to hear;

- respects the competence and views of others;

- does not succumb to peer or other pressure;

- contributes to a climate of mutual trust, respect and friendliness;

- refuses to let official actions be influenced by personal relationships, including those arising from the past or prospective employment;

- has the courage of his or her convictions;

- unflinchingly accepts responsibility;

- does not try to shift blame to others and accepts responsibility for one's own actions and conduct;

- never forgets that they are working for the people...all the people.

Every Assistant Public Defender must adhere to the spirit and letter of the provisions set forth in the State Bar Rules governing disciplinary conduct, the Texas Lawyer's Creed, and the Texas Code of Criminal Procedure.

## J.     Discrimination/Sexual Harassment:

*Policy*

1.     It is the policy of the Caprock Regional Public Defender Office to employ positive business and personnel practices designed to ensure the full realization of equal employment opportunity without regard to race, color, age, religion, sex, sexual orientation, national origin, handicap, or veteran status.

2.     The purpose of this policy is to provide a workplace that is free from unsolicited and unwelcome behavior, including sexual overtures or conduct, either physical or verbal.  This policy is in accordance with and in addition to the Texas Tech University Policy and Procedure Manuel.

3.     Specifically forbidden is discrimination/harassment of a sexual, racial, ethnic, or religious nature.  Such harassment  includes unsolicited remarks, gestures or physical contact, display or circulation of written materials or pictures derogatory to either gender or to a racial, ethnic, or religious group.

4.	Violations of this policy will not be permitted.  Any employee or supervisor who violates this policy will be subject to immediate and appropriate discipline up to and including immediate termination.  It is the duty of each employee to report any incident of prohibited conduct whether it involved them personally or another employee.

5.	Retaliation against an employee for reporting conduct in violation of this policy will not be permitted.

*Sexual Harassment and Discrimination – Definition*

1.	Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature when:

> Submission to such conduct is made whether explicitly or implicitly a term or condition of an individual's employment; or
>
> Submission to or rejection of such conduct by an individual is used as the basis of employment decisions affecting such individual; or
>
> Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

*Sexual Harassment and Discrimination Rules of Conduct*

1.	Personnel actions shall not be taken affecting an employee (either favorably or unfavorably) on the basis of conduct which violates this policy and is not related to the workplace.  Such conduct may include submitting to sexual advances, refusing to submit to sexual advances, protesting sexual overtures, or making a complaint concerning the alleged violations of this policy.

2.	Employees shall not behave in a manner that is unwelcome by any other employee and is personally offensive, such as, but not limited to the following examples:

> Repeated sexual flirtations, advances, or propositions;
>
> Continued or repeated verbal abuse of a sexual nature, sexually related comments and joking, graphic or degrading comments about an employee's appearance, or the display of sexually suggestive objects or pictures;
>
> Any uninvited physical contact by touching, such as patting, pinching, or brushing against another's body; or
> Any conduct that unreasonably interferes with another employee's

performance or creates an intimidating, hostile, or offensive working environment even if no tangible or economic damages result.

3. Employees shall not exert pressure for sexual favors, including implying or threatening that an applicant's or employee's cooperation of a sexual nature (or refusal of it) will have any effect on the person's employment, job assignment, wages, promotion, or on any other conditions of employment or future opportunities.

4. No employee shall bring or possess any pornographic or sexually explicit material in the workplace. Any such material found in the workplace shall be immediately confiscated. This subsection does not apply to evidentiary material handled in the normal course of criminal defense litigation.

*Reporting/Investigations*

1. Any employee who feels that he/she is a victim of discrimination or harassment shall immediately report the matter to the Chief Public Defender or the Office Manager. In addition, the employee may also file his/her complaint with the Director of Personnel or directly to any field office of the Equal Employment Opportunity Commission (EEOC) or the Texas Human Rights Commission (THRC). Provided, however, that in the event the employee elects to report directly to the EEOC or THRC, the employee must provide notice to the Chief Public Defender or Personnel Department within 24 hours of filing said report or complaint.

2. Any person who received a report of discrimination or harassment or becomes involved with its investigations shall keep all information about it as confidential as possible in order to protect other victims and witnesses from retaliation and the alleged harasser from defamation if the accusations are unfounded. All written materials relating to the investigation and recommended action, including complaint forms, notes, memos, statements, etc., shall be kept confidential to the greatest extent allowed by law and shall be maintained in a secure file with access allowed only to the Chief Public Defender and any other person specifically authorized by the Chief Public Defender.

3. Any person who received a report of discrimination/harassment shall treat the employee making the report with respect and dignity and shall immediately investigate the report seeking all assistance necessary to obtain a thorough investigation. If it becomes apparent that it is in the best interest of those involved for an employee to remain away from the workplace during the investigation, that employee will be placed on administrative leave with pay until completion of the investigation. If harassment is found, the Chief Public Defender shall take prompt and reasonable remedial action to end the harassment and prevent the misconduct from recurring.

12

4. Each employee has a responsibility to report incidents of obvious discrimination or harassment. Each employee shall cooperate with the Discrimination/Harassment Review Committee in the conduct of its investigation. Any employee who fails to comply is subject to discipline up to and including immediate termination.

5. Any employee who has been found to have been involved, actively, or passively, in discrimination/harassment, is subject to discipline, which may include reprimands, probation, suspension, and immediate termination.

6. Individuals who believe that they are being sexually harassed by a supervisor are not required to discuss the matter with their supervisor. They should notify and report such harassment to one of the other persons listed above.

## K.    Equal Employment:

It is the policy of the Caprock Regional Public Defender Office to prohibit discrimination in matters of recruitment, employment, training, promotion, wages, or discipline because of race, color, sex, sexual orientation, age, religion, national orientation, marital status, or disability in accordance with all Federal, State or local regulations.

## L.    Drug Free Workplace:

The office of the Caprock Regional Public Defender Office and the citizens of this community have a vital interest in maintaining a safe, healthful and efficient workplace for the Caprock Regional Public Defender Office employees and in maintaining the integrity and reputation of the Office. Being under the influence of a drug or alcohol on the job, may pose safety and health risks, not only to the user but to all those who work with the user.

The possession, use, abuse or sale of any legal or illegal drug, controlled substance or alcohol in the workplace poses an unacceptable risk to the safe, healthful and efficient performance of our mutual job responsibilities and the integrity and reputation of this Office. Such misconduct is expressly prohibited. Likewise, the illegal possession, use, abuse or sale of a legal or illegal drug, controlled substance or alcohol outside the workplace is a violation of law and is expressly prohibited. Any such misconduct by an employee of the Caprock Regional Public Defender Office diminishes the integrity, public trust and reputation of both our organization and employees and may result in disciplinary action up to and including termination.

The Caprock Regional Public Defender Office recognizes that the physical and psychological health of its employees is critical to its success. Accordingly, it is the right, obligation and intent of the Caprock Regional Public Defender Office to maintain a drug free, safe, healthful and efficient working environment for all its employees and to protect the Office's and employee's reputation, integrity, property, equipment and operations.

## M.    Confidentiality:

Although we are a public organization, the information contained in our files and records or otherwise obtained by virtue of our employment is strictly <u>CONFIDENTIAL</u>!  Employees are prohibited from discussing or providing written or verbal information on any aspect of a pending or closed case or internal procedures and operations with or to any person unless such information has previously been or required to be discussed in a legally recognized manner, e.g. a judicial proceeding or a proper request under the Texas Open Record Act.

Requests for information contained in our files or records should be made in writing.  Any questions on this policy and all written requests for information under the Texas Open Records Act shall be directed immediately to the Chief Public Defender.

Under no circumstances are employees of the Caprock Regional Public Defender Office to provide confidential information to any person outside of our organization.  Failure to strictly adhere to this policy will result in immediate disciplinary action, including termination.

## N.    Outside Speaking Engagements:

Employees of the Caprock Regional Public Defender Office are encouraged to participate in outside activities, which educate and assist in explaining the Caprock Regional Public Defender Office's role in the criminal justice process, explain citizen's individual rights, or represent the Caprock Regional Public Defender Office in our community.  These activities include speaking engagements, participation in seminars and attendance at community meetings.

Every Caprock Regional Public Defender Office employee has a recognized Constitutional right to freedom of speech.  However, prior approval from the Chief Public Defender is required whenever an employee undertakes to speak on behalf of the Caprock Regional Public Defender Office or represent any aspect of our organization to the public.

During normal business hours, all such speaking requests shall be coordinated with our business schedule and receive prior approval from the Chief Public Defender.  Our principal business commitment takes precedence over outside speaking engagements.

## O.    Outside and Self Employment:

All employees must have the written approval of the Chief Public Defender prior to beginning any outside employment or self-employment. Outside employment and self employment are defined as work for personal economic remuneration.  The Chief Public Defender may give such approval only if the following items are understood and agreed to by the employee:

1.    There is no conflict of interest between the Public Defender job and the proposed outside work;

2. The proposed work will not interfere with the employee's regular work schedule;

3. The proposed work will not, in the opinion of the Chief Public Defender, interfere with the quality or quantity of the employee's regular Public Defender work.

The employee should understand that after approval has been granted, if the preceding items are not met, the employee will be asked to resign either from the outside work or from the Public Defender's office. A request for permission to enter outside or self-employment must be initiated by the employee in writing and shall provide detailed information as to the nature of the outside work and the hours to be worked.

Any change in the nature or hours of previously approved outside work or self-employment shall be communicated in writing to the Chief Public Defender for the purpose of determining continued approval.

Under no circumstances are employees to contract outside or self-employment activities on Public Defender premises during times for which they are being compensated by the Office. Employees are not to disrupt or interfere with the productivity of coworkers in furtherance of outside work or self-employment.

Assistant Public Defenders are not allowed to perform criminal legal work outside the scope of their work for the office or which is in violation of Article 26.044, of Code of Criminal Procedure.

## P. Acceptance of Gifts:

The practice of Caprock Regional Public Defender Office employees accepting gifts or gratuities is not only unnecessary and undesirable, but also contrary to the public interest and law. Therefore, all employees are prohibited from accepting gifts, gratuities or favors from clients, their families or friends.

All attempts to provide gifts, favors, services or other things of value to employees of the Caprock Regional Public Defender Office shall be immediately reported to the Chief Public Defender.

The Chief Public Defender may approve exceptions to this rule, such as flowers or a box of candy shared by the entire Office.

## Q. Use of Public Defender Property for Personal Business:

Office supplies, computer, software and hardware, internet/email access, diskettes, photocopy equipment, telephone services, etc., are provided to Caprock Regional Public Defender Office employees for furtherance of official business purposes. These items are not for

personal use. They are not an informal fringe benefit of employment with the Caprock Regional Public Defenders Office.

The reasonable use of telephone for personal local calls of short duration is allowed. Personal long distance telephone calls (including FAX) are prohibited when charged to the Caprock Regional Public Defender Office.

## R.  Media Relations:

It is the intent of the Caprock Regional Public Defender Office to make public information available to the news media without undue delay, while at the same time, assuring that any official statements from the Caprock Regional Public Defender Office be handled from a central point in the Office. All employees should maintain a cordial and helpful relationship with representatives of the print, broadcast and television media in responding to media inquiries by referring inquiries to the Chief Public Defender or the appropriate Assistant Public Defender personnel. Any employee answering a news media inquiry must take full responsibility for any misquotes, interpretations or misinterpretations. In order to accomplish the above objectives, all Caprock Regional Public Defender Office employees shall abide by the following rules:

*Inquiries Regarding Litigation*

1.  No information regarding cases within the Caprock Regional Public Defender Office shall be made public unless previously authorized by the Chief Public Defender.

2.  From the time a case is received in the Caprock Regional Public Defender Office to the final disposition of the case, no employee shall make or authorize the release of any extra-judicial statement which may possibly have a prejudicial effect on a pending matter. This includes: a) The character, credibility, reputation or criminal record of a client or witness, or the identity of a witness, or the expected testimony of a witness; b) The possibility of a plea or the existence or contents of any admission, confession or statement given by a client, or that person's refusal to make a statement; c) Any opinion as to the guilt or innocence of any person; d) Information that a Public Defender employee knows or reasonably should know is likely to be admissible as evidence in a trial that would, if disclosed, create a substantial risk of prejudicing an impartial trial and e) The prior criminal record (including arrests, indictments or other charges of crimes), or the character or reputation of any person involved.

3.  Responses regarding litigation are further restricted and dictated by Rule 3.07 of the Texas Disciplinary Rules of Professional Conduct. Of paramount consideration is our ethical responsibility to avoid prejudicial pre-trial publicity.

*Non-Litigation Inquiries:*

1.  Employees of the Caprock Regional Public Defender Office who may from time to time be directed or requested by the Chief Public Defender to act as an official representative

of the office for a special purpose or occasions are to observe the following guidelines with appropriate good judgment.

Nothing is done publicly, by word or deed that would discredit the office of the Caprock Regional Public Defender Office, its officials, employees, or programs; and the conduct of an official representative is to be appropriate to the occasion.

No new information is made public without prior clearance with the Chief Public Defender or the designee of the Chief Public Defender.

Any statements made formally or informally are to reflect favorably and respectfully with reference to the Caprock Regional Public Defender Office.

Statements of facts regarding office programs are not to be issued unless previously published, and/or approved by the Chief Public Defender.

2.      Caprock Regional Public Defender Office employees shall not make any policy statements as to what the Caprock Regional Public Defender Office will or will not do unless such decision has previously been made by the Chief Public Defender and announced by him/her. Policy decisions will only be made and communicated by the Chief Public Defender or his/her designee.

## S.     Conduct:

1.      Courtesy:     Common Courtesy in interacting with other employees, court personnel, clients and others is required.

2.      Attitude:     A good attitude is important and required in maintaining a good working environment.

3.      Neatness and Organization:   OFFICES MUST BE KEPT CLEAN AND ORGANIZED. All employees are expected to clean up after themselves and be organized in their work and break areas.

4.      Work stations must be closed down at the end of the day. Monitors, terminals, radios, etc. need to be turned off before employee leaves for the day.

## T.     Personal Appearance:

Since the Office of the Caprock Regional Public Defender Office serves the public and is subject to public scrutiny, each employee has the obligation to view his or her personal appearance as it reflects on this office. Due to the law office setting and its traditional dress norms, employees are to dress conservatively and avoid extremes. Also, neatness and good grooming are important factors in projecting the Caprock Regional Public Defender Office in a positive public image.

## U.     Computer Policies and Procedures:

The Caprock Regional Public Defender Office maintains a computer network and related computer equipment for use by the Assistant Public Defenders and staff in the conduct of official business. All employees must be familiar with and follow office policy and procedure with respect to use of the computer network and related equipment. The failure to follow these policies and procedures may result in a loss of access to the network system and disciplinary action deemed appropriate by the Chief Public Defender, up to and including termination. All records created or maintained on the system are the property of the office of the Caprock Regional Public Defender Office and not the individual employees. In addition, many of the documents on the system are subject to the attorney/client privilege and must be kept confidential. The management of this office reserves the right to monitor the operation of the system, to access all of the records within it, and to retain or dispose of those records as it deems necessary and in accordance with the applicable laws. Subject to the policies set forth herein below, employees may use the system to store their personal information and send occasional messages. However, in doing so, the employees accept the organization's right to ownership of this system and acknowledge that they have no personal rights of privacy to any messages or information placed in or received from the system.

The following policies and procedure shall be adhered to with regard to the computer network and related equipment maintained and utilized by the Caprock Regional Public Defender Office.

*Policies*

1.     Employees are responsible for the proper use and maintenance of all Public Defender equipment, including any computers, terminals, printers and other equipment individually assigned to an employee.

2.     All employees are responsible to maintain the security of the network and the confidentially of all data on the network as required by Rule 1.05 of the Texas Rules of Professional Conduct and to the extent allowed by the Texas Open Records Act. All employees shall keep their passwords confidential and are prohibited from allowing any other person from accessing the network under their password.

3.     Client information shall only be accessed when necessary for the conduct of the business of the Caprock Regional Public Defender Office, and not for personal reasons or curiosity.

## V.     Ethics:

Each Assistant Public Defender is charged with the responsibility of strictly adhering to The Texas Disciplinary Rules of Professional Conduct, the Texas Lawyer's Creed and the laws and constitution of the State of Texas and of the United States.

## W.    Construction:

In the event of a conflict between this Office's Policies and Procedures Manual and the Texas Tech University Operating Policies and Procedure Manual, the provision which is the most restrictive shall control.

# Appendix A

**Job Title:** Chief Public Defender        **Grade:** Appointed **FLSA:** Exempt

**Date:** 10/01/10        **Reports To:** Law School Dean

**SUMMARY:** Appointed by the Director of the Office at the level of Adjunct Professor/Instructor under the administrative direction of the Director of the Office; responsible for managing all operations and administration of the Caprock Regional Public Defender Office (Office); manages all daily activities involving personnel, case handling and resources; develops and implements policies and procedures for the operations of the office and plans for future development; provides legal representation for, or ensures defendants are represented in, criminal proceedings and ensures their constitutional rights are upheld; serves as lead counsel in some cases; oversees and participates in preparation, presentation and disposition of cases; and cooperates with the Director and any authorized researchers.

**ESSENTIAL DUTIES:**

1. Directs, plans, manages and supervises the daily work activities of all professional and support staff including the maintenance of required reports and invoices;

2. Maintains a regular caseload and provides backup on caseloads of attorneys who are on leave or are unable to complete specific assignments;

3. Supervises student attorneys following the educational requirements and techniques established by the Director toward the student's full development of the advanced skills necessary to practice law; 12

4. Makes temporary adjustments to caseload policies depending on the overall complexity of certain cases, the type of cases, attorney experience, support staff experience, or other factors affecting the delivery of services;

5. Assists the Director in developing organizational and personnel practices and procedures;

6. Assists the Director in writing a standard operating policies and procedures manual;

7. Provides a copy of the standard operating policies and procedures manual to the Oversight Board or to the participating counties if requested;

8. Recruits, screens, hires, trains, monitors and evaluates staff and additional attorneys in a manner consistent with the standard personnel policies and procedures of Texas Tech University;

9. Notifies the Texas Task Force on Indigent Defense in writing if additional attorneys are hired so the budget may be revised to ensure appropriate tracking;

10. Maintains staff and attorneys at sufficient levels to effectively operate a public defender's office;

11. Notifies the Oversight Board in writing if exceptions to caseload standards are authorized;

12. Deploys a video-conferencing system that can provide connectivity between the public defender's office, the law school, the jails and courts of participating counties, and other private detention facilities used by participating counties through secure networks to ensure the proper protection of attorney-client confidentiality;

13. Requires attorneys, staff and student attorneys to participate in video-conferencing training to ensure successful deployment of technology and to ensure attorney-client confidentiality;

14. Provides a breakdown of cases and courts hearing those cases that allows for each participating county to comply with the reporting requirements of Texas Government Code § 71.0351(c);

15. Operates in a manner that meets the requirements of the Texas Fair Defense Act;

16. Monitors receipt of and make all case assignments to staff attorneys;

17. Screens all cases for conflicts of interest;

18. Provides analyses and advice to staff attorneys as needed;

19. Serves as departmental head in all communications with other entities;

20. Projects anticipated personnel needs, space allocations, and operating allowance needs;

21. Approves requisitions for the payment of invoices;

22. Maintains appropriate fiscal controls in all matters pertaining to expenses and purchases of services, equipment, and supplies;

23. Prepares and administers the annual operating and capital budget for the Office and controls budget expenditures to meet budget goals and requirements;

24. Pursues and administers grant funding functions when available;

25. Develops a strategic plan to identify and implement the long-term goals of the Office;

26. Allocates resources for services, equipment, facilities and finances;

27. Communicates with the Law School Dean and Clinic Director as directed;

28. Develops and establishes creative approaches to case management, budgetary restrictions or other unique problems confronting the Office;

29. Interacts with state and local bar associations, various organizations and committees involved in the improvement of justice and indigent representation systems and services;

30. Performs related duties as required;

31. Works with the Director in the implementation of the clinical programs as designed;

32. Cooperates with any authorized researchers;

33. Attends the weekly classroom component of the clinical section he supervises;

34. Provides legal advice to clients;

35. Interviews clients and witnesses to obtain information necessary for preparing a defense; 14

36. Participates in plea negotiation with prosecutors regarding pending cases;

37. Advises clients on plea offers, options, collateral consequence, and potential for success at trial or other dispositions of cases;

38. Directs the work of other attorneys, investigators, legal/administrative assistants and student attorneys in the preparation of a defense;

39. Seeks from the court any necessary funding for outside experts and investigation in the preparation of a defense;

40. Performs legal research;

41. Searches resources and studies legal records and documents to obtain information applicable to case issues under consideration and prepares appropriate documents;

42. Obtains documents by subpoena and other discovery methods;

43. Drafts briefs, motions, orders, subpoenas and other legal documents, as well as correspondence and reports;

44. Identifies any affirmative or de facto defenses and tactical procedural choices for clients;

45. Prepares cases for court and conducts hearings and trials related to pending cases;

46. Provides narrative, descriptive entries in client files of opinions, impressions, and facts collected;

47. Preserves any potential error for appellate points;

48. Advises clients of the constitutional rights waived by pleading guilty and the potential direct and collateral consequences of a guilty plea;

49. Advises non-citizen clients of the specific immigration consequences of criminal convictions;

50. Selects juries, examines and cross-examines witnesses, drafts and argues jury instructions and argues cases to the jury;

51. Staffs other cases assigned to the office with other attorneys and staff;

52. Responds to telephone calls from non-clients, family members of clients and walk-in customers, including private attorneys seeking advice and counsel;

53. Agrees to acquiesce to the supervision and direction of the Clinical Director in the proper clinical, educational techniques and best practices to provide the student attorneys a full, 15 rich educational environment and experience; and

54. Maintains the highest ethical standards of the profession.

55. Agrees to abide by any contractual agreements or grant award terms, conditions and/or reports approved by the Dickens County Commissioners Court.

**SPECIAL LIMITATIONS:** The Chief Public Defender may not engage in the private practice of criminal law or accept anything of value not authorized by Art. 26.044 of the Code of Criminal Procedure for services rendered as a public defender.

**QUALIFICATION REQUIREMENTS:** J.D./LL.B. from an accredited law school and meet the requirements of the Texas Code of Criminal Procedure Article 26.04 for appointment to all felonies, misdemeanors and juvenile cases in the 7th and 9th Administrative Judicial Regions as published by the individual counties in accordance with Art. 26, C.C.P., and as approved by the Texas Task Force on Indigent Defense. Those qualifications, without limitation, include:

1. Be a member in good standing of the State Bar of Texas;

2. Exhibit proficiency and commitment to providing quality representation to defendants in criminal cases;

3. Have trial experience in the use of and challenge to mental health or forensic expert witnesses and investigating and presenting evidence at the penalty phase of a criminal trial;

4. Have substantial experience in the practice of criminal law with at least five years experience practicing criminal law and during that time demonstrated that he or she has the required legal knowledge and skill necessary to provide representation in felonies, misdemeanors and juvenile cases and will apply that knowledge and skill with appropriate thoroughness and preparation;

5. Have tried to verdict as lead counsel a significant number of felony trials, including at least one homicide trial and other trials for offenses punishable as first or second degree felonies or capital felonies, showing substantial experience in the practice of criminal law;

6. Have participated and maintained compliance with the requirements of the State Bar of Texas in continuing legal education courses or other training relating to defense in criminal cases

**KNOWLEDGE, SKILLS, AND ABILITIES:** Substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing criminal cases; considerable knowledge of the organizational, procedural and human aspects in managing an organization. Skill in interviewing a variety of individuals and soliciting needed information to determine facts and circumstances, in developing effective defense strategies, in analyzing cases and applying legal principles, in presenting statements of law clearly and logically in written and verbal form, in presenting an effective defense in court, and in preparing clear, concise, accurate and effective legal, policy and procedural guidelines; skill in the management and conduct of complex negotiations and litigation; skill in legal research, analysis, and the drafting of litigation documents; skill in oral advocacy; skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence; skill in the investigation, preparation, and presentation of punishment evidence; skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements; skill in supervising professional, administrative and clerical employees; skill in managing multiple projects simultaneously; skill in communicating effectively with diverse groups of individuals utilizing tact and diplomacy; skill in preparing and administering budgets; ability to handle highly stressful criminal cases; ability to develop strategic plans; ability to adjust to rapidly fluctuating situations; ability to operate a personal computer and basic office equipment; ability to establish and maintain effective working relationships with subordinates, co-workers, employees, governmental department heads, elected/appointed officials, outside organizations, attorneys, the news media and the general public.

**PHYSICAL AND ENVIRONMENTAL REQUIREMENTS:** Physical requirements include lifting/carrying 25 lbs. occasionally; visual acuity, speech and hearing; hand and eye coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Applicant will be subject to sitting, standing, walking, reaching and handling to perform the essential functions.

**Job Title:** Assistant Public Defender I     **Grade:** Appointed/Instructor **FLSA:** Exempt

**Date:** 4/1/11                                              **Reports To:** Chief Public Defender

**SUMMARY:** Appointed by the Chief Public Defender, is responsible providing legal representation for defendants in criminal proceedings and ensuring their constitutional rights are upheld, to serve as lead counsel in some cases, to oversee and participate in preparation, presentation and disposition of cases, including misdemeanors, juvenile cases and felonies, and to supervise, train and work with assigned student attorneys.

**ESSENTIAL DUTIES:**

1. Provides legal advice to clients;

2. Interviews clients and witnesses to obtain information necessary for preparing a defense;

3. Participates in plea negotiation with prosecutors regarding the pending case;

4. Advises clients on plea offers, options, collateral consequence, and potential for success at trial or other dispositions of cases;

5. Directs the work of investigators, legal/administrative assistants and student attorneys in the preparation of a defense;

6. Seeks from the Court any necessary funding for outside experts and investigation in the preparation of a defense;

7. Performs legal research;

8. Searches resources and studies legal records and documents to obtain information applicable to case issues under consideration and prepare appropriate documents;

9. Obtains documents by subpoena and other discovery methods;

10. Drafts briefs, motions, orders, subpoenas and other legal documents, as well as correspondence and reports;

11. Identifies any affirmative or *de facto* defenses and tactical procedural choices for clients;

12. Prepares cases for court and conducts hearings and trials related to pending cases;

13. Provides narrative, descriptive entries in client files of opinions, impressions, and facts collected;

14. Preserves any potential error for appellate points;

15. Advises clients of the constitutional rights waived by pleading guilty and the potential direct and collateral consequences of a guilty plea;

16. Advises non-citizen clients of the specific immigration consequences of criminal convictions;

17. Selects juries, examines and cross-examines witnesses, drafts and argues jury instructions and argues cases to the jury;

18. Staffs other cases assigned to the office with other attorneys and staff;

19. Responds to telephone calls from non-clients, family members of clients and walk-in customers, including private attorneys seeking advice and counsel;

20. Supervises student attorneys in the full development of skills necessary to practice law;

21. Attends the weekly classroom component of the clinics;

22. Agrees to acquiesce to the supervision and direction of the Clinical Director in the proper clinical, educational techniques to provide the student attorneys a full, rich education environment and experience;

23. Cooperates fully with any researcher who has authorized access to the Office; and

24. Maintains the highest ethical standards of the profession.

**SPECIAL LIMITATION:** An Assistant Public Defender I may not engage in the private practice of criminal law or accept anything of value not authorized by Art. 26.044 of the Code of Criminal Procedure for services rendered as a public defender.

**QUALIFICATION REQUIREMENTS:** J.D./LL.B. from an accredited law school and meet the requirements of the Texas Code of Criminal Procedure Article 26.04 for appointment to all felonies, misdemeanors and juvenile cases in the 7th and 9th Administrative Judicial Regions as published by the individual counties in accordance with Art. 26, C.C.P., and as approved by the Texas Task Force on Indigent Defense. Those qualifications, without limitation, include:

1. Be a member in good standing of the State Bar of Texas;

2. Exhibit proficiency and commitment to providing quality representation to defendants in criminal cases;

3. Have trial experience in the use of and challenge to mental health or forensic expert witnesses and investigating and presenting evidence at the penalty phase of criminal trial;

4. At least two years experience in criminal law and during that time demonstrated that he or she has the required legal knowledge and skill necessary to provide representation in felonies,

misdemeanors and juvenile cases and will apply that knowledge and skill with appropriate thoroughness and preparation;

5. Have tried to verdict as lead counsel a significant number of trials;

6. Have participated and maintained compliance with the requirements of the State Bar of Texas in continuing legal education courses or other training relating to defense in criminal cases.

**KNOWLEDGE, SKILLS, AND ABILITIES:** Substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing criminal cases. Skill in interviewing a variety of individuals and soliciting needed information to determine facts and circumstances, in developing effective defense strategies, in analyzing cases and applying legal principles, in presenting statements of law clearly and logically in written and verbal form, in presenting an effective defense in court, and in preparing clear, concise, accurate and effective legal, policy and procedural guidelines; skill in the management and conduct of complex negotiations and litigation; skill in legal research, analysis, and the drafting of litigation documents; skill in oral advocacy; skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence; skill in the investigation, preparation, and presentation of mitigating evidence; skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements; skill in managing multiple projects simultaneously; skill in communicating effectively with diverse groups of individuals utilizing tact and diplomacy; ability to handle highly stressful criminal cases; ability to adjust to rapidly fluctuating situations; ability to operate a personal computer and basic office equipment; ability to establish and maintain effective working relationships with subordinates, co-workers, other employees, governmental department heads, elected/appointed officials, outside organizations, attorneys, the news media and the general public.

**PHYSICAL AND ENVIRONMENTAL REQUIREMENTS:** Physical requirements include lifting/carrying 25 lbs. occasionally; visual acuity, speech and hearing; hand and eye coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Applicant is subject to sitting, standing, walking, reaching and handling to perform the essential functions.

**Job Title:** Assistant Public Defender II      **Grade:** Appointed/Instructor **FLSA:** Exempt

**Date:** Anticipated within 2 years of 10-1-10 **Reports To:** Chief Public Defender

**SUMMARY:** Appointed by the Chief Public Defender, is responsible providing legal representation for defendants in criminal proceedings and ensuring their constitutional rights are upheld, to serve as lead counsel in some cases, to oversees and participate in preparation, presentation and disposition of cases, including felonies, juvenile cases and misdemeanors, and to supervise, train and work with assigned student attorneys.

**ESSENTIAL DUTIES:**

1. Provides legal advice to clients;

2. Interviews clients and witnesses to obtain information necessary for preparing a defense;

3. Participates in plea negotiation with prosecutors regarding the pending case;

4. Advises clients on plea offers, options, collateral consequence, and potential for success at trial or other dispositions of cases;

5. Directs the work of investigators, legal/administrative assistants and student attorneys in the preparation of a defense;

6. Seeks from the Court any necessary funding for outside experts and investigation in the preparation of a defense; 20

7. Performs legal research;

8. Searches resources and studies legal records and documents to obtain information applicable to case issues under consideration and prepare appropriate documents;

9. Obtains documents by subpoena and other discovery methods;

10. Drafts briefs, motions, orders, subpoenas and other legal documents, as well as correspondence and reports;

11. Identifies any affirmative or de facto defenses and tactical procedural choices for clients;

12. Prepares cases for court and conducts hearings and trials related to pending cases;

13. Provides narrative, descriptive entries in client files of opinions, impressions, and facts collected;

14. Preserves any potential error for appellate points;

15. Advises clients of the constitutional rights waived by pleading guilty and the potential direct and collateral consequences of a guilty plea;

16. Advises non-citizen clients of the specific immigration consequences of criminal convictions;

17. Selects juries, examines and cross-examines witnesses, drafts and argues jury instructions and argues cases to the jury;

18. Staffs other cases assigned to the office with other attorneys and staff;

19. Responds to telephone calls from non-clients, family members of clients and walk-in customers, including private attorneys seeking advice and counsel;

20. Supervises student attorneys in the full development of skills necessary to practice law;

21. Attends the weekly classroom component of the clinics;

22. Agrees to acquiesce to the supervision and direction of the Clinical Director in the proper clinical, educational techniques to provide the student attorneys a full, rich education environment and experience;

23. Cooperates fully with any researcher who has authorized access to the Office; and

24. Maintains the highest ethical standards of the profession. 21

**SPECIAL LIMITATION:** An Assistant Public Defender II may not engage in the private practice of criminal law or accept anything of value not authorized by Art. 26.044 of the Code of Criminal Procedure for services rendered as a public defender.

**QUALIFICATION REQUIREMENTS:** J.D./LL.B. from an accredited law school and meet the requirements of the Texas Code of Criminal Procedure Article 26.04 for appointment to all misdemeanors and juvenile cases in the 7th and 9th Administrative Judicial Regions as published by the individual counties in accordance with Art. 26, C.C.P., and as approved by the Texas Task Force on Indigent Defense. Those qualifications, without limitation, include:

1. Be a member in good standing of the State Bar of Texas;

2. Exhibit proficiency and commitment to providing quality representation to defendants in criminal cases;

3. Demonstrated that he or she has the required legal knowledge and skill necessary to provide representation in cases assigned to the Office and will apply that knowledge and skill with appropriate thoroughness and preparation;

4. Have participated and maintained compliance with the requirements of the State Bar of Texas in continuing legal education courses or other training relating to defense in criminal cases.

**KNOWLEDGE, SKILLS, AND ABILITIES:** Substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing criminal cases. Skill in interviewing a variety of individuals and soliciting needed information to determine facts and circumstances, in developing effective defense strategies, in analyzing cases and applying legal principles, in presenting statements of law clearly and logically in written and verbal form, in presenting an effective defense in court, and in preparing clear, concise, accurate and effective legal, policy and procedural guidelines; skill in the management and conduct of complex negotiations and litigation; skill in legal research, analysis, and the drafting of litigation documents; skill in oral advocacy; skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence; skill in the investigation, preparation, and presentation of mitigating evidence; skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements; skill in managing multiple projects simultaneously; skill in communicating effectively with diverse groups of individuals utilizing tact and diplomacy. Ability to handle highly stressful criminal cases; ability to adjust to rapidly fluctuating situations; ability to operate a personal computer and basic office equipment; ability to establish and maintain effective working relationships with subordinates, co-workers, other employees, governmental department heads, elected/appointed officials, outside organizations, attorneys, the news media and the general public.

**PHYSICAL AND ENVIRONMENTAL REQUIREMENTS:** Physical requirements include lifting/carrying 25 lbs. occasionally; visual acuity, speech and hearing; hand and eye 22 coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Applicant is subject to sitting, standing, walking, reaching and handling to perform the essential functions.

**Job Title:** Legal/Administrative Assistant – Office Manager **Grade:** Staff **FLSA:** Non-exempt

**Date:** 10/01/10                                          **Reports To:** Chief Public Defender

**SUMMARY:** Under the general supervision of the Chief Public Defender, provides a variety of complex and technical legal document preparation and other secretarial support to attorneys, investigators and other staff, which are often confidential and may include the use of problem solving skills and independent decision-making; prepares files and materials for use in court appearances; acts as the office manager; and performs other duties as assigned.

**ESSENTIAL DUTIES:**

1. Working within critical deadlines, word processes a variety of legal documents, which may include pleadings, motions, orders, warrants, petitions, subpoenas, witness lists, jury instructions, voir dire questions, verdict forms, reports, general correspondence and other materials from drafts, notes, verbal instructions, prior documents and dictated tapes;

2. Proofreads and edits drafts and completed materials for format, accuracy, grammar, spelling, punctuation, English usage and consistency;

3. Performs a variety of general office support work on a relief or as-needed basis, including maintaining accurate records and files and providing coverage for other assignments;

4. Uses a variety of office equipment such as computer terminals, printers, scanners, and copy reproduction and FAX equipment as well as standard office software such as word processing, spreadsheet and database applications;

5. Provides a variety of support to attorneys and student attorneys tracking and ensuring that all documents have been prepared and processed and appropriate actions taken in a timely manner; prepares periodic spreadsheets to track status of cases;

6. Verifies case law and code citations and quotations found in motions and other documents, using the law library or electronic sources;

7. Coordinates the scheduling of appointments between attorneys and student attorney of the Office and attorneys in the various District and County Attorney's Offices and defendants in jail and on bond;

8. Obtains and maintains records regarding prior convictions for clients;

9. Assists with compilation of statistical data; 23

10. Acts as office manager ensuring that supplies are maintained, upkeep of the office is sufficient, invoices are processed, purchase orders are processed as needed and other administrative functions are properly carried out; and

11. Provides limited supervision to the other legal assistants, if any, and interns in the office, ensuring that work is properly carried out as directed by the attorneys, student attorneys, and investigators.

**QUALIFICATION REQUIREMENTS:** Any combination of education and experience that would provide the individual the ability to be proficient in the essential duties listed. Applicant must be able to type at a net rate of 50 words per minute. At least two years of experience in processing legal documents in a court, criminal justice or legal office setting is preferred.

**KNOWLEDGE, SKILLS, AND ABILITIES:** Knowledge of legal office and criminal justice system terminology, forms, documents and procedures, including ProDoc/SOS; knowledge of the standard format for a variety of legal documents and forms, including briefs, motions, opinions, subpoenas and warrants; knowledge of the use of specified computer applications involving word processing, spreadsheets and standard report generation; knowledge of standard office practices and procedures, including filing and the operation of standard office equipment; knowledge of record keeping principles and practices; knowledge of correct business English, including spelling, grammar and punctuation; general knowledge of the organizational, procedural and human aspects in supervising within an organization; skill in independently preparing a variety of legal documents and forms; skill in editing and reviewing for accuracy, format and correct English usage technical and complex legal and court documents; skill in using applicable legal office terminology, forms, documents and procedures in the course of the work; skill in performing detailed legal office support work; skill in composing correspondence or documents independently or from brief instructions; ability to be flexible and able to competently perform in a variety of assignment areas; ability to use sound independent judgment in following and applying appropriate laws, codes, regulations, policies and procedures; ability to maintaining accurate legal office files; ability to organize one's own work, set priorities, work in a high volume setting and meet critical deadlines; ability to establish and maintain effective working relationships with those contacted in the course of the work. Also, additional experience in grant writing is preferred but not required.

**PHYSICAL AND ENVIRONMENTAL REQUIREMENTS:** Physical requirements include lifting/carrying 25 lbs. occasionally; visual acuity, speech and hearing; hand and eye coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Applicant is subject to sitting, standing, walking, reaching and handling to perform the essential functions.

**Job Title:** Investigator        **Grade:** Staff **FLSA:** Non-exempt

**Date:** 10/1/12        **Reports To:** Chief Public Defender

**SUMMARY:** Under the general supervision of the Chief Public Defender, is responsible for interviewing witnesses, clients and victims in the conduct of investigations; obtains, preserves, records and analyzes evidence for the defense of clients represented by the Public Defender Office; locates witnesses for the defense; and other duties as assigned.

**ESSENTIAL DUTIES:**

1. Plans, directs and conducts investigations to support the legal defense of criminal cases;

2. Establishes and maintains informant contacts to develop information relevant to cases;

3. Conducts surveillance stakeouts as necessary;

4. Identifies, locates and interviews clients to gather financial and factual statements for screening and intake purposes;

5. Identifies, locates and interviews witnesses, complainants, law enforcement officials and representatives of other agencies to gather information on events surrounding cases;

6. Contacts and maintains liaison with outside agencies and expert witnesses as reference resources for potential testimony in highly specialized fields;

7. Locates, obtains, evaluates and preserves documentary evidence from a variety of sources;

8. Confers with attorneys and student attorneys on points of law and procedure;

9. Writes and dictates reports of contacts and findings including statements, scene descriptions and analysis of physical evidence;

10. Appears as a witness and testifies at trials, hearings and motions;

11. Participates in training sessions;

12. Operates and maintains a variety of photographic, tape, graphic and projection equipment, including being proficient in presentation software;

13. Prepares, presents, and maintains records and reports; and

14. Willingly accepts tasks and cooperates with other the attorneys, students attorneys and other staff.

**QUALIFICATION REQUIREMENTS:** Three years of substantial criminal investigative experience, paralegal experience, or related education, training and/or investigative experience which provides the knowledge and skill requirements.

**KNOWLEDGE, SKILLS, AND ABILITIES:** Knowledge of the techniques, principles and methods used in criminal investigations; knowledge of the methods and techniques of screening, evaluating and preparing evidence and exhibits for trial; knowledge of the Texas Penal Code and the Constitution; general knowledge of the criminal justice system, state department of corrections and related agencies; skill to operate photographic, recording and graphic equipment; skill to prepare and set up electronic presentations devices (i.e. PowerPoint, projectors, document cameras, etc); ability to keep accurate notes and records; ability to prepare and present clear, concise and comprehensive reports; ability to read and understand legal codes, cases and technical material in such disciplines as medicine, physical and social sciences; ability to obtain information through interview and interrogation; ability to assess the credibility of witnesses; ability to gather and analyze facts and evidence and draw valid conclusions; ability to adjust to workload changes and work under stress to meet deadlines; ability to organize and prioritize workload to manager cases efficiently; ability to testify in court in a direct, clear and concise manner; ability to establish and maintain effective working relationships with attorneys, representatives of other agencies, clients, family member of clients, the public and co-workers.

**PHYSICAL AND ENVIRONMENTAL REQUIREMENTS:** Physical requirements include lifting/carrying 25 lbs. occasionally; visual acuity, speech and hearing; hand and eye coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Applicant is subject to sitting, standing, walking, reaching and handling to perform the essential functions.

**Job Title:** Director                                    **Grade:** Appointed **FLSA:** Exempt

**Date:** Current through 09/30/11              **Reports To:** Law School Dean

**SUMMARY:** Appointed by the Dean of the Law School at the level of Associate Professor and under the administrative direction of the Dean of the Law School, is responsible for the initial organization of the Office including all matters involving setting up the office, securing the agreement with the Counties and the Task Force for Indigent Defense, the initial concept and design, helping organize the Oversight Board whose primary responsibility will be to choose the governmental entity or non-profit corporation to become the Public Defender Office, performing the application and hiring process for the Chief Public Defender, to assist the Chief Public Defender in the development and implementation of operating and administrative policies and procedures for the Office and to make long range plans and set goals for future development.

**ESSENTIAL DUTIES:**

1. To conceptualize, design and implement the creation of the Office;

2. To help direct, plan, manage and supervise the work activities of the professional and support staff during the first year;

3. To recruit, screen, select and train the Chief Public Defender, to assist the Chief Public Defender with the selection of additional employees and to help monitor/evaluate staff performance;

4. Help provide analysis and advice to staff attorneys as needed; 26

5. Assist the Chief Public Defender in developing organizational practices and procedures and standard operating procedures and policies;

6. Until October 1, 2011, provide assistance to the Chief Public Defender in projecting personnel needs, space allocations, and operating allowance needs while assisting in establishing appropriate fiscal controls in all matters pertaining to reoccurring expenses and the purchase of services, equipment, and supplies conforming policies and procedures to established operating procedures of the University;

7. At all times to help develop a strategic plan to identify and implement the long-term goals of the Office;

8. Help develop and establish creative approaches to case management, budgetary restrictions or other unique problems confronting the Office;

9. To train instructors for the criminal clinical programs;

10. To supervise instructors and direct the establishment of proper syllabi and teaching procedure and techniques;

11. To perform and supervise the classroom component for the clinics;

12. To work with the Chief Public Defender in outcome assessment and grading procedures for the students;

13. To establish clinical manuals and procedures;

14. To train student attorneys and instructors on their duties and responsibilities;

15. To assist student attorneys in securing licensing from the State Bar of Texas;

**QUALIFICATION REQUIREMENTS:** J.D. from an accredited law school and be on staff at the Law School as an Associate Professor or above, and be a member in good standing of the State Bar of Texas.

**KNOWLEDGE, SKILLS, AND ABILITIES:** Substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing criminal cases; considerable knowledge of the organizational, procedural and human aspects in managing an organization. Skill in interviewing a variety of individuals and soliciting needed information to determine facts and circumstances, in developing effective defense strategies, in analyzing cases and applying legal principles, in presenting statements of law clearly and logically in written and verbal form, in presenting an effective defense in court, and in preparing clear, concise, accurate and effective legal, policy and procedural guidelines; skill in the management and conduct of complex negotiations and litigation; skill in legal research, analysis, and the drafting of litigation documents; skill in oral advocacy; skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence; skill in the investigation, preparation, and presentation of punishment evidence; skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements; skill in supervising professional, administrative and clerical employees; skill in managing multiple projects simultaneously; skill in communicating effectively with diverse groups of individuals utilizing tact and diplomacy; skill in preparing and administering budgets. Ability to handle highly stressful criminal cases; ability to develop strategic plans; ability to adjust to rapidly fluctuating situations; ability to operate a personal computer and basic office equipment; ability to establish and maintain effective working relationships with subordinates, co-workers, employees, Department Heads, Elected/Appointed Officials, outside organizations, attorneys, the news media and the general public.

**PHYSICAL AND ENVIRONMENTAL REQUIREMENTS:** Physical requirements include lifting/carrying 25 lbs. occasionally; visual acuity, speech and hearing; hand and eye coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Applicant is subject to sitting, standing, walking, reaching and handling to perform the essential functions.

# Exhibit H

*Curriculum Vitae & Affidavit of Philip Wischkaemper*

# Philip Wischkaemper

915 Texas Ave
Lubbock, Texas 79401
763-9900

---

Director of Professional Development for the Lubbock Private Defender Office

**Assistant County Attorney**                                    **3/89 - 3/90**
HOCKLEY COUNTY ATTORNEYS OFFICE                                  LEVELLAND, TX
Supervisor:      Kirk Palmer
Duties:  Screening, filing and trial of misdemeanor and juvenile cases.

**Associate**                                                    **3/90 - 10/91**
WISCHKAEMPER & MARTINEZ, ATTORNEYS AT LAW                        LUBBOCK, TX
SUPERVISOR:    Bill Wischkaemper
Duties: Handling all aspects of a criminal trial practice including intake, trial preparation,
Trial and appeals.

**Partner**                                                      **10/91 - 2/92**
KLINE & WISCHKAEMPER, ATTORNEYS AT LAW                           LUBBOCK, TX
Duties: Handling all aspects of a criminal trial practice including intake, trial preparation,
Trial and appeals.

**Partner**                                                      **2/92-10/94**
KLINE, SNUGGS & WISCHKAEMPER, ATTORNEYS AT LAW                   LUBBOCK, TX
Duties: Handling all aspects of a criminal trial practice including intake, trial preparation,
Trial and appeals.

**Partner**                                                      **10/94  - 10/01**
SNUGGS & WISCHKAEMPER, ATTORNEYS AT LAW                          LUBBOCK, TX
Duties: Handling all aspects of a criminal trial practice including intake, trial preparation,
Trial and appeals.  Also expanded practice into capital trial & post-conviction
Practice.

**CAPITAL ASSISTANCE ATTORNEY**                                  **10/01 – 10/10**
Texas Criminal Defense Lawyers Association                       Lubbock, TX
Supervisor:      Joseph Martinez, Executive Director, TCDLA
Duties:  Coordinating training, resources and technical assistance to attorneys
representing citizens accused of capital crimes.

**Deputy Director**                                              **10/10 – 12/13**
Regional Public Defender for Capital Cases                       Lubbock, Texas
Supervisor: Jack Stoffregen, Chief Defender
Duties: Assist Chief Defender

**Professional Development Director**                            **12/13 - Present**
Lubbock Private Defender Office
Supervisor:  Board of LPDO
Duties: Insure quality representation for indigent clients in Lubbock County.

## EDUCATION

**High School Diploma**                                          **5/74**
LUBBOCK CHRISTIAN HIGH SCHOOL                                    LUBBOCK, TX

**Undergraduate Studies**                                        **>83 - >84**
SOUTH PLAINS JR. COLLEGE                                         LEVELLAND, TX

**B.A. of General Studies - Emphasis in history**               **7/86**
TEXAS TECH UNIVERSITY                                            LUBBOCK, TX
GPA:  3.89
MAGNA CUM LAUDE

*Major:*    General Studies with Emphasis in History

*Minor:*    Political Science and English

**Doctor of Jurisprudence**                                                          **5/89**
TEXAS TECH UNIVERSITY SCHOOL OF LAW                                        LUBBOCK, TX


## BAR ADMISSIONS

X    Admitted in May 1989 to all Texas Courts.
X    Admitted in November 1989 to practice in The Northern District of Texas.
X    Admitted in November 1992 to practice in the United States 5th Circuit Court of Appeals.
X    Admitted in August 1997 to practice in the United States Supreme Court.


## PROFESSIONAL ASSOCIATIONS

\#    Texas Criminal Defense Lawyers Association - Director
\#    Lubbock Criminal Defense Lawyers Association - President 1994 - 1995
\#    Texas Bar Association
\#    Lubbock County Bar Association


## INSTRUCTIONAL EXPERIENCE AND SEMINARS ATTENDED

- Attendee-Brian Shechmeister Death Penalty College, Santa Clara, California, August, 2001
- Course Director and Presenter-2002 Capital Murder Seminar, Galveston, Texas, March, 2002
- Attendee-Life in the Balance, Kansas City, Missouri, March, 2002
- Faculty-First Annual Capital Trial Advocacy Course, Austin, Texas, January, 2002
- Attendee-NAACP Legal Defense and Educational Fund, Inc. 23rd Annual Capital Punishment Training Conference, Airle Virginia, July, 2002
- Co-Course Director and Presenter, Texas Capital Defense Conference, Corpus Christi, Texas, October, 2002
- Co-Course Director and Presenter, (DNA Presentation) Post-Conviction Practice, Houston, Texas, January, 2003
- Course Director-Capital Trial Advocacy-Future Dangerousness, Plano, Texas, January, 2003
- Faculty-Second Annual Capital Trial Advocacy Course, Plano, Texas, January, 2003
- Faculty-Texas Criminal Trial College, Huntsville, Texas, March, 2003
- Course Director, Texas Section-Life in the Balance, Austin, March, 2003
- Presenter-16th Annual Rusty Duncan Seminar and Meeting, San Antonio, Texas, June 2003
- Attendee-NAACP Legal Defense and Educational Fund, Inc. 24thAnnual Capital Punishment Training Conference, Airlie Virginia, July, 2003
- Course Director-Habeas Nuts and Bolts, Plano, Texas, July, 2003
- Co-Course Director-Capital Issues, McAllen, Texas, August, 2003
- Co-Course Director-Capital Issues 2003, MO Ranch, Hunt, Texas August 2003
- Course Director-First Annual Texas Forensics Seminar, Plano, Texas, August 2003
- Faculty-Third Annual Capital Trial Advocacy Course, Plano, Texas , January, 2004
- Course Director-Habeas Corpus Workshop, San Antonio, Texas, February, 2004
- Presenter-A day in the Life of a Criminal Defense Lawyer, College Station, Texas, February 2004
- Course Director and Presenter - El Paso Indigent Defense, El Paso, Texas, March, 2004
- Course Director and Presenter-Dallas Indigent Defense, Dallas, Texas, March, 2004
- Faculty-Cross Exam and Impeachment, Plano, Texas, May, 2004

- Faculty-Trial Advocacy in Criminal Cases, Plano, Texas March 2004 Faculty-Capital Voir-Dire, Plano, Texas, July, 2004
- 
- Attendee-NAACP Legal Defense and Educational Fund, Inc. 25th Annual Capital Punishment Training Conference, Airlie Virginia, July, 2004
- Presenter-Houston Bar Association (Post-Conviction Practice) Houston, Texas, July, 2004
- Co-Course Director-Second Annual Texas Forensics Seminar, Plano, Texas, August, 2004
- Faculty-National Institute for Trial Advocacy (Capital), Houston, Texas, September, 2004
- Presenter-Death Penalty Defense, Warm Springs, Oregon, October, 2004
- Co-Course Director and Presenter (DNA Presentation) Post-Conviction Seminar, Houston, Texas, January, 2005
- Co-Course Director-Capital Murder and Mental Health, Houston, February, 2005
- Faculty-Texas Criminal Trial College, Huntsville, Texas, March, 2005
- Faculty-Trial Advocacy in Criminal Cases, Plano, Texas, May 2005
- Course Director-El Paso Indigent Defense Seminar, El Paso, Texas, May 2005
- Course Director-Dallas Indigent Defense Seminar, Dallas, Texas, May, 2005
- Presenter-Indigent Defense Certification, Houston, Texas, May 2005
- Faculty-Capital Voir-Dire, Plano, Texas, June, 2005
- Faculty-Cross Exam and Impeachment-Plano, Texas, August, 2005
- Co-Course Director-Third Annual Texas Forensics Seminar, Dallas, Texas, September, 2005
- Co-Course Director, Faculty and Presenter-Fourth Annual Capital Trial Advocacy Course, Plano, Texas, January 2005
- Attendee-NAACP Legal Defense and Educational Fund, Inc. 26th Annual Capital Punishment Training Conference, Airlie Virginia, July, 2005
- Co-Course Director and Presenter, Capital Murder Seminar, South Padre Island, Texas, November, 2005
- Faculty-Cross Exam and Impeachment-Plano, Texas, December, 2005
- Co-Course Director and Presenter-Capital Murder, Dallas, Texas, March 2006
- Faculty- Texas Criminal Trial College, Huntsville, Texas, March 2006
- Co-Course Director, El Paso Voir Dire Program, May 2006
- Co-Course Director, Dallas Public Defender Program, May 2006
- Co-Course Director, Experts and Pretrial Motions, Plano, Texas, May 2006
- Co-Course Director and Faculty, Capital Trial Advocacy Program, Plano, Texas, May 2006
- Presenter, Capital Murder Update, Rusty Duncan Advanced Course, San Antonio, Texas, June 2006
- Co-Course Director and Faculty, Capital Voir Dire, Plano, Texas 2006
- Attendee-NAACP Legal Defense and Educational Fund, Inc. 26th Annual Capital Punishment Training Conference, Airlie Virginia, July, 2006
- Faculty, Criminal Trial Advocacy Program, Plano, Texas, August, 2006
- Co-Course Director, Punishment Phase of a Capital Case, Plano, Texas August, 2006
- Co-Course Director, Fourth Annual Forensics Seminar, Dallas, Texas, August 2006
- Co-Course Director, Cross Examination Seminar, Plano Texas, November 2006
- Co-Course Director, Padre Island Capital Murder Seminar, November 2006
- Co-Course Director, Capital Voir Dire, Plano, Texas, April 2007
- Course Director, Texas Track, Life in the Balance, Dallas, Texas, March 2007
- Course Director, Habeas Corpus Litigation, Plano, Texas, March 2007
- Co-Course Director, Punishment Phase at Trial, Plano, Texas, March 2007
- Presenter, Annual Rusty Duncan Advanced Criminal Law Course, San Antonio, Texas, June 2007
- Co-Course Director and Faculty, Capital Mitigation, Plano, Texas, July 2007
- Presenter, State Advanced Criminal Law Course, Houston, Texas, July 2007
- Co-Course Director and Faculty, Capital Trial Advocacy, Plano, Texas, August 2007
- Faculty, Criminal Trial Advocacy Program, Plano, Texas, August 2007
- Co-Course Director, One Day Capital Video Seminar, El Paso, Texas, August 2007

- Co-Course Director, Fifth Annual Forensics Seminar, Dallas, Texas, October, 2007
- Co-Course Director, Capital Murder Seminar, South Padre Island, Texas, November 2007
- Faculty, Cross Exam Seminar, Plano Texas, December 2007
- Faculty, Evidence Boot Camp, Plano, Texas, February, 2008
- Co-Course Director, Capital Murder, Habeas and Mental Health Seminar, San Antonio, Texas, February, 2008
- Co-Course Director, Death of a Child Seminar, Plano, Texas, March 2008
- Co-Course Director, Capital Voir Dire Seminar, Plano, Texas, April, 2008
- Presenter, Rural Association for Court Administration, Waco, Texas, April 2008
- Co-Course Director, Capital Trial Advocacy, Plano, Texas May, 2008
- Presenter and Faculty, Indigent Defense-El Paso, Texas, May 2008
- Co-Course Director, One Day Capital Video Seminar, Tyler, Texas, June 2008
- Attendee-NAACP Legal Defense and Educational Fund, Inc. 28th Annual Capital Punishment Training Conference, Airlie Virginia, July 2008
- Co-Course Director, Mitigation Seminar, Plano, Texas, July 2008
- Co-Course Director, The mind and Criminal Defense, Plano, Texas, July, 2008
- Presenter, State Bar Advanced Criminal Law Course, San Antonio, Texas, July 2008
- Co-Course Director, Mitigation Seminar, Lubbock, Texas, August 2008
- Co-Course Director, Expert Witnesses in Capital Cases, Plano, Texas, August 2008
- Faculty, Presenter, Criminal Trial Advocacy Program, Plano, Texas, August 2008
- Co-Course Director, Sixth Annual Forensics Program, Dallas, Texas, October 2008
- Presenter, 2nd Annual Red Mass Ethics Seminar, Lubbock, Texas October 2008
- Presenter, SMU Capital Murder Clinic, Dallas, Texas, October 2008
- Co-Course Director and Presenter, Capital Murder Seminar, South Padre Island, Texas, November 2008
- Faculty, Cross Exam and Impeachment, Plano, Texas, December 2008
- Faculty, Evidence Boot Camp, Plano, Texas, January, 2009
- Co-Course Director, Capital Murder Seminar, Houston, Texas, February, 2009
- Co-Course Director, Capital Voir Dire, Plano, Texas May 2009
- Co-Course Director, Capital Trial Advocacy, Plano, Texas May 2009
- Co-Course Director, Mind and Criminal Defense, Plano, Texas, May, 2009
- Co-Course Director, Capital Mitigation, Plano, July 2009
- Presenter, State Bar Advanced Criminal Law Course, Dallas, Texas, July 2009
- Presenter, Criminal Defense Criminal Trial Skills and Trial Law Program, Plano, Texas, August, 2009
- Co-Course Director and Presenter, Experts, Plano, Texas, March 2010
- Co-Course Director, TCDLA Capital/Habeas Seminar, Austin, Texas February 2010
- Co-Course Director, Capital Voir Dire, Plano, Texas, March 2010
- Co-Course Director, Capital Trial Advocacy, Plano, Texas, May 2010
- Faculty, Capital Voir Dire, Plano, Texas 2011
- Presenter and Faculty, Trial Advocacy for Military Lawyers, Plano, Texas, August 2011
- Faculty, Capital Voir Dire, Plano, Texas 2012
- Co-Course Director, State Bar of Texas Advanced Criminal Law-Forensic Track, San Antonio, Texas, July 2012
- Faculty, Capital Voir Dire, Houston, June, 2013
- Faculty, Nuts and Bolts, Lubbock, January 2014
- Faculty, Dallas Indigent Defense, February, 2014
- Faculty, El Paso Forensics and Experts, September, 2014

## Publications

- Editor - Texas Criminal Defense Lawyers Trial Notebook
- Co-Author – Texas Punishment-A Source Book for Defense Lawyers

- Original Editor of Texas Criminal Defense Lawyers Penal Code and Code of Criminal Procedure
- Former Managing Editor – Texas Criminal Defense Lawyers Capital Litigation Update
- Original Editor of Texas Criminal Defense Lawyers Non-Penal Code Crimes Annotated

## Trial Level Experience in Capital Cases*

- United States v. Eli Mungia – Lubbock Division of the Northern District of Texas, 1994
- State v. Robert Salizar – 72nd District Court of Lubbock County, Texas, 1998
- State v. Eddie Rowton – 154th District Court of Lamb County, Texas, 1998
- State v. Raymond Leyva – 64th District Court of Hale County, 1997
- State v. Felton White – 137th District Court of Lubbock, County, 2000
- State v. Michael Arispe – 121st District Court of Terry County, Texas 1996
- State v. Eric Christensen – 364th District Court of Lubbock County, Texas 1998
- State v. Jesus Rameriz – 154th District Court of Lamb County, Texas 1997
- State v.  Wesley Weaver - 237th District Court of Hockley County, Texas 1996
- State v. Arthur Wayne Johnson – 99th District Court, Lubbock County, Texas 2000
- State v. Michael Rodriguez – 283rd District Court, Dallas County, Texas 2001**

*I was appointed or hired as co-counsel on the above cases.  Only 3 went to verdict as Death Penalty cases.  The remainder were either plead or the state or government waived death.
**I was hired as co-counsel on this case but withdrew prior to trial because I accepted a position as Capital Assistance Counsel for TCDLA.

## Post-Conviction Experience in Capital Cases

- Michael McBride v. Johnson
- Odell Barnes v. Johnson
- Michael Blair v. Johnson and Ex Parte Michael Blair
- Bobby Ray Hopkins v. Johnson
- Jaime Elizalde v. Dretke
- Joe Lee Guy v. Johnson
- Michael Rosales v. Johnson
- United States v. Bruce Webster

# AFFIDAVIT

THE STATE OF TEXAS       §
                                  §
COUNTY OF LUBBOCK      §

Before me, the undersigned authority, personally appeared Philip Wischkaemper, who upon his oath deposed and stated the following:

"My name is Philip Wischkaemper. My Texas Bar number is 21802750. I have been licensed to practice law in Texas since 1989. I am also licensed in the Federal District Courts of the Northern District of Texas, The United States Fifth Circuit Court of Appeals and the United States Supreme Court.

Currently, I work for the Lubbock County Private Defenders Office as the Professional Development Director. My duties there include training all of the appointed attorneys in Lubbock County, as well as overseeing and assisting the appointed attorneys on their cases, as well as their overall progress as lawyers. My CV is attached hereto and incorporated herein for all purposes as if set forth verbatim.

Mr. Vargas's new attorney, Frank Sellers, approached me about this case. Prior to executing this affidavit, I was furnished by Mr. Sellers a copy of his Motion for New Trial, an Affidavit executed by his client, Mr. Vargas, an Affidavit executed by Mr. Vargas' Mother, Darcy Vargas and the offense report of Trooper Garza, the arresting officer.

Mr. Sellers informed me that Vargas was represented by Lubbock-based attorney Artie Aguilar. I also was informed that Aguilar was court-appointed due to Vargas's indigent status. Sellers explained to me that Mr. Vargas was never shown any of the discovery, never discussed the viability of a motion to suppress with his previous attorney, never discussed a 38.23 jury instruction in the event a motion to suppress were denied. Instead, Aguilar simply told Vargas that if he did not plead guilty, the 3-year probation offer would be revoked, and Vargas would have to do 5-year probation (the previous offer). I have also reviewed the motion for new trial and supporting exhibits.

If these allegations are true, this would constitute deficient performance by Mr. Aguilar during the guilty-plea process. As the Supreme Court made clear in *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010), the ABA Standards guide what is professionally reasonable in representing a defendant during the guilty-plea process. The ABA Standards applicable here provide:

> To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should

not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

ABA Standard 14-3.2. *Responsibilities of defense counsel — Guilty Pleas.*

In my opinion, the following were important to Vargas in determining whether to give up his right to trial: (1) the validity of the initial stop; (2) the validity of the continued detention after the Trooper advised him he would receive a warning; (3) the validity of Vargas's subsequent consent; (4) the potential success of a motion to suppress; and (5) in the event the court denied the motion to suppress, whether those issues could be raised at trial and at any subsequent appeal.

Additionally, the Texas State Bar's Performance Guidelines for Non-Capital Indigent Defense, Guideline 4.1: Investigation, state:

> Counsel has a duty to conduct, or secure the resources to conduct, an independent case review and investigation as promptly as possible. Counsel should, regardless of the client's wish to admit guilt, determine whether the charges and disposition are *factually and legally correct and inform the client of potential defenses to the charges.* Counsel should explore all avenues leading to facts relevant both to the merits and to the penalty in the event of conviction. (emphasis added).

There is no evidence that I have been made aware, either by documentation or conversations with Mr. Sellers that indicate Mr. Aguilar performed any of the functions of a proper and thorough investigation and evaluation of the case as required by the ABA and Texas Guidelines. If that is indeed the case, then Aguilar's performance fell below accepted professional norms.

In all fairness to Aguilar, he should be given the opportunity to respond to these allegations. Sellers has also informed me that Aguilar has declined on multiple occasions to speak about this case. In my opinion, the only way for him to be heard would be for this Court to provide a live hearing.

If the allegations of the client and client's mother prove to be true, it is also my opinion that Vargas was prejudiced by Aguilar's deficient performance. The law is clear that Vargas only has to show that had he been advised of these things, he would have exercised his constitutional right to a jury trial. It is important to note that this is not a hopeless case. In fact, each of the issues above seem meritorious based on the trooper's police report, which I reviewed in forming the opinions in this affidavit. Generally, law enforcement is not allowed to detain an individual just to "check on" the vehicle's occupants. The trooper then goes onto say that he asked for consent "after the stop was completed." This, too, seems to run afoul of the Fourth Amendment and Article 38.23. (*See:* **US v. Dortch, 199 F. 3d 193 - Court of Appeals, 5th Circuit 1999**) As Vargas stated in his affidavit, had he been advised about whether a motion to suppress might be successful or whether raising factual issues before the jury at trial might have been

successful, he would have insisted on going to trial. Based on the facts of his case, this would have been a perfectly reasonable decision in my opinion.

Sellers also asked me to give background about the appropriate number of cases for court-appointed attorneys. It is well known that Aguilar is responsible for all indigent defense in the 106th District, which covers four counties. In addition, he maintains an active trial practice. For our Lubbock County court-appointed attorneys, our questioning of active lawyers has indicated that the maximum number of *clients* one attorney can effectively represent at any given time is 65. Each of those clients may have multiple cases, therefore, the caseload may be and usually is higher than 65. In our experience, however, the focus should be on the client, and not the number of cases a single client has.

The nature of indigent defense is that many of our clients are incarcerated. Our internal rule at the Lubbock Private Defender Office (Pursuant to the State Bar Guidelines on Non-Capital Representation) is that each client must be contacted every 30 days to update them on their case. With as many as half and sometimes more of their clients in jail at a given time, it is difficult for an attorney to fulfill his or her obligations to more than the 65 client limit we impose. However, we still demand that the attorney maintain regular contact and keep the client informed. From what I can tell from the affidavits given and conferences with Mr. Sellers, Aguilar failed under State Bar of Texas Guideline 1.3 B to "maintain regular contact with the client and keep the client informed of the progress of the case.

Mr. Aguilar is the Contract Attorney for the 106th Judicial District. He covers the counties of Dawson, Gaines, Garza and Lynn pursuant to a contract with the 106th Judicial District. In a review by the Indigent Defense task Force of Gaines County's Indigent Defense System released in June, 2013, the report reflected:

> The monitor asked the contract attorney for the total number of cases to which he had been appointed in FY2012. The contract attorney reported that he had been appointed to 254 felony cases and two appeals cases across the four counties involved in the contract. In the monitor's visit with the contract attorney, the attorney noted that the contract represents about 60% of his total work. Based on the recommended caseload limitations set in the contract, if the contract attorney did no extra work outside of the contract, the attorney would be limited to 150 felony appointments per year. The 254 felony appointments and two appeals appointments are equivalent to 1.77 attorneys working at the maximum caseload recommendations. If the contract attorney's assessment that the contract comprises about 60% of his annual workload is accurate, 2.95 attorneys would be required to handle this annual workload. This caseload exceeds the limit set by the contract.

It appears Mr. Aguilar is, as many public defenders are, overloaded. Because of his excessive workload, he is unable to provide sufficient attention to each case

assigned to him. As a result, Mr. Vargas' case was compromised by not being fully investigated factually nor analyzed sufficiently for legal issues. As a result, Mr. Aguilar's conduct fell below professional norms and, as a result, Mr. Vargas was prejudiced.

Philip Wischkaemper

Subscribed and sworn to before me on September 29, 2014, by Philip Wischkaemper.

LORETTA MARTINEZ
Notary Public, State of Texas
My Commission Expires 04-25-2016

Notary Public, State of Texas

# Exhibit I
*Affidavit of Frank Sellers*

# AFFIDAVIT

THE STATE OF TEXAS                          §
                                            §
COUNTY OF LUBBOCK                           §

Before me, the undersigned authority, personally appeared Frank Sellers, who upon his oath deposed and stated the following:

1. My name is Frank Sellers. I am over 18 years of age, have personal knowledge of the facts set forth below and am competent and authorized to make this affidavit. Following his guilty plea where he was represented by Artie Aguilar, I agreed to take over Victor Vargas's case as his *pro bono* counsel in an attempt to withdraw his guilty plea.

2. On July 23, 2014, I was in the 106th District Court in Dawson County appearing on another matter. As I was gathering my belongings to leave, I observed Vargas enter his guilty plea. Outside of the courthouse, I overheard Vargas telling his Mom "he had no choice." I asked if they would agree to tell me what happened.

3. Vargas and his mother then recounted the facts contained in their affidavits. Even though he had just entered his plea, Vargas told me it was not his intent to plead guilty but that Aguilar would not show him the video, police report, or lab report; instead, Aguilar told Vargas he could either plead guilty for a 3-year probation or a 5-year probation. Vargas informed me that Aguilar made clear he had no legal defense whatsoever. Without any personal review of the evidence or any advice on the law, Vargas thought he had to plead guilty.

4. I agreed to represent Vargas *pro bono* with the hopes of withdrawing his plea. I contacted Philip Wischkamper who agreed to provide an affidavit. Wischkaemper also told me I should contact the Texas Indigent Defense Commission (TIDC) because they would be familiar with what was acceptable with respect to the appropriate caseload for court-appointed attorneys.

5. I emailed with Jim Bethke, Executive Director of TIDC, who put me in touch with his staff. They sent me the report compiled on Gaines County from FY2012, as well as a letter in response from Judge Schildknect. It was apparent that Aguilar was completely overburdened with the contract he had signed with the 106th District alone, yet he was still accepting private cases on the side.

6. Vargas signed a release for Aguilar's file, which Aguilar provided me. After reviewing the file, it was clear that very little work had been done, and that no notes about discovery were in the file. Nor was there any transmittal letter that would customarily be sent to the client with a copy of his discovery. One note, presumably by Aguilar's staff, in Aguilar's Vargas file is particularly interesting: "2-13-14 Mom or daughter said it was ridiculous the way you were handling this case."

7. In order to give Aguilar every opportunity to explain what happened, I contacted Aguilar's office by telephone in August of 2014. Aguilar conveyed to my legal assistant that he "declined" to speak with me.

8. I tried to speak with Aguilar a second time in the Dawson County courtroom on September 3, 2014. He told me he would not speak with me and that all I was trying to do was "make things difficult," because that is "all [I] ever do."

9. I contacted Pam Huse, the Dawson County District Clerk, and requested the list of active cases Aguilar had in that County at the time. In Dawson County alone, Aguilar had 47 pending felony cases, 34 pending probation revocations, and 1 pending appeal. From personal knowledge, the pending appeal is on a case that I tried. The trial lasted two weeks. Reading the record alone would take two full uninterrupted days, nevermind the complex legal issues that must be written on. I then contacted Lubbock County to see how many active cases Aguilar had in Lubbock (10 active, open criminal cases; and 10 active, open civil cases). Just in Lubbock and Dawson counties alone, Aguilar is dangerously close to the maximum number of cases recommended by the ABA.

10. It is my opinion that the indigent defense system in the 106th District suffers systemic defects. Aguilar probably does the best he can given the confines of his budget and time restraints. Unfortunately, that is not enough, and Vargas suffered prejudice from Aguilar's deficient performance and lack of legal counsel.

_____
Frank Sellers

Subscribed and sworn to before me on October 2, 2014, by Frank Sellers.

MARINA MEDRANO
MY COMMISSION EXPIRES
February 14, 2017

_____
Notary Public, State of Texas

# Tab #4

Notice of Appeal

FILED
IN COURT OF APPEALS
ELEVENTH DISTRICT

OCT 2 8 2014

SHERRY WILLIAMSON, CLERK
By_____Deputy

11-14-00283-CR

CAUSE NO. 13-7245

| STATE OF TEXAS | § | IN THE 106TH DISTRICT COURT |
| | § | |
| V. | § | OF |
| | § | |
| VICTOR VARGAS | § | DAWSON COUNTY, TEXAS |

**Notice of Appeal**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant in the above-styled and numbered cause, through his undersigned *pro bono* counsel, and files this notice of appeal. In support thereof Defendant would show this Honorable Court as follows:

On July 23, 2014 judgment and imposition of sentence was entered against the Defendant. Defendant timely filed a motion for new trial and requested a hearing. Despite these requests supported by affidavit, the court overruled the motion by operation of law on October 21, 2014. Therefore, this notice is timely filed.

Defendant hereby gives written notice of appeal to the Court of Appeals for the Supreme Judicial District of Texas, at Eastland, Texas, from the trial court's (1) denial of a hearing on his motion for new trial, and (2) the trial court's implicit legal ruling on his motion for new trial.

Respectfully submitted,

**Hurley, Guinn & Sellers**

By: _____
Frank Sellers
Texas Bar No. 24080305

1805 13th Street
Lubbock, Texas 79401

FILED
DAWSON COUNTY, TEXAS
2014 OCT 24 PM 4:22
PAT HUSE
DISTRICT CLERK

P: 806.771.0700
F: 806.763.8199
*Pro Bono Counsel for Defendant-Appellant*

## Certificate of Service

I certify that today, October 24, 2014, a copy of the foregoing was served upon the Dawson County District Attorneys Office, *via fax number 806-872-3174.*

Frank Sellers

# Tab #5

Order to Show Cause (Oct. 28, 2014)



**JIM R. WRIGHT**
CHIEF JUSTICE

**MIKE WILLSON**
JUSTICE

**JOHN M. BAILEY**
JUSTICE

# Court of Appeals
## Eleventh District of Texas

100 WEST MAIN STREET, SUITE 300
P. O. BOX 271
EASTLAND, TEXAS 76448

October 28, 2014

**SHERRY WILLIAMSON**
CLERK

**TELE: 254/629-2638**
**FAX:  254/629-2191**
sherry.williamson@txcourts.gov
www.txcourts.gov/11thcoa.aspx

Frank Sellers
* DELIVERED VIA E-MAIL *

Michael S. Munk, District Attorney
* DELIVERED VIA E-MAIL *

**RE:**     Appellate Case Number:  **11-14-00283-CR**         Trial Court Case Number:  13-7245
**Style:**   Victor Vargas v. The State of Texas

==Mr. Sellers is requested to respond immediately to sherry.williamson@txcourts.gov  indicating receipt of this notification.==

We have this day received and filed a copy of the Notice of Appeal, Motion for New Trial,  the Trial Court's Certification of Defendant's Right to Appeal and the trial court information form from the District Clerk in the above cause. This case bears the above docket number that should be used on all future correspondence and filings.

We note that the Notice of Appeal appears to be untimely filed in the trial court.  The due date was October 21, 2014.  TEX. R. APP. P. 26.2.  The sentence was imposed on July 23, 2014; a Motion for New Trial was timely filed on August 22, 2014; and the Notice of Appeal was filed on October 24, 2014, 93 days after the date that the sentence was imposed.

Appellant may file a Motion for Extension of Time to File the Notice of Appeal, providing a reasonable explanation for the failure to timely file the Notice of Appeal, which may include proof of mailing.  The motion is due on or before **November 5, 2014.**  TEX. R. APP. P. 10.5(b), 26.3.  Absent a timely filed Notice of Appeal or Extension of Time to File the Notice of Appeal, this appeal may be dismissed for want of jurisdiction.  TEX. R. APP. P. 25.2.

Upon reviewing the trial court's Certification of Defendant's Right of Appeal, it indicates Appellant waived his right of appeal. Appellant is requested to provide this Court with a response, in writing, showing grounds to continue this appeal. If the response is not filed on or before **November 5, 2014,** the appeal may be dismissed.

**NOTICE:  Effective January 1, 2014, e-filing is mandatory in the Eleventh Court of Appeals. Documents <u>MUST</u> contain an email address.**

Respectfully yours,

*Sherry Williamson*

Sherry Williamson, Clerk

cc:     District Clerk - Dawson County (DELIVERED VIA E-MAIL)
        Carter Schildknecht, Judge (DELIVERED VIA E-MAIL)

# Tab #6

Court of Appeals Opinion (issued Nov. 20, 2014)



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00283-CR
_____

## VICTOR JAMES VARGAS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**

**Dawson County, Texas**

**Trial Court Cause No. 13-7245**

## MEMORANDUM OPINION

The trial court convicted Victor James Vargas, Appellant, of the state jail felony offense of possession of methamphetamine. Appellant attempts to appeal that conviction. In a letter dated October 28, 2014, this court notified the parties that the Trial Court's Certification of the Defendant's Right to Appeal, which was signed by Appellant and his attorney, indicated that Appellant had waived his right of appeal in this case. *See* TEX. R. APP. P. 25.2(a)(2), (d). We requested that

Appellant respond on or before November 5, 2014, and show grounds to continue the appeal. Appellant filed a motion for extension of time to file his notice of appeal, which this court granted, but he has not filed any response related to his waiver of appeal.

A valid waiver of appeal, whether negotiated or non-negotiated, prevents a defendant from appealing without the trial court's consent. *Monreal v. State*, 99 S.W.3d 615, 622 (Tex. Crim. App. 2003). Appellant has not obtained the trial court's consent to appeal, and Appellant's waiver appears to be valid. The documents on file in this case indicate that Appellant and the State entered into a plea agreement in which Appellant waived various rights and that, upon Appellant's plea of guilty, the trial court convicted Appellant and assessed his punishment pursuant to the terms of the plea agreement. Appellant acknowledged that he signed a waiver of his right to appeal. The plea papers are signed by both Appellant and his counsel. Thus, the trial court's certification—reflecting that Appellant has waived his right of appeal—is supported by documentation and is not defective. *See Dears v. State*, 154 S.W.3d 610 (Tex. Crim. App. 2005). Because Appellant waived his right to appeal in this cause and because the trial court certified that Appellant has no right of appeal, we must dismiss this appeal without further action. TEX. R. APP. P. 25.2(d); *Chavez v. State*, 183 S.W.3d 675, 680 (Tex. Crim. App. 2006).

Accordingly, this appeal is dismissed.

PER CURIAM

November 20, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

2

# Tab #7

Motion for Rehearing (filed Dec. 31, 2014)

ACCEPTED

ELEVENTH COURT OF APPEALS
EASTLAND, TEXAS
12/9/2014 11:14:52 AM
SHERRY WILLIAMSON
CLERK

No. 11-14-00283-CR

| | | |
|---|---|---|
| VICTOR VARGAS | § | IN THE COURT OF APPEALS |
| | § | |
| | § | RECEIVED IN |
| | | 11th COURT OF APPEALS |
| V. | § | FOR THE ELEVENTH DISTRICT |
| | § | 12/9/2014 11:14:52 AM |
| | § | SHERRY WILLIAMSON |
| THE STATE OF TEXAS | § | IN EASTLAND, TEXAS |

RECEIVED IN
11th COURT OF APPEALS
EASTLAND, TEXAS
12/9/2014 11:14:52 AM
SHERRY WILLIAMSON
Clerk

## Appellant's Motion for Rehearing

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

FILED

December 31 2014

Eleventh Court of Appeals
Sherry Williamson
Clerk

### BACKGROUND

On October 28, 2014, this Court issued a letter asking Appellant to show cause why he should be allowed to appeal after he: (1) filed a late notice of appeal, and (2) waived his right to appeal. Undersigned counsel filed a motion to extend time to file notice of appeal, but unfortunately simply missed the second-to-last paragraph asking for a reasonable explanation for why Vargas she be allowed to continue his appeal post-waiver.

While no excuse typically justifies missing deadlines, undersigned counsel would point out to the Court that at that time, he was in the eighth day of a four-week capital murder jury trial styled, *State v.*

1

*Thomas Michael Dixon*, Cause No. 2012-435,942, In the 140th District Court of Lubbock County, Texas. Trial in Dr. Dixon's lasted for four weeks and concluded on November 18, 2014.

In light of this and the reasons below, Appellant asks this Court to reinstate his appeal and allow him to submit a brief on the merits.

## RELEVANT FACTS

Prior to his guilty plea, Appellant Vargas was represented by court-appointed counsel, Artie Aguilar. After his guilty-plea, undersigned counsel agreed to represent Vargas *pro bono* to file a motion for new trial attempting to reverse Vargas's guilty plea because it was both involuntary and the result of ineffective assistance of counsel. The chronology from there is as follows:

- **August 22, 2014**: Motion for New Trial filed with Dawson County District Clerk. Importantly, this motion contained the following exhibits: affidavits from Victor Vargas, Darcy Vargas, Frank Sellers, as well as the arresting officer's police report, and the lab report from the DPS lab.

2

- **September 19, 2014**: Defendant's Second Request for Hearing on Motion for New Trial filed with Clerk.

- **October 3, 2014**: First Amended Motion for New Trial filed with Clerk. This motion contained the following additional exhibits: Contract for Indigent Defense in the 106th Judicial District Court of Texas (file marked December 9, 2013); Letter from Judge Schildknecht to Joel Lieurance, Policy Monitor at TIDC (July 19, 2013); Texas Indigent Defense Commission, Review of Gaines County's Indigent Defense Systems (June 11, 2013); and Affidavit of Philip Wischkaemper.

It is beyond dispute that the timely filed motion for new trial and amended motoin for new trial raised matters that were indeterminable from the record—whether Vargas's guilty-plea was voluntary and whether it was the result of ineffective assistance of counsel. Nevertheless, the trial court allowed the motion to overrule by operation of law, and without a hearing.

Vargas subsequently filed notice of appeal of the trial court's "(1)

3

denial of a hearing on his motion for new trial, and (2) the trial court's implicit legal ruling on his motion for new trial." (Appellant's Notice of Appeal, at 1).

## ARGUMENT FOR REHEARING

When a defendant's motion for new trial raises issues "not determinable from the record, which could entitle him to relief, the trial judge abuses [his or her] discretion in failing to hold a hearing." *Martinez v. State*, 74 S.W.3d 19, 21 (Tex. Crim. App. 2002). The purpose of the hearing is to "fully develop the issues raised in the motion." *Id.* To obtain a hearing, "the motion must be supported by an affidavit specifically showing the truth of the grounds for attack." *Id.* Not every element must be established "but rather must merely reflect that reasonable grounds exist for holding that such relief could be granted." *Id.*; *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993) ("affidavit is not required to reflect every component legally required to establish relief, but the motion for new trial or affidavit must reflect

4

that reasonable grounds exist for holding that such relief could be granted.").

Bad legal advice or no legal advice constitutes ineffective assistance. *Ex Parte Moussazadeh*, 361 S.W.3d 684, 692 (Tex. Crim. App. 2012) (misinforming defendant about parole eligibility ineffective); *Ex parte Gallegos*, 511 S.W.2d 510, 513 (Tex. Crim. App. 1974) ("In applying the reasonably effective assistance standard to the facts of the instant case, we conclude . . . that petitioner Gallegos was denied the effective assistance of counsel when counsel failed to advise Gallegos how the facts of his case related to the Texas law of robbery, thus preventing the guilty plea from being knowingly and voluntarily entered.").

The federal courts agree. In *Cavitt*, defense counsel advised Mr. Cavitt to plead guilty following a traffic stop drug case with Fourth Amendment issues. *United States v. Cavitt*, 550 F.3d 430, 441 (5th Cir. 2008). This advice, however, came before the defense received the video of the stop. *Id.* When defense counsel did receive the video, he refused to let the defendant view it before deciding to plead guilty. *Id.*

The Fifth Circuit held that these were matters indeterminable from the record but had an appreciable chance of success — both the ineffective assistance claim and the suppression issue. The *Cavitt* court reversed and sent the case back to the district court and required a hearing. *Id.*

This Court must do the same. Matters raised are indeterminable from the record. No one knows what was said during the Aguilar's representation of Appellant Vargas. Vargas's affidavit, however, makes clear that not much if any advice was given, except to plead guilty, while refusing to let Appellant view the video of his traffic stop. Like in the cases cited above, Vargas's affidavit established matters that reasonably rose to the level of ineffective assistance of his court-appointed counsel. Worse, Aguilar has compounded the issue by refusing twice to provide an affidavit or even speak with Vargas's undersigned counsel. The law is clear. A hearing is required.

### CONCLUSION & PRAYER FOR RELIEF

Wherefore, Vargas prays this Court reinstate his appeal and allow him to more fully brief the issue above.

Respectfully submitted,

Frank Sellers
Texas Bar No. 24080305
HURLEY, GUINN & SELLERS
1805 13th Street
Lubbock, Texas 79401
806.771.0700 tel
806.763.8199 fax
frank@hurleyguinn.com
*Attorney for Appellant*

## CERTIFICATE OF SERVICE

Pursuant to TEX. R. APP. P. 9.5(d), the foregoing was served on opposing counsel *via* email to michael.munk@co.dawson.state.tx.us on December 9, 14.

Frank Sellers

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(2), I hereby certify that this motion contains 960 words (excluding the caption, identification of the parties, index, list of authorities, signature, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Frank Sellers

# Tab #8

Denial of Motion for Rehearing (Jan. 22, 2015)



**JIM R. WRIGHT**
CHIEF JUSTICE

**MIKE WILLSON**
JUSTICE

**JOHN M. BAILEY**
JUSTICE

# Court of Appeals
## Eleventh District of Texas

100 WEST MAIN STREET, SUITE 300
P. O. BOX 271
EASTLAND, TEXAS 76448

January 22, 2015

**SHERRY WILLIAMSON**
CLERK

**TELE: 254/629-2638**
**FAX: 254/629-2191**

sherry.williamson@txcourts.gov
www.txcourts.gov/11thcoa

Frank Sellers
Hurley & Guinn
1805 13th Street
Lubbock, TX 79401
\* DELIVERED VIA E-MAIL \*

Michael S. Munk, District Attorney
Dawson County
106th Judicial District
P.O. Box 1124
Lamesa, TX 79331
\* DELIVERED VIA E-MAIL \*

**RE:** Appellate Case Number:  11-14-00283-CR
Trial Court Case Number:     13-7245
**Style:** Victor James Vargas
v. The State of Texas

The Court has this day **DENIED** Appellant's motion for rehearing in the above cause.

A letter certifying compliance with TEX. R. APP. P.48.4 and a copy of the return receipt is due in this Court on or before **February 6, 2015.**

If either party wishes to file a Petition for Discretionary Review, please note:

1)  Pursuant to TEX. R. APP. P. 68.3(a), the petition and all copies of the petition must be filed with the Clerk of the Court of Criminal Appeals; and

2)  Pursuant to TEX. R. APP. P. 68.4(i), a copy of this Court's opinion must be attached to each copy of the Petition for Discretionary Review.

Respectfully yours,

*Sherry Williamson*

Sherry Williamson, Clerk